IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARLITA THOMAS, as Mother, Next Friend, and Special Administrator of NORMAN L. SMITH, JR., deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 3563 |
| SHERIFF OF COOK COUNTY, COOK COUNTY, JOHN STROGER, JR., MICHAEL F. SHEAHAN, SGT. MONCZYNSKI, Star 831, OFFICER SANCHEZ, Star 8131, OFFICER DAVIS, Star 7153, OFFICER TOOMEY, Star 7463, OFFICER JOHNSON, Star 6273, OFFICER THIEMECKE, Star 8136, OFFICER HOUSTON, OFFICER FACUNDO, Star 4254, SGT. HERNANDEZ, Star 1010, SGT. DEW, Star 1020, SGT. STRONER, Star 944, LT. KRZYZOWSKI, Star 130, P. WESTBROOK, C. LACY, R. PATTON, A. BRADLEY, T. NELSON, and K. WEST, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Castillo<br><br>Magistrate Judge Mason |
| Defendants. | ) | JURY DEMANDED |

**FIFTH AMENDED COMPLAINT**

NOW COMES the plaintiff, MARLITA THOMAS, as Mother, Next Friend, and Special Administrator of NORMAN L. SMITH, JR., deceased, by her attorneys, SMITH, COFFEY & ALEXANDER, and for her Fifth Amended Complaint against defendants, SHERIFF OF COOK COUNTY, COOK COUNTY, JOHN STROGER, JR., MICHAEL F. SHEAHAN, SGT. MONCZYNSKI, OFFICER A. SANCHEZ, OFFICER DAVIS, OFFICER TOOMEY, OFFICER

1

JOHNSON, OFFICER THIEMECKE, OFFICER HOUSTON, OFFICER FACUNDO, SGT. HERNANDEZ, SGT. DEW, SGT. STRONER, LT. KRZYZOWSKI, P. WESTBROOK, C. LACY, R. PATTON, A. BRADLEY, T. NELSON, and K. WEST, and states as follows:

**INTRODUCTION**

1. This is a civil action seeking damages for depriving plaintiff's deceased, while acting under color of law as Cook County Sheriff and Correctional Officers and Cook County Jail health officials, of rights secured by the Constitution and laws of the United States, including the rights secured by the 8th and 14th Amendments to the Constitution, and for related State-law claims, including Wrongful Death.

**JURISDICTION**

2. This action is brought pursuant to 42 U.S.C. sec. 1983, and the Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. Sections 1331 and 1341(3) and (4) and 1343, and the aforementioned constitutional and statutory provisions. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to Section 1367 to hear and decide claims arising out of state law.

**PARTIES**

3. Plaintiff is a citizen of the United States, who currently resides in Lansing, Illinois. She sues on behalf of her son, Norman L. Smith, deceased, who was an African-American citizen of the United States and was a pretrial detainee at Cook County Jail, Division 5, Tier 1-M, at the time of his death.

4. Defendant Sheriff of Cook County runs the Cook County Jail and the Cook County Department of Corrections and is the employer of the correctional officers sued herein. Cook

2

County is a duly incorporated governmental entity in Illinois, and runs the health service for detainees at Cook County Jail under the name "Cermak Health Services of Cook County," and Cook County, Illinois is liable for any judgments related to its agents and employees arising in the course of their employment, pursuant to 745 ILCS 10/2-302. All of these may be referred to collectively as the "institutional defendants."

5. John Stroger, Jr. is the President of the Cook County Board. Michael F. Sheahan is the Cook County Sheriff. The above defendants, who may be collectively referred to as the "official defendants," are sued in their official capacities.

