IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARLITA THOMAS, as Mother, Next Friend, )
and Special Administrator of NORMAN L. )
SMITH, JR., deceased, )
)
Plaintiff, )
)
v. ) No. 04 C 3563
)
SHERIFF OF COOK COUNTY, ) Judge Castillo
et. al. )
)
Defendants. )

**DEFENDANTS' MOTION TO IN LIMINE TO BAR PLAINTIFF'S EXPERTS FROM EXPRESSING OPINIONS BASED HEARSAY WITNESS STATEMENTS**

NOW COME Defendants, COOK COUNTY, and certain other defendants (hereinafter "Defendants") by and through their attorney RICHARD A. DEVINE, State's Attorney of Cook County, through his Assistant, Andrew J. Creighton, and hereby moves of an order *in limine* prohibiting Plaintiff's Experts From Expressing Opinions Based on Hearsay witness statements, and in support thereof states as follows:

1. Plaintiff has retained an expert on correctional institutions named William F. Naber. Mr. Naber has submitted his expert reports and been deposed in this case. Exhibit "A" (Naber Deposition pages 62-68) attached hereto.

2. Both in his report and at deposition Mr. Naber, as a basis for his opinions, relied upon representations of statements of "inmate interviews by legal counsel" regarding the subject matter of this case. Naber depo. pages 62-68.

3. Mr. Naber did not see written statements of the witnesses but was advised of the so-called statements by plaintiff's counsel. Naber depo. p. 63.

4. Counsel for plaintiff has repeatedly during depositions in this case referred to written notes they made of witness interviews.

5. This Court has denied Defendant's Motion to Compel the Plaintiff's Attorneys' notes of the hearsay statements based on the work product privilege.

6. Mr. Naber's opinions based on these hearsay statements are incompetent, lacking foundation, and prejudicial and should not be presented to the jury.

7. Plaintiff has retained an infectious disease expert, Dr. Ben Katz. During Dr. Katz's deposition, Plaintiff's attorney also attempted to elicit opinions based on the hearsay statements. Exhibit "B" (Katz deposition pages 107-116) attached hereto.

8. Federal Rule of Evidence 703 does not provide for the admission into evidence of otherwise inadmissible evidence relied upon by an expert. *United States of America v. 0.59 Acres of Land*, 109 F.3d 1493. (9th Cir. 1997). In *United States of America v. Rollins*, 862 F.2d 1998. (7th Cir. 1987), the court stated that expert testimony that is based in part on hearsay may be admissible if the evidence relied on by the expert is the type of evidence that experts in that field normal rely on. In *Rollins*, the hearsay relied on by the expert drug agent was limited to the meaning of a code word and was not based solely on hearsay information. Defendants herein submit that the Plaintiff's Attorneys' hearsay as to what the decedent's cellmates said or did is not the type of evidence that an expert in any filed can rely on.

2

WHEREFORE Defendants , prays that this court enter an order *in limine* barring Plaintiff's experts from expressing opinions based on hearsay statements.

                              Respectfully submitted,

                              RICHARD A. DEVINE
                              State's Attorney of Cook County

                              Andrew J. Creighton

                              Assistant State's Attorney
                              Medical Litigation Section
                              300 Richard J. Daley Center
                              Chicago, Illinois 60602
                              (312) 603-5111

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARLITA THOMAS, as Mother, Next        )
Friend, and Special Administrator      )
of NORMAN L. SMITH, JR., deceased,     )
                                       )
            Plaintiff,                 )
                                       )
      -vs-                             )   No.  04 C 3563
                                       )
SHERIFF OF COOK COUNTY, COOK COUNTY,   )   Judge Castillo
JOHN STROGER, JR., MICHAEL F.          )
SHEAHAN, SGT. MONCZYNSKI, Star 831;    )   Magistrate Judge
OFFICER SANCHEZ, Star 8131; OFFICER    )   Mason
DAVIS, Star 7153; OFFICER TOOMEY,      )
Star 7463; OFFICER JOHNSON, Star 6273; )
OFFICER THIEMECKE, Star 8136; OFFICER  )
HOUSTON; OFFICER FACUNDO, Star 4254;   )
SGT. HERNANDEZ, Star 1010; SGT. DEW,   )
Star 1020; SGT. STRONER, Star 944;     )
LT. KRZYZOWSKI, Star 130;              )
P. WESTBROOK, C. LACY, R. PATTON,      )
A. BRADLEY, T. NELSON, K. WEST,        )
                                       )
            Defendants.                )

     The Deposition of WILLIAM F. NABER, called by the

defendants for examination, taken pursuant to the Federal

Rules of Civil Procedure of the United States District

Courts pursuant to the taking of depositions, taken before

Daniel M. Priscu, a C.S.R. within and for the County of

Cook, State of Illinois, at the Richard J. Daley Center,

66 West Washington Street, Room 500, Chicago, Illinois, on

Wednesday, August 9, 2006, commencing at the hour of

10:50 a.m.