6. The following parties were, during the events complained of, correctional officers at Division 5, Tier 1-M, of the Cook County Jail: Officer A. Sanchez, Star 8131, Officer Davis, Star 7153, Officer Toomey, Star 7463, Officer Johnson, Star 6273, Officer Thiemecke, Star 8136, Officer Houston, Officer Facundo, Star 4254. The following Cook County Correctional officers were supervisory officers at Division 5, Tier 1-M during the events complained of, and signed off on reports by subordinate officers who indicated deficiencies in manpower and equipment which contributed to the lack of adequate care afforded plaintiff's decedent: Sgt. Monczynski, Star 831, Sgt. Hernandez, Star 1010, Sgt. Dew, Star 1020, Sgt. Stroner, Star 944, Lt. Krzyzowski, Star 130. The following parties were Cermak Health Services medical techs on duty at Division 5 during the relevant period: P. Westbrook, C. Lacy, R. Patton, A. Bradley, T. Nelson, and K. West. All of the individuals named in this paragraph may be referred to collectively as the "individual defendants." They are all sued in their individual capacities.

7. At all times relevant hereto, the individual and official defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the State of Illinois, Cook

3

County, and the Cook County Sheriff's Department, and within the scope of their employment with defendant institutions.

**FACTS**

8. On Friday, April 23, 2004, Norman L. Smith, Jr., age 32, ("Norman") was sitting on a friend's porch in Chicago, Illinois, committing no crimes and possessing no contraband. Two Chicago Police officers, from the same area as two police officers that Norman had recently filed an OPS complaint against, approached him, searched him, found no contraband, then arrested him for possession of a controlled substance.

9. Norman, who enjoyed good health for most of his life, had been suffering from what seemed like flu symptoms at the time of his arrest. The arresting officers transported Norman to Cook County Jail, where he was screened by Cermak Health Services. Norman complained to the medical personnel at Cermak about his physical condition at the screening, but he was cleared for general prison population.

10. By Monday, April 26, 2004, Norman's physical condition had deteriorated, and he began making requests of various Cook County Sheriff Officers, including defendant correctional officers, to be seen by a doctor or to be taken to Cermak Health Center. These deputies refused Norman's repeated requests for medical attention, stating that Norman, who did not use drugs, was only "dopesick."

11. Norman's condition continued deteriorating each day. By the morning of April 27, 2004, anyone observing Norman could see that he was obviously in serious need of urgent medical attention. He was vomiting green liquid repeatedly and could not eat at all. He continued making repeated requests of the sheriff officers, including defendant officers, each day

4

to be seen by a doctor, pleading with them that felt like he was going to die soon. The officers continued to deny his requests, and they sometimes refused to allow him to make written requests for medical attention. Norman also made a request for medical attention to Cermak med tech P. Westbrook, and other defendant medical techs, but they refused his requests.

12. Officer Toomey was responsible for the inmates in Tier M-1 on April 26, 2004 from 3:00 p.m. until 11:00 p.m., and again on April 27, 2004, from 3:00 p.m. until 11:00 p.m., and again on April 29, 2004, from 3:00 p.m. until 11:00 p.m. It was Officer Toomey's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Toomey deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

13. Officer Davis was responsible for the inmates in Tier M-1 on April 27, 2004, from 7:00 a.m. until 3:00 p.m., and again on April 28, 2004, from 7:00 a.m. until 3:00 p.m. It was the officer's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Davis deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

14. Officer Johnson was responsible for the inmates in Tier M-1 on April 27, 2004,

5

from 11:00 p.m. until 7:00 a.m. on April 28, 2004. It was the officer's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Johnson deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

15. Officer Thiemecke was responsible for the inmates in Tier M-1 on April 28, 2004, from 3:00 p.m. until 11:00 p.m. It was the officer's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Thiemecke deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

16. Officer Houston was responsible for the inmates in Tier M-1 on April 28, 2004, from 11:00 p.m. until 7:00 a.m. on April 29, 2004. It was the officer's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Houston deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

17. Officer Facundo was responsible for the inmates in Tier M-1 on April 29, 2004, from 7:00 a.m. until 3:00 p.m. It was the officer's duty during this period to complete rounds

every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Facundo deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

18. Officer Sanchez was responsible for the inmates in Tier M-1 on April 29, 2004, from 11:00 p.m. until 7:00 a.m. on April 30, 2004. It was the officer's duty during this period to complete rounds every half hour, during which it was his duty to check on the health, safety, and well being of all the detainees on his Tier, including Norman. During these periods, Norman's condition was such that anyone observing him would have realized that Norman needed urgent medical attention for his life threatening condition. In breach of his duty, Officer Sanchez deliberately, wilfully, and wantonly ignored the obvious and serious medical needs of Norman.