EXHIBIT A

Page 62

1 March 8th.
2  A  The cover sheet is how I know which
3 document we're looking at. The cover letter?
4  Q  March 9th.
5  A  I do have that in front of me, sir.
6  Q  Can you refer to page 8 of 13?
7  A  I'm at that page, sir.
8  Q  Sir, I'm referring about halfway down with
9 the paragraph that says, "Inmate interviews by legal
10 counsel," do you see where I'm referring to?
11  A  Yes, sir. I'm at that paragraph.
12  Q  Who is the legal counsel that you're
13 referring to there?
14  A  I believe that was Mr. Alexander and
15 Mr. Smith.
16  Q  Have you ever seen any interviews that
17 Mr. Alexander or Mr. Smith took in this case?
18  A  I have not seen any written documents,
19 sir.
20  Q  Do you see the next sentence that refers
21 to an Inmate Hippe?
22  A  Yes, sir.
23  Q  And can you read that sentence for us?
24  A  (As Read), Inmate Hippe, H-i-p-p-e,

Page 63

1 reportedly told Attorneys Alexander and Smith
2 detailed information on how sick Mr. Smith was from
3 the day he arrived on the M1 tier.
4  Q  Have you ever talked to Inmate Hippe?
5  A  No, I have not, sir.
6  Q  Have you ever talked to Inmate Robinson?
7  A  No, I have not, sir.
8  Q  Have you ever talked to any inmates in
9 this case?
10  A  No, I have not, sir.
11  Q  If you look at the rest of that page, you
12 are referring to various inmate statements; is that
13 correct?
14  A  That's correct, sir.
15  Q  And those are all statements that
16 Mr. Alexander provided you?
17  A  Or Mr. Smith.
18  Q  And when I say "statements," those are
19 oral statements he advised you of?
20  A  In our discussions, yes, sir.
21  Q  And have you relied upon those oral
22 statements given to you by Mr. Alexander in this
23 case in reaching your opinions?
24  A  They influence my opinions, yes, sir.

Page 64

1  Q  And, in fact, if the statements that --
2 the oral statements that Mr. Alexander told you
3 about in regards to these inmates, if, in fact, they
4 were incorrect or not true, that might alter your
5 opinions in this case, is that true?
6  A  I would have to see what those differences
7 were, sir.
8  Q  Can you read the first -- underneath that
9 paragraph where it is discussing, do you see the
10 next sentence it starts Inmate Hippe, can you read
11 that for us? It's a single sentence.
12  A  (As Read), Inmate Hippe stated he
13 personally handed a request slip to a corrections
14 officer and was told that the officer would take
15 care of it.
16  Q  Were you advised by Mr. Alexander or
17 anybody else as to what the date was this request
18 slip was handed to a corrections officer?
19  A  They may have said it, but I don't recall
20 writing it down.
21  Q  Would it make a difference in any of the
22 opinions you have in this case as to what date if,
23 in fact, Mr. Hippe gave a request slip to someone he
24 did that?

Page 65

1  A  I would have to look at that item, yes,
2 sir.
3  Q  It might or might not?
4  A  It may or might not.
5  Q  Was there any information related to you
6 by Mr. Alexander in regard to how Mr. Hippe knew the
7 decedent, Mr. Smith?
8      MR. ALEXANDER: Can I hear that question
9 again?
10      (Question read.)
11      THE WITNESS: I honestly don't recall that
12 at this moment, sir.
13 BY MR. CREIGHTON:
14  Q  Can you read the next sentence that starts
15 Inmate Smith for us, sir?
16  A  Am I wrong? I don't see anything.
17  Q  Johnson. I'm sorry. I misspoke.
18  A  (As Read) Inmate Johnson spoke about how
19 long it took Mr. Smith to suffer and die.
20  Q  And that was also information you received
21 from Mr. Alexander?
22  A  Or Mr. Smith.
23  Q  Or Mr. Smith. Referring to plaintiff's
24 attorneys?