19. Sgt. Stroner was the Area Supervisor for Division 5, Tier 1M on April 26, 27, 28, and 29, 2004, from 3:00 p.m. to 8:00 p.m. During this period it was Stroner's duty to conduct supervisor security checks of Tier 1M. During this period Sgt. Stroner was made aware that Tier 1M officers were complaining of a major security risk in Tier 1M, in that the video monitors for the Tier were not working, and that short-handed Tier 1M officers had to cross check an additional tier, Tier 1L. In breach of his duty, Sgt. Stroner intentionally, deliberately, and indifferently ignored the risks that these problems posed for inmates, including the risk that serious health needs of inmates would go unattended.

20. Lt. Krzyzowski was the Area Supervisor for Division 5, Tier 1M on April 27, 2004, from 11:00 p.m. to 7:00 a.m. on April 28, 2004. During this period it was Krzyzowski's duty to

7

conduct supervisor security checks of Tier 1M. During this period Lt. Krzyzowski was made aware that Tier 1M officers were complaining of a major security risk in Tier 1M, in that the video monitors for the Tier were not working, and that short-handed Tier 1M officers had to cross check an additional tier, Tier 1L. In breach of his duty, Krzyzowski intentionally, deliberately, and indifferently ignored the risks that these problems posed for inmates, including the risk that serious health needs of inmates would go unattended.

21. Sgt. Dew was the Area Supervisor for Division 5, Tier 1M on April 27, 2004, from 7:00 a.m. to 3:00 p.m. During this period it was Sgt. Dew's duty to conduct supervisor security checks of Tier 1M. During this period Sgt. Dew was made aware that Tier 1M officers were complaining of a major security risk in Tier 1M, in that short-handed Tier 1M officers had to cross check an additional tier, Tier 1L. In breach of his duty, Sgt. Dew intentionally, deliberately, and indifferently ignored the risks that these problems posed for inmates, including the risk that serious health needs of inmates would go unattended.

22. Sgt. Hernandez was the Area Supervisor for Division 5, Tier 1M on April 28 and 29, 2004, from 7:00 a.m. to 3:00 p.m. During this period it was Hernandez's duty to conduct supervisor security checks of Tier 1M. During this period Sgt. Hernandez was made aware that Tier 1M officers were complaining of a major safety and security risk in Tier 1M, in that short-handed Tier 1M officers had to cross check an additional tier, Tier 1L. In breach of his duty, Sgt. Hernandez intentionally, deliberately, and indifferently ignored the risks that these problems posed for inmates, including the risk that serious health needs of inmates would go unattended.

23. Sgt. Monczynski was the Area Supervisor for Division 5, Tier 1M on April 28 and 29, 2004, from 11:00 p.m. to 7:00 a.m. of the following day. During this period it was

Monczynski's duty to conduct supervisor security checks of Tier 1M. During this period Sgt. Monczynski was aware or should have been aware that Tier 1M officers were complaining of a major security risk in Tier 1M, in that the video monitors for the Tier were not working, and that short-handed Tier 1M officers had to cross check an additional tier, Tier 1L. In breach of his duty, Sgt. Monczynski intentionally, deliberately, and indifferently ignored the risks that these problems posed for inmates, including the risk that serious health needs of inmates would go unattended. Monczynski also breached his duty to protect inmates by failing to call 911 after being informed that Norman was critically ill.