Page 66

1  A  Yes, sir.
2  Q  And when you received that information
3  from plaintiff's attorneys, did they tell you what
4  date Mr. Johnson, Inmate Johnson, observed
5  Mr. Smith?
6  A  I do not recall that exactly at this
7  moment, sir.
8  Q  Would that have any relevance to your
9  opinions in this case?
10 A  It may or may not.
11 Q  Could you read the next sentence, sir?
12 A  Starting with Inmate Robinson?
13 Q  Yes, sir.
14 A  (As Read) Inmate Robinson witnessed
15 Mr. Smith being too sick to eat, to get out of bed,
16 and saw him vomit repeatedly.
17 Q  Were you given any information by
18 plaintiff's counsel in regards to how Inmate
19 Robinson would have been able to observe Mr. Smith?
20 A  My recollection of the conversation is
21 that Mr. Robinson was an inmate in unit 1M at the
22 time that Mr. Norman Smith was an inmate in that
23 same unit.
24 Q  Do you know whether or not you were told

Page 67

1  Inmate Robinson was a cell mate of Mr. Smith's or
2  not?
3  A  I don't believe I was told that, sir.
4  Q  In regards to that same statement, were
5  you advised as to any date that Inmate Robinson
6  witnessed Mr. Smith being too sick to eat or get out
7  of bed or saw him vomiting?
8  A  I did not remember that.
9  Q  If, in fact, Inmate Robinson saw Mr. Smith
10 unable to eat or get out of bed or vomit, would that
11 be of relevance to you in your opinions of this
12 case?
13 A  I don't understand your question, sir.
14 I'm sorry.
15 Q  These are all oral statements that were
16 given to you by plaintiff's attorneys, right?
17 A  That's correct, sir.
18 Q  None of them have dates on them, correct?
19 A  That's correct, sir.
20 Q  Would it be of any relevance and would it
21 have made any difference in your opinions in this
22 case as to what dates each of these events happened
23 if, in fact, they happened?
24 A  It may or may not. I couldn't say until I

Page 68

1  know what the facts are.
2      THE WITNESS: Can I take a break?
3      (Discussion off the record.)
4      MR. CREIGHTON: And I want to admonish you
5  under Judge Castillo's rule here you shouldn't be
6  talking to the witness about his testimony during
7  this case. I just want to admonish you we intend to
8  hold you to his rules.
9      MR. ALEXANDER: We also want to put on the
10 record here according to the clock in here it is
11 12:18. We've agreed to come back at 1:00 o'clock.
12     (Luncheon recess.)
13     MR. CREIGHTON: We're back on the record.
14     Let the record reflect that the witness and
15 the plaintiff's attorneys just came in. They came in about
16 1:07. It's about 1:08, and we're starting again.
17 BY MR. CREIGHTON:
18 Q  Mr. Naber, just kind of a little
19 background.
20     On the falsified records that you -- or the
21 documents you believe were falsified records, do you have a
22 recollection as to approximately how many different pages
23 there were?
24 A  In this case my best recollection at this

Page 69

1  moment is there was at least seven where they
2  basically use the same times at different locations.
3  Q  In regards to going back again to that
4  issue of falsification, besides the living unit
5  logs, do you have information as to what other types
6  of records, if any, were falsified in your opinion?
7  A  In terms of actual changing or alteration
8  or falsification, I believe that was what I mainly
9  relied on was those living unit logs because those
10 were the officers who were directly supervising
11 Mr. Smith.
12     There were some log entries that I would not
13 called falsified but questionable in terms of what sergeants
14 and lieutenants added in those reports that I reviewed.
15 Q  When you use the term "questionable," what
16 do you mean by that?
17 A  What I'm looking for is a standard of
18 care, and this is a fairly simple case if we can
19 just stay to the fact pattern. And so what I'm
20 trying to tell you is when I see certain things
21 happening at certain times or not happening at
22 certain times, that makes it questionable in my mind
23 as to whether or not, in fact, it did happen or did
24 something else happen and it just wasn't recorded.

```
        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

MARLITA THOMAS, as Mother, Next        )
Friend, and Special Administrator      )
of NORMAN L. SMITH, JR., deceased,     )
                                       )
                Plaintiff,             )
                                       )
          -vs-                         )   No.  04 C 3563
                                       )
SHERIFF OF COOK COUNTY, COOK COUNTY,   )   Judge Castillo
JOHN STROGER, JR., MICHAEL F.          )
SHEAHAN, SGT. MONCZYNSKI, Star 831;    )   Magistrate Judge
OFFICER SANCHEZ, Star 8131; OFFICER    )   Mason
DAVIS, Star 7153; OFFICER TOOMEY,      )
Star 7463; OFFICER JOHNSON, Star 6273; )
OFFICER THIEMECKE, Star 8136; OFFICER  )
HOUSTON; OFFICER FACUNDO, Star 4254;   )
SGT. HERNANDEZ, Star 1010; SGT. DEW,   )
Star 1020; SGT. STRONER, Star 944;     )
LT. KRZYZOWSKI, Star 130;              )
P. WESTBROOK, C. LACY, R. PATTON,      )
A. BRADLEY, T. NELSON, K. WEST,        )
                                       )
                Defendants.            )
```