24. Cermak medical technician P. Westbrook was assigned to Division V on April 26, 27, and 28, 2004. Cermak medical technician C. Lacy was assigned to Division V on April 27, 2004. Cermak medical technician R. Patton was assigned to Division V on April 26, 27, and 28, 2004. Cermak medical technician A. Bradley was assigned to Division V on April 26, 28, and 29, 2004. Cermak medical technicians T. Nelson and K. West were assigned to Division V on April 29, 2004. During the times of their assignments, these med techs had the duty to check on the health of inmates in Division V, Tier M-1, and to respond promptly to any requests for medical attention by inmates. In breach of this duty, the listed med techs intentionally, wilfully, and wantonly ignored obvious symptoms that Norman was exhibiting that clearly showed he needed emergency medical attention to correct a life threatening situation, and the listed med techs ignored multiple requests for medical attention for Norman, both verbal and in writing.

25. As Norman's health continued to deteriorate, he was not able to move and was forced to lie on the concrete floor in his own vomit. Several of Norman's tiermates made repeated requests over several days to defendant officers and defendant Cermak medical techs for

9

medical attention, all of which were refused. When the tiermates' repeated requests were ignored, the tiermates began begging the officers to get Norman medical attention, explaining that Norman could not still be "dopesick" after several days, and that he was dying. All requests were denied, and all the tiermates could do was gather around Norman and pray for him as he neared death.

26. Finally, on Thursday, April 29, 2004, with Norman near death, a correctional officer allowed one of Norman's tiermates to make a written request for medical attention to Cermak Health Services. This request explained that Smith was having chest pains, fever, vomiting, and that he had been ill for two weeks. This request was ignored and no medical attention or treatment was provided to Norman.

27. On April 30, 2004, one of Norman's tiermates awoke at 4:00 a.m. to help with breakfast. He saw that Norman was lying on the floor of his cell, having convulsions. The tiermate immediately told a sheriff's deputy, defendant Officer A. Sanchez, Star 8131, of Norman's condition. The officer alerted the Sargent on duty, defendant Sargent Monczynski, Star 831, of Norman's condition.

28. Sargent Monczynski did not come to the cell to check on Norman for one half hour. After finally observing Norman's condition, the Sargent called a Cermak Hospital paramedic.

29. It took one half hour for the Cermak paramedic, defendant J. Myvette, to arrive, although Cermak is in the next building and connected by a courtyard. Paramedic Myvette had no assistants and no medical equipment. He checked Norman's pulse and then casually walked to the tier office to get Norman's I.D., taking the I.D. of another prisoner by mistake.

30. Paramedic Myvette spent one half hour in the tier office trying to get the proper

10

I.D. for Norman, while Norman's tiermates were yelling at Myvette "this man's real sick in here, he needs help." The paramedic responded "he's going to have to wait." The paramedic finally got the I.D. mixup straightened out and called for more paramedics from Cermak.

31. By the time the additional Cermak paramedics arrived, Norman was barely breathing, with one eye shut and one eye open with his eye rolled up in the back of his head. The paramedics brought a Gurney on wheels, but stopped about one hundred feet short of Norman because there was a set of stairs to get down to the tier level. The paramedics then simply stood there at the top of the stairs not moving, and Norman's tiermates asked them why they were not helping Norman. They responded that they did not have the manpower to lift Norman up the steps, so there was nothing they could do. Upon hearing this, three of Norman's tiermates went and carefully lifted Norman and carried him up the steps to the Gurney. The tiermates then watched the paramedics slowly wheel Norman out of the tier, and the tiermates could observe no attempt at CPR or other treatment.

32. Norman died shortly later that morning of meningitis, a condition which would have been readily treatable had he been afforded access to reasonable medical treatment by the defendants.

33. The failure of the defendants to provide access to medical care for Norman constituted complete, deliberate, wilful and wanton, and criminal indifference to Norman's serious medical needs.

34. As a direct and proximate result of the defendants' wilful and wanton indifference to Norman's serious medical needs, Norman was caused to suffer great pain, mental anguish, and death.