The Deposition of BEN Z. KATZ, M.D., called by the defendants for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pursuant to the taking of depositions, taken before Daniel M. Priscu, a C.S.R. within and for the County of Cook, State of Illinois, at Children's Memorial Hospital, 700 West Fullerton Street, Room 741, Chicago, Illinois, on Monday, June 26, 2006, commencing at the hour of 1:20 p.m.



EXHIBIT B

## Page 106

1   Matias thought Smith might be dope sick, a term used for
2   drug withdraws.
3      Matias stated that Smith was complaining of
4   not seeing the paramedics or doctors, and Matias helped
5   Smith fill out a detainee medical form on Thursday
6   afternoon. And Matias put the request in the interlock
7   medical box. Do you see that?
8    A   Yes.
9    Q   So this would indicate that the form was
10   put in the box on Thursday afternoon, right, sir?
11    A   Correct.
12    Q   And do you see the symptoms here that
13   Matias is talking about for Smith that I just read?
14    A   Yes.
15    Q   And would those be symptoms of menengitis,
16   Doctor?
17    A   Sure, sleeping, vomiting, not eating
18   properly.
19    Q   Now, I realize Mr. Matias has not been
20   deposed yet. As I said, I will get you a copy of
21   his deposition when it happens, but as you know,
22   Doctor, we've interviewed him, and he tells us that
23   Norman was sick pretty much the entire time he was
24   there in Cook County Jail, getting progressively

## Page 107

1   worse, that Matias for several days prior to his
2   death had to help him walk, that he couldn't eat,
3   that he was vomiting for several days at a time.
4   I'll stop there.
5      Could those be symptoms of menengitis,
6   Doctor?
7    MR. CREIGHTON: Objection, form.
8    MR. GALLAGHER: I'm going to object to the
9   form. I'm also going to object because we've never
10   received from counsel any statement from Mr. Matias,
11   which even though we've asked for.
12    MR. CREIGHTON: I'll join in the
13   objection, same objection.
14    MR. ALEXANDER: We've given you everything
15   that's produceable. We have no statement from
16   Mr. Matias at this time.
17    MR. GALLAGHER: You just said you had a
18   statement from Mr. Matias.
19    MR. ALEXANDER: A verbal statement, not
20   the kind that's produceable. As you know, that
21   would be attorney work product.
22   BY MR. ALEXANDER:
23    Q   Anyway, can you answer my question. Would
24   you like to hear it again?

## Page 108

1    THE WITNESS: Yes, I'd like to hear it
2   again.
3    MR. ALEXANDER: Can you find it there,
4   Mr. Court Reporter? Thank you.
5      (Question read.)
6    THE WITNESS: Yes.
7    MR. CREIGHTON: Same objection.
8    MR. ALEXANDER: You don't have to repeat
9   the objection when the questions are read back.
10   Check the rules on that, if you don't believe me.
11    MR. CREIGHTON: Same objection.
12   BY MR. ALEXANDER:
13    Q   And, Doctor, are those the sort of
14   symptoms, whether or not they were symptoms of
15   menengitis at the time, but are those the sort of
16   symptoms that any reasonable person observing would
17   have said, hey, this guy should be allowed access to
18   medical care in your opinion?
19    MR. GALLAGHER: Objection, form.
20    THE WITNESS: Yes.
21   BY MR. ALEXANDER:
22    Q   And Mr. Matias also tells us at least a
23   couple of days before Mr. Smith's death he made a
24   request of a Cermak nurse for medical attention for