11

## Count I

### Section 1983, Fourteenth and Eighth Amendment Claim

1-34. Paragraphs 1-34 above are re-alleged here as if fully set forth.

35. The actions of the individual defendants, described above, whereby defendants were aware of but deliberately, wilfully, and wantonly ignored the obvious serious medical needs of Norman and the substantial risk of serious injury and death, and failed to take appropriate steps to protect him, constituted deliberate indifference to Norman's serious medical needs, thus violating the Fourteenth and Eighth Amendments to the United States Constitution.

36. As a direct and proximate result of these Constitutional violations, Norman was caused to suffer great pain, mental anguish, and death.

WHEREFORE, plaintiff Marlita Thomas demands judgment against the individual defendants, jointly and severally, for compensatory damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00) and further demands judgment against the individual defendants, jointly and severally, for punitive damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00), plus attorney's fees pursuant to statute and the costs of this action, and such other and further relief as this Court deems just, proper, and equitable.

## Count II

### 1983 Action (Monell Claim) Against Institutions and Official Defendants for Failure to Properly Instruct, Supervise, and Provide Adequate Health Care

1-36. Paragraphs 1-36 above are realleged here as if fully set forth herein.

37. The Constitutional violations detailed above were caused in part by the customs, policies, and practices of the institutional defendants, as promulgated, enforced, and disseminated

by the official defendants, whereby the institutions and official defendants charged with ensuring adequate health care to pre-trial detainees at Cook County Jail failed utterly to provide access to the most basic health care commensurate with a civilized society, in this case and many other cases, including at least one other prior recent case of a pretrial detainee being allowed to slowly die from meningitis while being denied any access to medical care.

38. These failures include (1) fostering an atmosphere at the Cook County Jail where correctional and medical personnel were encouraged to disregard serious medical needs of detainees; and (2) knowingly failing to ensure that serious emergent medical needs of detainees could be treated in a reasonable time frame, by (a) failing to provide any medical services in the night hours, (b) failing to have an adequate plan to respond to emergency medical needs, including a plan to move prisoners up stairways, (c) failing to have a reasonably equipped or staffed emergency medical response team, (d) failing to have a system in place so that medical requests of detainees are reviewed promptly by properly trained medical staff and acted upon in a reasonable manner, (e) severely understaffing correctional officers at Cook County Jail, in violation of accepted practices and court orders, despite knowing that such understaffing greatly increases the chances that detainees' serious medical needs go untreated, (f) failing to correct serious safety problems such as broken video monitoring systems, despite knowing that such problems greatly increase the chances that detainees' serious medical needs go untreated; and (3) failing to have an adequate assessment of incoming detainee's health situation by qualified physicians; and (4) encouraging the destruction of documents and false writing of reports to cover up inadequacies in the medical care of detainees, thus maintaining an atmosphere and climate where inmates' serious medical needs are ignored and Constitutional violations are not prosecuted

or punished.

WHERFORE, plaintiff Marlita Thomas demands judgment against the institutional defendants and the official defendants for compensatory damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00), plus attorney's fees pursuant to statute and the costs of this action, and such other and further relief as this Court deems just, proper, and equitable.

## Count III

### Wrongful Death Pursuant to State Law Against Individuals and Institutions

1-34. Paragraphs 1-34 above are realleged here as if fully set forth.

35. Decedent Norman L. Smith, Jr. at all times relevant to this Complaint exercised due care for his own safety.

36. At the time and place aforesaid, the individual defendants and the institutional defendants, acting by and through their duly authorized agents and/or employees, owed decedent the duty to refrain from wilful and wanton acts or omissions which could cause suffering or death to the decedent.