## Page 109

1   Mr. Smith and that the nurse said he was a piece of
2   shit and was dope sick and did not see him.
3      In your opinion, Doctor, is that proper
4   access to medical care?
5    MR. CREIGHTON: Objection, form.
6    MR. GALLAGHER: Objection.
7    MR. CREIGHTON: Beyond the scope of his
8   expertise.
9   BY MR. ALEXANDER:
10    Q   Assuming that Mr. Matias' statement is
11   true.
12    A   Just read back the question again. I'm
13   sorry.
14      (Question read.)
15    MR. CREIGHTON: Same objection.
16    THE WITNESS: So it's obviously not proper
17   access to medical care.
18   BY MR. ALEXANDER:
19    Q   Also, I'm not sure I have his name here.
20   One witness has testified that he visited Norman
21   Smith on the 27th. This was the date -- I believe
22   it was the 27th of April, I believe, the date that
23   Norman went to court, and said that Norman was
24   stumbling as he was walking out of the visiting

Page 110

1 room.
2     Could that be a possible indication that he
3 was suffering from menengitis?
4     MR. CREIGHTON: Objection, form.
5     THE WITNESS: It could be.
6 BY MR. ALEXANDER:
7     Q And we also have reports from several tier
8 mates, I believe including Mr. Matias, that on the
9 day Mr. Smith went to court on the 27th, he was
10 vomiting both before and after his court appearance.
11     Could those be symptoms of menengitis?
12     MR. CREIGHTON: Objection, form.
13     THE WITNESS: Yes. I remember
14 specifically in the hypothetical you said no
15 vomiting, as I recall.
16 BY MR. ALEXANDER:
17     Q You're speaking now to Mr. Creighton
18 regarding his earlier questions on that subject?
19     A Right.
20     Q And the answers you gave to Mr. Creighton
21 in that hypothetical, would they change if you found
22 out that Norman, in fact, had been vomiting on the
23 date of the 27th?
24     A Well, the hypothetical was that he wasn't

Page 111

1 vomiting. So if he were vomiting, then he would
2 have had symptoms of menengitis.
3     Q Now, you were asked several questions some
4 several times about whether or not these guards
5 could make a formal diagnosis of menengitis. Do you
6 remember that, Doctor?
7     A Yes.
8     Q What is the real point here? In your
9 opinion when a person is sick and exhibiting these
10 symptoms, are the guards supposed to diagnose
11 menengitis, or if not, what are they supposed to do,
12 Doctor?
13     MR. CREIGHTON: Objection, form, beyond
14 his expertise.
15     MR. GALLAGHER: Objection, form.
16 BY MR. ALEXANDER:
17     Q You can answer.
18     A Well, it seems to me that obviously a
19 guard is not going to be able to diagnose
20 menengitis, but they need to know when somebody is
21 sick. And if they have any doubts as to whether
22 somebody is sick, they need to refer them to
23 somebody who can tell whether they are sick or not
24 and then what they have.

Page 112

1     Q Is it sufficient in your opinion, Doctor,
2 for a guard to decide on his own that somebody is
3 dope sick or having drug withdraw symptoms and they
4 don't need to see a doctor with these symptoms?
5     MR. GALLAGHER: Objection, form.
6     MR. CREIGHTON: Objection, beyond his
7 expertise, beyond his report.
8     MR. GALLAGHER: Beyond the scope of his
9 answers, and it is beyond the scope of the questions
10 that have been asked. It's beyond the scope of the
11 opinions he's given.
12 BY MR. ALEXANDER:
13     Q You can answer that.
14     THE WITNESS: Could you read the question
15 back, please?
16     (Question read.)
17     THE WITNESS: No.
18     MR. CREIGHTON: Same objection.
19 BY MR. ALEXANDER:
20     Q What should have been done, Doctor?
21     MR. CREIGHTON: Objection.
22     MR. GALLAGHER: I'm going to object to the
23 form of that question.
24     THE WITNESS: They should do whatever they