37. As detailed above, the defendants breached this duty by wilfully and wantonly committing one, more, or all of the following acts or omissions:

    (a)    Deliberately ignoring the serious medical needs of the decedent;

    (b)    Failing to bring the decedent's condition to the attention of medical personnel so that he could be properly diagnosed and treated;

    (c)    Refusing to allow the decedent to make written requests for medical treatment;

      (d)    Refusing decedent's verbal and written requests for medical attention;

      (e)    Failing to provide timely access to medical treatment for a serious condition of which they were aware;

      (f)    Otherwise acting wilfully and wantonly toward decedent, in total and criminal disregard to his medical needs.

    38.    As a direct and proximate result of one or more of the foregoing wilful and wanton acts and/or omissions of the individual defendants, the decedent was caused to die on April 30, 2004.

    39.    The institutional defendants are sued in this count pursuant to the doctrine of respondeat superior, in that the individual defendants performed the actions complained of while on duty and in the employ of defendant institutions, and while acting within the scope of this employment.

    40.    The decedent left surviving him his three minor children, Da'Quan Magsby, Amber Smith, and Kailah Smith, his mother, Marlita Thomas, and various siblings.

    41.    By reason of the death of decedent, decedent's children and other relations have suffered pecuniary damages and been deprived of the support, comfort, protection, and society of the decedent.

    WHEREFORE, plaintiff Marlita Thomas demands judgment against the individual and institutional defendants, jointly and severally, for compensatory damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00) and further demands judgment against all defendants, jointly and severally, for punitive damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00), plus attorney's fees pursuant to statute and the costs of

this action, and such other and further relief as this Court deems just, proper, and equitable.

## Count IV

### Survival Action

1-34.   Paragraphs 1-34 above are realleged as if fully stated here.

35.   Plaintiff's decedent survived for approximately one week during his sickness, prior to his death.

36.   During this period, Norman Smith was conscious, and he suffered great pain and agony prior to his death, proximately caused by the above-stated acts and/or omissions of the defendants.

WHEREFORE, plaintiff Marlita Thomas demands judgment against all defendants, jointly and severally, for compensatory damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00) and further demands judgment against all defendants, jointly and severally, for punitive damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00), plus attorney's fees pursuant to statute and the costs of this action, and such other and further relief as this Court deems just, proper, and equitable.

## Count V

### Intentional Infliction of Emotional Distress Against Individuals and Institutions

1-34.   Paragraphs 1 through 34 above are realleged here as if fully set forth herein.

35.   The above-detailed conduct by the individual defendants was extreme and outrageous, exceeding all bounds of human decency.

36.   Defendants performed the acts detailed above with the intent of inflicting severe emotional distress or with knowledge of the high probability that the conduct would cause such

16

distress.

37. As a direct and proximate result of this conduct, plaintiff did in fact suffer severe emotional distress, resulting in injury to his mind, body, and nervous system, including loss of sleep, mental anguish, nightmares, and excruciating physical pain and emotional suffering.

WHEREFORE, plaintiff Marlita Thomas demands judgment against all individual and institutional defendants, jointly and severally, for compensatory damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00) and further demands judgment against all individual and institutional defendants, jointly and severally, for punitive damages in an amount in excess of THREE MILLION DOLLARS ($3,000,000.00), plus attorney's fees pursuant to statute and the costs of this action, and such other and further relief as this Court deems just, proper, and equitable.

**Count VI**

**Reimbursement Claim Against County Pursuant to 745 ILCS 10/2-302**

In the event any individual defendants are found liable for their actions performed in the course of their employment, Cook County, Illinois must indemnify the employee for this verdict pursuant to 745 ILCS 10/2-302.

WHEREFORE, plaintiff Marlita Thomas demands that Cook County, Illinois pay any compensatory judgments against individual defendants who acted in the course of their employment.

>                          Respectfully submitted,
>
>                          MARLITA THOMAS
>
>
>                          By:___s/ Daniel S. Alexander_____
>                                 One of her attorneys

Daniel S. Alexander
Phillip L. Coffey
Christopher R. Smith
SMITH, COFFEY & ALEXANDER
119 North Peoria Street
Suite 3A
Chicago, Illinois 60607
312-850-2600