Page 113

1 need to do to make certain that the fellow can get
2 medical attention and see a medical person.
3 BY MR. ALEXANDER:
4     Q Now, you gave some opinions that at least
5 since the 29th Norman was exhibiting serious
6 symptoms of menengitis. Do you remember that,
7 Doctor?
8     A Yes.
9     Q Now I'm going to ask a hypothetical
10 question.
11     If you assume for the sake of my question
12 that the statements I just recently told you about in this
13 deposition are true; namely, the ones by Carlos Matias about
14 the symptoms that Norman was experiencing, even as early as
15 the 27th, and about the vomiting on the 27th, about the
16 stumbling on the 27th, Doctor, if you assume that as true,
17 do you have an opinion to a reasonable degree of medical
18 certainly that Norman was exhibiting symptoms of menengitis,
19 even as early as the 27th?
20     MR. CREIGHTON: Objection to form.
21     THE WITNESS: If those statements are
22 true, then it is likely that Mr. Smith was
23 exhibiting signs of menengitis as early as the 27th.
24

Page 114

1  BY MR. ALEXANDER:
2    Q  And do you hold that opinion to a
3  reasonable degree of medical certainty, Doctor?
4    A  Yes.
5        MR. ALEXANDER: That's all I have.
6        MR. GALLAGHER: I have a couple more
7  questions.
8            FURTHER EXAMINATION
9  BY MR. GALLAGHER:
10   Q  Doctor, the symptoms that counsel asked
11 you about, vomiting, inability to sleep, not eating,
12 those could be symptoms of the flu as well, couldn't
13 they, Doctor?
14   A  Right. But we know he died of menengitis,
15 so it's unlikely that he had the flu two days before
16 and then menengitis. Obviously, those symptoms
17 don't mean you have menengitis.
18       In the context of this case if he had those
19 symptoms two days before, they were most likely due to the
20 bacterial menengitis, which killed him.
21   Q  If he had them two days before?
22   A  I said if he had them two days before.
23   Q  And you're not suggesting, though, are
24 you, Doctor, that anytime anybody vomits that

Page 115

1  medical attention should be rendered to them, are
2  you?
3    A  I did not say that.
4    Q  You're not saying, are you, that if a
5  correctional officer understands that if someone
6  vomited in their cell that they should call for
7  medical help?
8    A  Not one episode of vomiting, no.
9    Q  I think counsel asked you -- Mr. Matias
10 said that he vomited three times over several days.
11       If someone vomited even every day, would that
12 be symptoms of -- or would that be enough to call a medical
13 doctor?
14   A  Well, obviously, there's some point at
15 which the answer becomes, yes, so I think vomiting
16 and difficulty walking and some of the other things,
17 difficulty sleeping, or sleeping too much, either
18 way, those start to be the kind of symptoms where
19 you need to get concern and you need to start seeing
20 somebody about.
21       There's always going to be some point where
22 you could decide where it is, but those symptoms together
23 would be reasonable for a guard to say, maybe you should go
24 see a doctor.

Page 116

1    Q  If they were over a period of time,
2  correct? If they became aware of them over a period
3  of time; is that correct, Doctor?
4        MR. ALEXANDER: I'm going to object as to
5  form.
6        THE WITNESS: I'm just saying or at one
7  time.
8  BY MR. GALLAGHER:
9    Q  So, now, after talking to counsel, you're
10 more familiar with the fact that this medical
11 request form was filled out sometime in the
12 afternoon of the 29th and placed in a black box; is
13 that correct, sir?
14       MR. ALEXANDER: I'm going to object.
15       I wasn't talking to counsel. I was asking
16 him questions in the deposition, if that's what you're
17 referring to.
18 BY MR. GALLAGHER:
19   Q  Well, you're assuming that that's the
20 truth based on what counsel asked you; is that
21 correct?
22       MR. ALEXANDER: Objection, form.
23       THE WITNESS: Yes, based on the
24 information that he told me about and based on the

Page 117

1  other things that I had read in other depositions.
2  It seems that this detainee health service request
3  form was placed in a box sometime in the afternoon
4  of April 29th.
5        MR. GALLAGHER: Thank you very much. No
6  further questions.
7        MR. CREIGHTON: Nothing.
8        MR. ALEXANDER: I have a couple more.
9            FURTHER EXAMINATION
10 BY MR. ALEXANDER:
11   Q  Doctor, are you aware of whether or not,
12 maybe from the depositions you've read or some of
13 the materials, whether inmates are also supposed to
14 be able to get access to medical care directly by
15 asking a guard?
16       MR. CREIGHTON: Objection, form.
17 Objection, relevancy.
18       THE WITNESS: From what I've read, my
19 understanding is that if people ask to see a doctor,
20 that a guard is not supposed to make a medical
21 judgment and say you're not sick enough to see a
22 doctor. So that's my impression about how the
23 correctional facility works.
24