UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARLITA THOMAS, as Mother, Next Friend, and Special Administrator of NORMAN L. SMITH, JR., deceased,<br><br>Plaintiff,<br><br>v.<br><br>COOK COUNTY SHERIFF, MICHAEL F. SHEAHAN; COOK COUNTY; JOHN STROGER, JR.; SGT. MONCZYNSKI, Star 831; SGT; HERNANDEZ, Star 1010; SGT. STRONER, Star 944; SGT. DEW, Star 1020; LT. KRZYZOWSKI, Star 130; OFR. SANCHEZ, Star 8131; OFR. DAVIS, Star 7153; OFR. FACUNDO, Star 4254; OFR. HOUSTON; OFR. JOHNSON, Star 6273; OFR. THIEMECKE, Star 8136; OFR. TOOMEY, Star 7463; P. WESTBROOK,<br><br>Defendants. | )))))))))))))))))))))) | No. 04 C 3563<br><br>Judge Ruben Castillo |

## MEMORANDUM OPINION AND ORDER

This case arises out of the tragic death of Norman L. Smith, Jr., ("Smith") while he was

in the custody of the Cook County Department of Corrections ("CCDOC" or "Cook County

Jail"). On Friday, April 23, 2004, Smith was arrested and charged with possession of a

controlled substance. Smith's mother claims that he died seven days later at Cook County Jail

because the sheriff's officers and medical staff at the Jail ignored his obvious symptoms of

meningitis and the repeated requests of Smith and his fellow inmates for medical help. Plaintiff

Marlita E. Thomas ("Thomas" or "Plaintiff"), as Smith's mother and the independent

administrator of his estate, brings this suit under 42 U.S.C. § 1983; the Illinois Wrongful Death

Act, 740 ILCS 180/1 (2005); the Illinois Survival Act, 755 ILCS 5/27-6 (2005); and Illinois

common law against Cook County, the Sheriff of Cook County Michael F. Sheahan ("Sheriff")

in his official capacity, the President of the Cook County Board John Stroger, Jr. ("Stroger") in

his official capacity, Sergeant James Monczynski ("Monczynksi"), Officer Alex Sanchez

("Sanchez"), Officer Donetta Davis ("Davis"), Officer Terrence Toomey ("Toomey"), Officer

Douglas Johnson ("Johnson"), Officer Louis Thiemecke ("Thiemecke"), Officer Darryl Houston

("Houston"), Officer Jesus Facundo ("Facundo"), Sergeant Gerald Dew ("Dew"), Sergeant

Steven Stroner ("Stroner"), Lieutenant Raymond Krzyzowski ("Krzyzowski"), Sergeant Ivan

Hernandez ("Hernandez"), and Peggy Westbrook ("Westbrook") (collectively, "Defendants").[1]

At issue is Plaintiff's Fifth Amended Complaint ("Complaint"). (R. 150.) Defendants

have joined in three separate motions for summary judgment, filed by the individual defendants

(R. 260), Hernandez (R. 286), and Cook County (R. 324).[2]

## MOTIONS TO STRIKE

Defendants also filed a motion to strike the following documents: (1) Plaintiff's Rule

Local Rule 56.1(b)(3)(B) statement of additional facts; (2) Plaintiff's combined response to

Defendants' Local Rule 56.1(a)(3) statement of undisputed facts; (3) Plaintiff's combined

response to Defendants' motions for summary judgment in their entirety or in part; and (4)

---

[1] Pursuant to this Court's order of March 21, 2006, Plaintiff filed a Fifth Amended
Complaint (the "Complaint") dismissing the Cook County Bureau of Health Services, John Raba,
Ruth Rothstein, Callie Baird, and Daniel Brown as defendants. (R. 150, Compl.) On January 10,
2007, this Court further granted Plaintiff's motion to dismiss with prejudice the claims raised
against defendants C. Lacy, A. Bradley, K. West, T. Nelson, and R. Patton. (R. 343.)

[2] No summary judgment motion was filed on Peggy Westbrook's behalf. She is
represented by Cook County's counsel.

Plaintiff's exhibits 3, 8, 14, 23, 66, and 74.[3] (R. 352, Defs.' Mot. to Strike.) Hernandez filed an additional motion to strike, essentially repeating certain claims in the joint motion to strike (R. 373, Hernandez Mot. to Strike); accordingly, this Court will address only the joint motion to strike and will address Hernandez's motion specifically where it deviates from the joint motion.

Defendants argue that Plaintiff violated the local rules and thus should be given the ultimate sanction of striking Plaintiff's statement of additional facts and her responses to Defendants' statements of fact. Local Rule 56.1 requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *Malec v. Sanford*, 191 F.R.D. 581, 582-83 (N.D. Ill. 2000). Courts in this district have broad discretion to enforce Local Rule 56.1, and the Seventh Circuit regularly upholds its strict enforcement. *See, e.g., Koszola v. Bd. of Ed. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995).

Defendants complain that Plaintiff filed 140 numbered paragraphs in her joint statement of additional facts, even though under Local Rule 56.1(b)(3)(C), plaintiff needed prior leave of Court to file more than 40 paragraphs. (R. 352, Defs.' Mot. to Strike at 3.) Plaintiff, however, had to respond to three separate summary judgment motions from Cook County, Hernandez, and the remaining Defendants. While Defendants concede that perhaps Plaintiff could have filed 120 paragraphs total (40 paragraphs per motion), they quibble over the remaining 20. (*Id.* at 3.) This Court admonishes Plaintiff for not following the local rules, but we find that the factual complexity in this case warrants the relaxation of the 40-paragraph limit. *See* Local Rule 56.1,

---

[3] Defendants Cook County and Westbrook's motion to join in the motion to strike is granted. (R. 358.)

Committee Comment ("A party may seek leave to file more asserted statements of fact or additional fact, upon a showing that the complexity of the case requires a relaxation of the 80 or 40 statement limit".) Defendants also complain that Plaintiff's statement of facts should be stricken because it is not "concise," but the more appropriate action would be for this Court to simply disregard any extraneous facts Plaintiff includes. (R. 352, Defs.' Mot. to Strike at 6.)

Defendants next argue that Plaintiff violates Local Rule 56.1(b)(3)(C)—which requires a statement "consisting of short numbered paragraphs"—by impermissibly combining six to ten statements of fact into a single numbered paragraph. (*Id.* at 3.) Not only do Defendants do the same thing in their statements of fact (*see, e.g.*, R. 262, Defs.' Facts ¶¶ 10-74), but they compound the problem by responding to Plaintiff's numerous factual statements as merely "Disputed" despite that certain fact statements are incontrovertibly undisputed. (*See, e.g.*, R. 368, Defs.' Resp. to Pl.'s Facts ¶ 109.) In addition, Defendants do not provide a list to this Court of the allegedly problematic paragraphs beyond a reference by example to Plaintiff's paragraphs 53 to 57. We also note that both parties improperly include some legal conclusions, hearsay, and speculation in their statements of fact, which this Court will not consider. *Malec*, 191 F.R.D. at 583. Because of the mutual responsibility the parties share for their unwieldy statements of fact, this Court will not sanction Plaintiff. First, a movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions in a 56.1(a) statement on the off-chance that one's opponent might not file a correct response.

Defendants next request that this Court strike affidavits from and any references to Smith's fellow inmates: Titus Haynes, George Robotis, Darius Parker, and Alan Robinson. Defendants argue that Plaintiff never disclosed them as witnesses or individuals with relevant

4

information before the September 15, 2006 discovery cut-off, and thus Defendants did not have the opportunity to depose them. (R. 352, Defs.' Mot. to Strike at 6-7.) Defendants also ask for the draconian remedy of striking all of Plaintiff's summary judgment submissions. (*Id.* at 7-8.) In her response, however, Plaintiff attached a copy of a 2004 fax that her counsel sent to counsel for the individual Defendants which included Robinson, Robotis, and Haynes as potential witnesses. (R. 361, Resp. to Mot. to Strike, Ex. 1, Fax.) Then, in 2006, before the close of discovery, Plaintiff's attorney disclosed the addresses for these witnesses to Defendants' counsel. (*Id.*, Exs. 2-5.) The Sheriff himself raised the possibility of Parker's testimony in his Rule 26(a)(1) supplemental disclosures, as the Sheriff stated that any of the names listed on a "Group Grievance" document, submitted by Parker, may have information relevant to medical requests on Smith's behalf. (*Id.*, Exs. 6-7.) Furthermore, Plaintiff's counsel disclosed Parker's address in a letter dated August 25, 2006. (*Id.*, Ex. 8.) Because Plaintiff disclosed these witnesses prior to the discovery cut-off, we will not strike her summary judgment submissions.

Defendants also request that this Court strike Plaintiff's Exhibit 23, Addendum to Dr. Katz's Expert Opinion Report, because it was disclosed for the first time on or about November 7, 2006, after the close of discovery and after Dr. Katz's deposition had already been taken. (*Id.* at 8-9.) The one-page addendum addresses the deposition testimony of Smith's cellmate, Cory Mitchell, which occurred after Dr. Katz's deposition. The addendum is proper for this purpose.

We grant Defendants' motion to strike only as to paragraph 139 of Plaintiff's statement of facts, in which Plaintiff attempts to incorporate by reference all facts submitted and answered and all supporting materials filed in the case of *Addie McCall v. Sheahan*, 03 C 5948 (N.D. Ill. filed Aug. 22, 2003), in which Judge Holderman granted summary judgment to the Sheriff on the

plaintiff's policy claims. In addition to far exceeding the Local Rule's limit on statements of fact, Plaintiff does not attempt to demonstrate the relevance, probative value, and admissibility of these materials beyond a cursory summary of that case. *Malec*, 191 F.R.D. at 583 ("the 56.1(a) statement should be limited to material facts.") It is not this Court's job to weed through the stack of additional evidence Plaintiff wishes to admit. Accordingly, this Court will strike the portion of Plaintiff's Rule 56.1(b)(3)(B) statement of additional facts adopting and incorporating by reference the materials filed in *Addie McCall v. Sheahan, et al.*, 03 C 5948 (N.D. Ill.).

Hernandez's motion to strike added one argument: that this Court should not consider the portion of Plaintiff's response brief that exceeds 15 pages because Plaintiff did not seek leave of court to file an oversized brief. (R. 373, Hernandez Mot. to Strike at 4.) Plaintiff's 28 page brief, however, was in response to: (1) Hernandez's 15 page memorandum in support of his motion for summary judgment (R. 290); (2) Defendant Cook County's 7 page memorandum in support of its motion for summary judgment (R. 325); and (3) the remaining Defendants' 15 page memorandum in support of their motion for summary judgment (R. 261). Plaintiff's 28 page response brief is much less than the total 45 pages she would have been entitled to had she filed three separate responses. Accordingly, Hernandez's motion is denied.

## UNDISPUTED FACTS

### I.    The Parties

Smith was arrested on April 23, 2004, and taken to Division V, Tier 1-M, of Cook County Jail. Despite inmate testimony that Smith had requested medical attention and was obviously very sick, it is undisputed that none of the officers or medical staff on duty during Smith's incarceration, except Officer Toomey, have any memory of Smith before he was found

convulsing and comatose in his Cook County Jail cell in the early morning of April 30, 2004.[4] Defendants Monczynski, Sanchez, Davis, Toomey, Johnson, Thiemecke, Houston, Facundo, Hernandez, Dew, Stroner, and Krzyzowski were assigned as correctional officers or supervisory correctional personnel at Division 5, Tier 1-M at the Cook County Jail during various shifts between April 24 and April 30, 2004, where Smith's jail cell was located. (R. 262, Defs.' Facts ¶ 2.) The Sheriff is the Jail's warden. (*Id.*) Cook County finances the Jail and subcontracts with Cermak Health Services ("Cermak") to provide medical care to detainees. (*Id.* ¶ 3.) Defendant Westbrook is employed by Cermak as a Correctional Medical Technician ("CMT").[5] (*Id.* ¶ 6.) She was on duty for Division 5, Tier 1-M during various shifts the last week of April 2004. (*Id.*)

## II. Cermak

Cermak is located on Cook County Jail grounds, with its emergency room ("ER") located in its own building. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 32, Myvett Dep. at 66.) Cermak has a dispensary, or clinic, in each jail division. (*Id.* at 67.) During the day shift, the CMTs rotate their responsibilities of working in the clinic and dispensing medication on the tier. (*Id.* at 68.) The clinic closes at 3 p.m.; after that, the Cermak receiving center handles inmate complaints, and at night, the ER handles complaints. (*Id.* at 32-33.) Between April 24 and April 30, 2004, CMTs Westbrook, Bradley, Lacy, and Patton were assigned to Division 5, Tier 1-M. Myvett was one of two CMTs on duty in the Cermak ER in the early morning of April 30, 2004.

---

[4] (*See, e.g.*, R. 369, Defs.' Supp'l Ex. 18, Davis Dep. at 39-40 (testifying that officer has no memory of Smith); *id.*, Ex. 21 (same), Johnson Dep. at 72 (same); *id.*, Ex. 16, Facundo Dep. at 20, 71 (same).)

[5] Some Cermak staff are CMTs and some have the higher certification of paramedic. The distinction is not relevant to this opinion, and the term CMT will be used for both.

7

## A.    Tier Visits

Cermak policy mandates that its personnel make daily visits to the tiers of Cook County Jail. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 98, 109.) Cermak staff are required to turn in "Daily Encounter Forms" each day which document their tier visits and contact with inmates. (*Id.* ¶ 132.) The correctional officers' Living Unit Logs (or "tier logs") also may reflect medical visits to a tier. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 130.) It is disputed, however, if the officer or the CMT is supposed to sign the tier log, and whether the tier logs get signed at all when a CMT arrives on the tier. (*Id.*, Ex. 18, Davis Dep. at 58-59; *id.*, Ex. 19, Dew Dep. at 79; R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Pl. Ex. 15, Bradley Dep. at 38; *id.*, Ex. 71, Kiriazes Dep. at 51, 112; *id.*, Ex. 45, Lacy Dep. at 57.)

Generally, CMTs do not go inside the tier to dispense medications; rather, they stand in the interlock—the locked area on the tier where the officers stay when they are not doing security checks. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 106.) The officer opens the interlock door, the CMT calls the inmates' names, and the inmates come to the door to get their medication. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 65, Westbrook Dep. at 28-29; *id.*, Ex. 32, Myvett Dep. at 68-69.) The CMT cannot see into any inmate's cell from the tier door. (*Id.*, Ex. 65, Westbrook Dep. at 29.) CMT Westbrook estimates that it takes 2 to 3 hours to dispense the medications. (*Id.* at 31.) Cermak personnel cannot access the jail cells unless there is a lockdown, where the inmates are all locked into their cells. (*Id.*, Ex. 71, Kiriazes Dep. at 135.)

Nevertheless, Woodrow Winfrey ("Winfrey")—the Cermak Health Administration supervisor for Division V in April 2004—testified that CMTs sometimes fail to make their daily tier rounds, and he is aware of multiple inmate grievances to that effect. (R. 368, Defs.' Resp. to

8

Pl.'s Facts ¶ 113; R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 68, Winfrey Dep. at 29, 46.) He stated that in general, some CMTs do not make their tier visits because no officer was present on the tier to let them in. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 68, Winfrey Dep. at 90.) CMT Lacy testified that he has "frequently" gone to a tier to dispense medications but that there was no officer on the tier; he then finds an officer on another tier to assist him.[6] (*Id.*, Ex. 45, Lacy Dep. at 68-69.) Sergeant Stroner agrees that Cermak staff did not go to each tier on a daily basis. (*Id.*, Ex. 37, Stroner Dep. at 18, 42.)

Both Winfrey and Howard Hradek ("Hradek"), the Cermak supervisor and CMT interim director in April 2004, specifically recall two group inmate grievances (in July 2003 and in December 2000) against CMT Patton for failing to make tier rounds and dispense medications. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 108.) Hradek and Winfrey disciplined Patton more than once for his repeated failures to perform daily tier visits.[7] (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 68, Winfrey Dep. at 64.) Nevertheless, Hradek—who had the authority to set up training for CMTs—never instituted training on the importance of daily tier visits. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 138; Pl.'s Ex. 68, Winfrey Dep. at 28, 46, 62.)

## B. Requests for Medical Attention

Detainees can request medical attention through written medical request forms which

---

[6] Westbrook, however, testified that in her seven years of employment, an officer was always present when she visited a tier. (*Id.*, Ex. 65, Westbrook Dep. at 46-47.)

[7] Previously, on July 10, 2003, Winfrey had also written up Patton for failing to turn in Daily Encounter forms for half the days he worked in May, and a previous supervisor reprimanded Patton for failing to make tier rounds in 2000 and 2001. (*Id.* at 71, 73.) CMT Bradley was also disciplined, in June 2003, for failing to turn in daily encounter forms on May 9, 20, 21, 29, and 30, 2003. (*Id.*, Ex. 15, Bradley Dep. at 62.)

Cermak personnel are required to retrieve each day. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 98, 109, 123.) A locked black box (the "request box") is used to collect the written requests. (*Id.* ¶ 119.) The box is attached to the wall of the interlock, an area of the tier not accessible to detainees. (*Id.*) It is not possible to see inside the locked box. (*Id.*, Ex. 18, Davis Dep. at 58.) Blank detainee medical request forms are kept alongside the box. (R. 262, Defs.' Facts ¶ 46; R. 344, Pl.'s Resp. to Defs.' Facts ¶ 46.) Officers do not have a key to the locked request box. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 119.) Sometimes detainees would leave completed medical request forms in the sleeve outside the locked box where the blank forms were kept, or would hand the form directly to a Cermak staffer. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J, Ex. 45, Lacy Dep. at 25-26; *id.*, Ex. 71, Kiriazes Dep. at 53.)

One key will open all of the medical request boxes, and all CMTs are issued keys to open the request boxes. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J, Ex. 68, Winfrey Dep. at 40-41; *id.*, Ex. 67, Hradek Dep. at 50-51.) Although Winfrey and Hradek have keys to the locked boxes, they know that some CMTs in Division 5 do not have keys. (*Id.*) Of the four CMTs working in Division 5 the last week of April 2004, only Patton had a key to the request box. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 73, Patton Dep. at 31-32.) CMTs Bradley, Myvett, and Lacy were not aware if any CMTs had a key. (*Id.*, Ex. 72, Bradley Dep. at 16; id., Ex. 32, Myvett Dep. at 76; *id.*, Ex. 45, Lacy Dep. at 24.) Between 5 and 10 years have passed since any memoranda have been distributed to CMTs informing them how to access keys to open the locked medical request boxes. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 125.)

CMTs may not have access to the medical request box if no officer is on the tier. (*Id.*, Ex. 68, Winfrey Dep. at 97-98) Jean Kiriazes ("Kiriazes"), the director of Continuous Quality

10

Improvement and Risk Management at Cermak, has heard at least ten complaints from CMTs of lack of access to detainee medical requests. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 116-17.) In 2004, 2005, and 2006, CMT Lacy heard a number of complaints that medical request forms were not being picked up. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 45, Lacy Dep. at 92.)

Inmate Parker, a clean-up worker during his incarceration in Division 5, swore in his affidavit that he often saw medical request slips in the interlock garbage, and that he had put in five unanswered medical request forms himself. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 64; R. 349, Ex. 14, Parker Aff. ¶¶ 5, 7.) Parker also attested that he often saw CMTs unable to gain access to Tier 1-M because the guard was watching another tier. (Id. ¶ 8.) On April 19, 2004, he filed a grievance on behalf of 52 Division V inmates (Tier 2-D) complaining that CMTs did not properly administer basic medications and requesting that medical request slips be picked up properly.[8] (Id., Ex. 14, Parker Dep., Dep. Ex 1.) Director Kiriazes signed the April 2004 group grievance form and responded on April 28, 2004, that medication is properly administered. (Id., Ex. 14, Parker Dep., Dep. Ex 2.) Parker appealed this response, claiming that even when inmates show severe signs of sickness, no medication is given and service is delayed. (Id.) The Appeal Board denied the appeal, stating that the issues were addressed on April 29, 2004. (Id.)

Inmates could also make verbal requests to CMTs or officers for medical care. (R. 349, Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. 45, Lacy Dep. at 29-30; id., Ex. 32, Myvett Dep. at 70.) Cermak policy is for a CMT to evaluate an inmate as if his claim of sickness is the whole

---

[8] This Detainee Grievance from Division V at the Jail—11 days before Smith's death—although not for Tier 1-M, is relevant to Plaintiff's allegations about policies and practices at the Jail. Accordingly, Defendants' motion in limine to bar the introduction and any testimony regarding 'Detainee Grievance' date April 19, 2004 is denied. (R. 306.)

truth, regardless of what the officer may say. (*Id.*, Ex. 70, Raba Dep. at 80.) There is no training for recognizing drug withdrawal or meningitis symptoms. (*Id.*, Ex. 45, Lacy Dep. at 45). Westbrook testified that if an inmate was too sick to come out of the cell, she would go to him (with a guard) if he screamed out from his cell or if she was notified by another inmate of an immobile sick inmate. (*Id.*, Ex. 65, Westbrook Dep. at 32-33, 62.) Westbrook testified that the CMT decides whether to call the doctor, and the doctor decides whether the officer should bring the inmate to see him. (*Id.*, Ex. 65, Westbrook Dep. at 34-35.) If the tier was on lockdown, Westbrook testified that a guard was always available to go with her to every cell. (*Id.* at 38, 63.) CMTs should note all inmate contact even if it does not result in a medical referral. (*Id.* at 39.)

## III.    Cook County Correctional Officers

### A.    Security Checks

Sheriff department policy requires that correctional officers perform security checks to monitor detainee living units, or jail cells, every thirty minutes. (R. 368, Defs.' Resp. to Pl. Facts ¶ 67.) To perform security checks, officers are supposed to physically walk through the tier and look into each area of the tier, including the cells, dayrooms, and catwalks (hallways). (*Id.*) When an officer walks into the tier, there must be a back-up officer in the interlock. (*Id.*, Ex. 18, Davis Dep. at 14; *id.*, Ex. 28, Hernandez Dep. at 80; *id.*, Ex. 20, Toomey Dep. at 56; *id.*, Ex. 21, Off. Johnson Dep. at 24; *id.*, Ex. 22, Houston Dep. at 17.) Policy allows one officer to watch two tiers at the same time ("cross-watching") is allowed if there is a clear sightline between the two tiers and they are close together. (*Id.* ¶ 65.)

As area supervisors, sergeants have a duty to conduct checks of Tier 1-M at least twice per shift and review the officers' daily Living Unit Logs. (R. 368, Defs.' Resp. to Pl.'s Facts ¶

55; R. 262, Defs.' Facts ¶¶ 36-37.) The area supervisors are responsible for staffing correctional officers on the tier, and thus know when Tier 1-M officers are cross-watching both tiers 1-M and 1L, which was a common occurrence in April 2004. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 54.)

The detainees are in the day room for approximately 5.5 hours of the afternoon/evening shift (3 p.m. to 11 p.m.). (R. 262, Defs.' Facts ¶ 41; R. 344, Pl.'s Resp. to Defs.' Facts ¶ 41.) Cell doors are unlocked at the same time from the interlock to allow the detainees out, but the officer must enter the tier to re-lock each cell individually. (*Id.* ¶ 42; R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 21, Johnson Dep. at 58.) When the inmates go to bed (at approximately 9:00 p.m.) the process of individually opening and locking the cell doors is repeated. (*Id.*) During most of the night shift, the inmates are confined to their cells. (R. 262, Defs.' Facts ¶ 49.) Inmates may bang on the cell doors to alert officers to problems during the night shift. (*Id.* ¶ 50.) Although the cell doors are unlocked in the early morning for breakfast, not all inmates get breakfast. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 21, Johnson Dep. at 67.)

Despite the policy that officers should make physical security checks of the jail tier, Defendant officers and supervisors testified that correctional officers are not always required to actually walk around the tier for a security check. Officer Hernandez stated that officers can stay in the interlock and do a visual security check unless they see something suspicious. (*Id.*, Ex. 28, Hernandez Dep. at 98-101). Sergeant Monczynski believes officers need not do a physical security check if inmates are in the day room. (*Id.*, Ex. 23, Monczynski Dep. at 150.)

Officer Davis testified that she occasionally does her security check through the interlock window; Officer Toomey does security checks through the window if no back-up is available or sometimes if he is watching two tiers at the same time. (*Id.*, Ex. 18, Davis Dep. at 14; id., Ex.

20, Toomey Dep. at 56-58.) Sergeants Dew and Monczynski agree that in the absence of back-up, officers do a visual security check from the interlock. (*Id.*, Ex. 19, Dew Dep. at 53-54; *id.*, Ex. 23, Monczynski Dep. at 40.) Officer Facundo, however, stated that he would do a physical security check even without back-up. (*Id.*, Ex. 16, Facundo Dep. at 48.) Officer Thiemecke testified that if no officer or supervisor were immediately available for backup, he could find another backup. (*Id.*, Ex. 24, Thiemecke Dep. at 49.) Officer Sanchez did not believe that back-up was mandatory to enter the tier in April 2004. (*Id.*, Ex. 14, Sanchez Dep. at 111-12.) With a visual security check through the glass, the officer cannot see every area in the tier where prisoners could be, including the stairs going down to the cells and the hallways by the cells. (*Id.*, Ex. 37, Stroner Dep. at 47-48.) Officers also cannot see into cells or areas in the dayroom or the stairwells from the glass in the interlock. (*Id.*, Ex. 19, Dew Dep. at 54-55; id., Ex. 20, Toomey Dep. at 57.) Thiemecke testified that an officer cannot see inmates in the day room who are blocked by the stairs. (*Id.*, Ex. 24, Thiemecke Dep. at 33)

Inmates often lay down in the walkways outside of the cells or sleep on the dayroom floor. (*Id.*, Ex. 14, Sanchez Dep. at 123-24.) Facundo testified that it was common for inmates to sleep in the dayroom, and in the catwalks next to the cells. (*Id.*, Ex. 16, Facundo Dep. at 25, 67-68.) An inmate can refuse to go out for recreation and stay in to rest if he is sick or if he cannot walk. (*Id.*, Ex. 28, Hernandez Dep. at 131-32). When detainees are sleeping in the day room or catwalks or cells, officers should wake them during security checks to make sure they are alive. (*Id.*, Ex. 16, Facundo Dep. at 70.)

Defendant officers also testified that if they are "cross-watching", they may make security checks through the television monitor of the other tier, and through the interlock glass of the tier

14

where the officer is. (*Id.* at 58; id., Ex. 26, Stroner Dep. at 46-47, 53.) The monitor shows the day room area, but not the cells or the walkways outside of the cells. (*Id.*, Ex. 26, Stroner Dep. at 54; *id.*, Ex. 14, Sanchez Dep. at 114, 124.) Sergeant Stroner testified that in April 2004, it was routine for several monitors to be broken every day, sometimes for more than a day or two. (*Id.*, Ex. 26, Stroner Dep. at 61, 63.) Stroner would only note a broken monitor in his sergeant's log if all the monitors were broken at the same time for a long period of time. (*Id.*) If the 1-M monitor in Tier 1-L is not working, the officer cannot see into 1-M if cross-watching from 1-L. (*Id.*, Ex. 16, Facundo Dep. at 23) There is no clear sightline between tiers 1-M and 1-L. (*Id.* ¶ 66.) Noise does not easily permeate through the glass that separates the tiers. (*Id.*) An officer in 1L could not hear an inmate in his cell in 1M. (*Id.*, Ex. 26, Stroner Dep. at 70-72.) Lieutenant Krzyzowski testified that understaffing at the jail is a chronic problem that he has discussed with his supervisors. (R. 262, Defs.' Facts ¶ 38.)

During the night while inmates are sleeping, officers are still required to do security checks every thirty minutes. (R. 262, Defs.' Facts ¶ 33; R. 344, Pl.'s Resp. to Defs.' Facts ¶ 33.) Each cell door has a chuckhole, or opening, that the officer could (with the aid of a flashlight) peer into to view inmates. (*Id.*) Inmates frequently stuff things in chuckholes for privacy or other reasons, such as obstructing air drafts, but officers are supposed to remove the obstruction if they cannot see through the chuckhole. (*Id.*, Ex. 19, Dew Dep. at 136; *id.*, Ex. 23, Monczynski Dep. at 131; *id.*, Ex. 26, Stroner Dep. at 108-09; *id.*, Ex. 28, Hernandez Dep. at 127; *id.*, Ex. 21, Johnson Dep. at 26-27.) Officers Houston, Sanchez, and Johnson stated that they would look into the cell with a flashlight and check for movement to make sure the inmates were alive. (*Id.*, Ex. 21, Johnson Dep. at 24; *id.*, Ex. 22, Houston Dep. at 11; *id.*, Ex. 14, Sanchez Dep. at 12-13.)

15

There may be a blind spot in some corner cells. (*Id.*, Stroner Dep. at 69-70.)

It takes five to ten minutes to do a security check. (*Id.*, Ex. 18, Davis Dep. at 45; *id.*, Ex. 24, Thiemecke Dep. at 119; *id.*, Ex. 21, Johnson Dep. at 26.) All of the officer Living Unit Logs from April 24 to April 30, 2004, state that the Division 5, Tier 1-M officer—even when cross-watching—performed every required security check.

## B.    Requests for Medical Attention

Officers are trained to contact their supervisor whenever they come into contact with an inmate who appears or claims to be sick, and the supervisor determines whether Cermak should be called. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 35; R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 53, 56.) Monczynski, Thiemecke, and Krzyzowski testified, however, that in emergency situations or when a supervisor is not available, an officer does not need a sergeant's approval to call Cermak when an inmate is sick. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 24, Thiemecke Dep. at 139; *id.*, Ex. 23, Monczynski Dep. at 31; *id.*, Ex. 31, Krzyzowski Dep. at 52.)

The defendant officers disagree on the extent of evaluation they may make of an inmate requesting medical attention. Officers are not trained to recognize illnesses. (*Id.* ¶ 97.) Sergeant Dew claims that if an inmate makes a verbal medical request to an officer, the officer will evaluate the seriousness of the claim before contacting their supervisor to assess the situation. (*Id.*, Ex. 19, Dew Dep. at 29-30.) He testified: "If you know inmates, inmates tend to lie." (*Id.* at 127.) By contrast, Stroner and Davis testified that they always contact Cermak if an inmate looks sick or requests medical assistance, whether they believed the inmate was sick or not. (*Id.*, Ex. 26, Stroner Dep. at 11-12, 120; *id.*, Ex. 18, Davis Dep. at 42.)

If one inmate requested medical attention on behalf of another inmate, the officer would

16

have a duty to talk to the sick inmate or the sergeant. (*Id.*, Ex. 26, Stroner Dep. at 40; *id.*, Ex. 18, Davis Dep. at 38; *id.*, Ex. 21, Johnson Dep. at 16.) If the officer was in the interlock while the inmates were in their cells, he would not know if there was a problem in a cell unless a cellmate got the officer's attention by hollering or banging on doors. (*Id.*, Ex. 22, Houston Dep. at 45.)

The smell of vomit would not necessarily tip off the officers that an inmate was sick. Sergeant Dew testified that he would not know if an inmate threw up in his cell because "you smell vomit a lot in the jail. Doesn't mean somebody threw up. That place stinks." (*Id.*, Ex. 19, Dew Dep. at 63-64.) If an inmate threw up in the day room, inmate workers would probably clean it up, and if an inmate threw up in his cell, he or his cellmates would probably clean it up. (*Id.*, Ex. 18, Davis Dep. at 47-48; *id.*, Ex. 21, Johnson Dep. at 65.)

To obtain a medical request form, the detainee would have to knock on the interlock door where the medical request forms are kept in an open slot on the side of the locked request box. (*Id.*, Ex. 21, Johnson Dep. at 66.) Stroner testified that when an officer hands out a medical request form, he should instruct the detainee to give the form to the officer when he was finished filling it out. (*Id.*, Ex. 26, Stroner Dep. at 10.)

An officer may receive a medical request form from an inmate directly or the inmate may slip them under the interlock door. (*Id.*, Ex. 18, Davis Dep. at 16-17.) Most of the officers do not read the forms, they just put them in the medical request box after they are filled out. (*Id.*; id., Ex. 21, Johnson Dep. at 66; *id.*, Ex. 16, Facundo Dep. at 67-81; *id.*, Ex. 14, Sanchez Dep. at 29; *id.*, Ex. 26, Stroner Dep. at 36-38; id., Ex. 22, Houston Dep. at 72.) Thiemecke, however, puts the completed medical request forms right back in the side pocket of the box with the blank forms or lays them on top of the box. (*Id.*, Ex. 24, Thiemecke Dep. at 135.) Officers do not have

17

keys to the locked medical request box. (R. 262, Defs.' Facts ¶ 36.)

Callie Baird, the executive director of the CCDOC from 2003 until November 2004, testified that in response to inmate complaints regarding access to medical care, she tried to improve Cermak's response time, better ensure their daily tier visits, and improve documentation of requested and received medical attention. (R. 369, Defs.' Supp'l Ex. 32, Baird Dep. at 42-43, 70-71.) Furthermore, the CCDOC stressed to officers that they are not medical personnel and should not make any diagnosis, just call for medical attention. (*Id.* at 75.)

## IV. The Events of April 24 through April 30, 2004

### A. April 23, 2004

On Friday, April 23, 2004, Smith was arrested and charged with possession of a controlled substance. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 9.) Smith was arrested at the home of his friend Darius Williams. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 7, Williams Dep. at 27.) Williams saw Smith the day before his arrest, and he thought that Smith looked normal. (*Id.*)

### B. April 24, 2004

On Saturday, April 24, 2004, Cermak gave Smith the customary general health examination for incoming detainees which included, among other things, a chest X-ray, a blood pressure screening, and the taking of medical history from Smith. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 10.) Cermak's Medical Intake Form for Smith indicates that Smith was on medicine for high blood pressure, and that he used tobacco and alcohol. (R. 348, Ex. 22, Katz Dep., 4/24/04 Intake Form.) The Form indicated that Smith did not need methadone (used for drug withdrawal). (*Id.*) After being booked and processed, Smith was placed within the general prison population in Division 5, Tier 1-M. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 10.)

18

On that day, Facundo was the officer assigned to monitor both Tier 1-M and Tier 1-L during the day shift (7 a.m. to 3 p.m.). (*Id.* ¶¶ 81-82.) Facundo's log stated that he performed sixteen security checks for each tier. (*Id.*) Sergeant Dew was the area supervisor for Tier 1-M and Tier 1-L. (*Id.*) Facundo noted on his log that cross-watching was a "major safety and security risk!" (*Id.*) There were no medical staff visits to Tier 1-M during the day shift on April 24. (*Id.*) CMTs Lacy and Bradley were on duty, and Westbrook and Patton were off that day. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 45, Lacy Dep. at 46-47.)

Detainees Cory Mitchell ("Mitchell") and Carlos Matias ("Matias") became Smith's cellmates in Division V, Tier 1-M. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 3.) According to Mitchell, when Smith first arrived at their cell, he had a cough and runny nose, but was otherwise talkative and did not complain of illness. (*Id.* ¶ 66.) Matias testified in his deposition that Smith was brought into his cell at approximately 3:00 p.m., during the start of the afternoon shift (3:00 p.m. to 11:00 p.m.), "walking like dizzy . . . kind of walking like sick," and "he started throwing up." (*Id.*, Ex. 13, Matias Dep. at 10-12.)[9] Matias testified that he asked Smith if he was "dopesick" (*i.e.*, was suffering from drug withdrawal), and Smith responded that he "don't mess around with no dope." (*Id.*) Matias testified that he and Smith also told an African-American female nurse that Smith was sick and throwing up, but she did not help.[10] (*Id.* at 21, 26-27.)

---

[9] As Matias's deposition has been taken, the motion in limine by Defendants Westbrook, Bradley, Lacy, Nelson, Patton, West, and Cook County to bar testimony of Carlos Matias (R. 309) as well as the motion in limine by Defendants Sheahan, Monczynski, Sanchez, Davis, Dew, Facundo, Hernandez, Houston, Johnson, Krzyzowski, Stroner, Thiemecke, and Toomey to bar Matias' testimony (R. 270) are denied as moot.

[10] Westbrook was the only African-American female CMT working in Division V, Tier 1-M at the relevant time.

Matias claims that the nurse dismissed Smith's symptoms as drug withdrawal. (*Id.*)

Officer Vasquez was assigned to monitor both Tier 1-M and Tier 1-L during the night shift—11 p.m. April 24, 2004 to 7 a.m. April 25, 2004.[11] (R. 368, Defs.' Resp. to Pl. Facts ¶¶ 79-80.) Sergeant Monczynski was the area supervisor responsible for Tier 1-M and 1-L during this shift. (*Id.*) Vasquez indicated on his 1-M and 1-L logs that cross-watching tiers 1-M and 1-L posed a security risk. (*Id.*)

### C.    April 25, 2004

On Sunday, April 25, Officer Ruzanski was assigned to monitor both Tier 1-M and Tier 1-L during the afternoon shift. (R. 368, Defs.' Resp. to Pl. Facts ¶¶ 83-84.) His log stated that he performed 17 security checks for both Tier 1-M and 1-L and that cross-watching tiers 1-M and 1-L posed a security risk. (*Id.*) No medical staff visits occurred during that shift. (R. 348, Ex. 56, 4/25/04 1-M Tier Log.) Officer Thiemecke covered for Ruzanski during his break from 5 p.m. to 6 p.m., and wrote down that the cross-watching was a security risk. (*Id.*, Ex. 57, 4/25/04 1-L Tier Log.) That day, CMTs Lacy and Bradley were on duty. (*Id.*, Ex. 45, Lacy Dep. at 49.)

Matias testified that on April 25, Smith "was doing worse, throwing up and throwing up more and more. . . . ." (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 29.) He saw Smith laying down on the floor in the day room and going to the bathroom to throw up. (*Id.*) Matias said Smith sometimes would not make it to the bathroom, and Matias would clean up the vomit. (*Id.* at 29-30.) Matias stated that he tried to get help for Smith from the officers, but

---

[11] Defendants, Plaintiff, and the various deponents have differed in their description of this shift as the previous day's "night shift" (here, April 24) or the next day's "night shift" (here, April 25). In the interest of consistency and clarity, this Court will apply the term "night shift" to the day on which the shift starts; *i.e.*, the last of the three shifts of the day.

when he asked Ruzanski to let Smith back in the tier so Matias would not have to clean up his vomit anymore, Ruzanski locked Matias in his cell. (*Id.* at 32-35.)

### D. April 26, 2004

Officer Davis was assigned to Tier 1-M and Sergeant Dew was the area supervisor during the day shift (7:00 a.m. to 3:00 p.m.) on Monday April 26, 2004. (R. 348, Ex. 4, 4/26/04 Tier Log.) No Cermak personnel visited Tier 1-M during that shift. (*Id.*) Davis testified in her deposition that she does not remember Smith. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 12.) CMT Westbrook was on duty that day. (R. 348, Ex. 45, Lacy Dep. at 49-50.)

On this date, the video monitor for Tier 1-M in the Tier L-1 interlock was inoperable. (R. 262, Defs.' Facts ¶ 39.) Officer Toomey was assigned to monitor both Tier 1-M and Tier 1-L during the afternoon shift (3 p.m. to 11 p.m.), and the area supervisor was Sergeant Stroner. (R. 368, Defs.' Resp. to Pl. Facts ¶¶ 87-88.) Toomey's log states that he performed 16 security checks for both tiers. (*Id.*) Toomey indicated on the Tier Log that he could not be on two tiers at same time. (*Id.*) He also noted that the "video monitor for 1M does not work!" (R. 348, Ex. 36, 4/26/04 Tier Log.) No medical staff visited during this shift. (*Id.*)

Officer Williams was assigned to monitor Tier 1-M and Tier 1-L during the night shift on April 26, 2004. (R. 368, Defs.' Resp. to Pl. Facts ¶¶ 85-86.) His log states he performed 16 security checks for both tiers. (*Id.*) While Williams' Tier Log states that he took a break from 1 a.m. to 2 a.m., it does not indicate whether there was a relieving officer. (R. 348, Ex. 58, 4/26/04 1-M night shift Tier Log.) Officer Williams was supervised by Sergeant Gradowski. (*Id.*)

### E. April 27, 2004

Officer Davis was assigned to Tier 1-M during the day shift on Tuesday, April 27, 2004,

supervised by Dew. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 33, 55.) Dew testified that he has no memory of Smith. (R. 344, Pl.'s Resp. to Defs.' Facts ¶ 20.) The Officer's Living Unit Log stated that Davis cross-watched another tier from 10:00 a.m. to 11:00 a.m., and from 1:05 p.m. to 2:00 p.m, and that this was a "Major security risk." CMT Westbrook visited the tier 1-M during the day shift. (*Id.*) CMTs Lacy and Patton were also on duty that day. (Ex. 45, Lacy Dep. at 52.)

That morning, Smith appeared in the Circuit Court of Cook County for the Fifth Municipal District located in Bridgeview, Illinois, for a violation of bail bond hearing. (*Id.* ¶ 11. R. 369; Defs.' Supp'l Ex. 1, Pl.'s Resp. to Cook County's Requests to Admit ¶ 1.) Smith left the jail at 5:30 a.m., and returned at 1:30 p.m. (*Id.*, Ex. 35, Division 5 Movement Log.) During the hearing, Smith did not state on the record that he had health problems or was being denied medical care. (*Id.* ¶ 11. R. 369; Defs.' Supp'l Ex. 1, Pl.'s Resp. to Cook County's Requests to Admit ¶¶ 5-6.) Donna Norton, the assistant state's attorney at the court proceedings, testified that the hearing probably lasted at most two minutes. (*Id.*, Ex. 5, Norton Dep. at 15.) While Smith was in court, Darius Williams and Smith's girlfriend, Teshana Malone, stopped by the jail to visit him. (*Id.*, Ex. 7, Williams Dep. at 64-65.)

Around lunchtime, detainee Mitchell testified that he spoke to a Cook County Jail guard in the Tier 1-M dayroom about Smith's illness, but the guard denied Mitchell's request for medical assistance for Smith. (R. 344, Pl.s' Resp. to Defs.' Facts ¶ 12.) Mitchell also heard other detainees tell a guard that Smith was sick and had been lying on the floor all week. (*Id.* ¶ 68; R. 348, Ex. 1, Mitchell Dep. at 85-86.) According to Mitchell, Smith told him that he was either asleep or he otherwise missed Cermak personnel when they came to the tier. (*Id.*) Mitchell observed that Smith was visibly ill and getting progressively worse, including vomiting,

shaking, and not moving very much, often with a blanket pulled over him. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 66; *see also, id.*, Ex. 3, Haynes Aff.¶ 2 (Smith visibly ill).) Smith shivered, smelled sickly, gave his meals away to other detainees, could not keep conversations with people, and could not move well. (R. 348, Ex. 1, Mitchell Dep. at 63, 68, 100-02.) In the mornings, Smith did not get up until the guard forced him to leave his cell. (*Id.* at 106.)

Other detainees helped Smith walk by letting him lean on them and by carrying his things. (*Id.* at 109.) Sometimes, Smith would just lay on the dayroom floor and other detainees would walk around him. (*Id.* at 59-60, 63-64; *see also, id.*, Ex. 3, Haynes Aff.¶¶ 2-3.) Smith's cellmates—Mitchell and Matias—as well as Tier 1-M detainees Titus Haynes and Alan Robinson, testified that they helped Smith fill out and submit medical request forms. (*Id.* at 64, 69; *id.*, Ex. 3, Haynes Aff. ¶ 3; *id.*, Ex. 66, Robinson Aff.; *id.*, Ex. 1, Matias Dep. at 43-45.) Detainee Robinson further attested that he complained about Smith's condition to CMT Westbrook, including his loss of energy, inability to eat, serious weight loss, and constant vomiting. (*Id.*, Ex. 66, Robinson Aff.)

Officer Toomey worked 3 p.m. to 11 p.m. on Tier 1-M on April 27, 2004, supervised by Stroner. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 35.) The video monitor for Tier 1-M in the Tier 1-L interlock was still inoperable. (R. 262, Defs.' Facts ¶ 39.) The officer relieving Toomey during his break from 5 p.m. to 7 p.m. noted that he was cross-watching Tiers 1-M and 1-L, and that the video monitor for 1-M was still not working, and Toomey cross-watched both tiers from 7 p.m. until the end of his shift. (R. 348, Ex. 27, 4/27/04 Tier Log.) Toomey testified that before lock-up, Smith had been laying on the floor next to his cell. (R. 368, Defs.' Resp. to Pl. Facts Ex. 20, Toomey Dep.) When Toomey told Smith it was time to lock up, Smith stood up, picked

up his blanket, and walked into his cell without assistance. (*Id.* at 114-15.) Toomey did not think Smith appeared to be sick. (*Id.* at 21, 115.) Toomey testified that he never saw Smith vomit, and no one asked him to summon medical assistance for Smith. (*Id.* at 21, 116.)

That evening, Maurice Merritt, Smith's cousin, and Darius Williams came to visit Smith at 8:15 p.m. and stayed until 8:50 p.m. (R. 369, Defs.' Supp'l Ex. 6, 4/27/04 Division 5 Visitor Log.) Williams testified that Smith looked sick, "really bad, like he had lost like 10 to 20 pounds in two days," and Smith said that he felt really sick, but that the guards would not take him to the doctor because they thought he was "BS'ing." (*Id.*, Ex. 7, Williams Dep. at 33-34, 45-46.) Smith's face looked like it was sunken in and he was shaking, and Smith told Williams that he felt "like I'm going to die in here." (*Id.* at 36-37.) Williams testified that Smith told him he had put in a request for medical attention. (*Id.* at 39) Teshana Malone, Smith's girlfriend, testified that she talked with Smith on the telephone that evening, and that he also told her he did not feel well. (R. 262, Defs.' Facts ¶ 72.)

That night, Office Lazinek was assigned to both Tier 1-M and 1-L in Division 5 during the night shift, and Lt. Krzyzowski was the area supervisor.[12] Lazinek was the officer assigned to monitor Tier 1-M during the night shift. (R. 368, Defs.' Resp. to Pl. Facts ¶¶ 89-90.) The Log stated that Lazinek performed 16 security checks on both tiers every half hour. (*Id.*) Lazinek wrote that it was a "major security risk" for the officer to be in two places at one time. (*Id.*) In

---

[12] While the parties agree that Officer Lazinek cross-watched Tiers 1-L and 1-M during the night shift on April 27 and Officer Houston cross-watched Tiers 1-L and 1-M during the night shift on April 28, they also, seemingly contradictorily, allege that Officer Johnson cross-watched Tiers 1-M and 1-L during the April 27 and April 28 night shifts. (*See* R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 57, 91-92; R. 262, Defs.' Facts ¶ 31.) None of these officers has any memory of Smith. (R. 262, Defs.' Facts ¶ 34.)

addition, the tier 1-L video monitor, which permits officers to monitor part of the tier 1-M dayroom while the officers check tier 1-L, was inoperable. (*Id.*; R. 262, Defs.' Facts ¶ 29.)

**F.    April 28, 2004**

On Wednesday, April 28, Davis worked the day shift in Tier 1-M, Division V, and Hernandez was the Area Supervisor. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 36, 56.) CMT Westbrook visited Tier 1-M during the day shift and dispensed medications. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 4-5, 37, 131.) She has no recollection of Smith. The Officer Living Unit Log states that all Tier 1-M inmates moved without incident to recreation (to the day room). (R. 368, Defs.' Reply Ex. 9, Off. Living Unit Log from 4-28-04, 7 a.m. to 3 p.m.) That day, CMTs Westbrook, Patton, and Bradley were on duty. (R. 348, Ex. 45, Lacy Dep. at 52)

In his affidavit, detainee George Robotis attested that on April 28th, 2004, he saw Matias give a female nurse at least two medical request forms on Smith's behalf. The nurse replied with words to the effect of, "That's what you get for using drugs." (R. 348, Ex. 8, Robotis aff. ¶ 2.) In his affidavit, Robotis also attested that on that day, he personally complained to the nurse that visited Tier 1-M about Smith's condition. (*Id.* ¶ 6.) Detainee Haynes attested that he and other detainees complained to Officers Toomey and Davis about Smith's illness on April 28, and April 29, 2004, during both the day and evening shift. (*Id.*, Pl.'s Ex. 3, Haynes Aff ¶ 3.)

Officer Thiemecke worked the afternoon/evening shift (3 p.m. to 11 p.m.) in Tier 1-M, Division V on April 28, and Stroner was the Area Supervisor. (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 36, 53.) Thiemecke noted in the Tier Log that he cross-watched Tiers 1-L and 1-M from 4:08 p.m. to 5:00 p.m., and again from 6:00 p.m. to 8:20 p.m., and that this was a security risk. (R. 348, Ex. 19, 4/28/04 evening Tier Log.) In addition, Thiemecke wrote that he submitted two

forms stating that the video monitor for Tier 1-M in the Tier 1-L interlock was still not operable. (*Id.*; R. 262, Defs.' Facts ¶ 48.) Hernandez did not personally observe any inmate exhibiting symptoms of serious illness. (R. 346, Pl.'s Resp. to Cook County's Rule 56.1 Statement ¶ 8.) Thiemecke testified that he did not hear any inmates coughing or vomiting during the afternoon shift on the 28th, and he did not receive any complaints from any inmate about chest pains. (Defs.' Ex. N to Mot. for Summ. J at 114.)

That evening Smith called his sister, Shania Stubbs, to patch in his friend Darius Williams on a three-way call. (R. 369, Defs.' Supp'l Ex. 7, Williams Dep. at 31, 41-42.) Williams testified that Smith told him he was feeling really sick, and that he repeatedly told the guards he was sick, but they would not take Smith to the hospital. (*Id.* at 42-43.) Stubbs does not recall Smith saying he was sick during that conversation. (R. 262, Defs.' Facts ¶ 73.)

Smith's cellmate Matias testified that by April 28, 2004, Smith could barely even walk. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 61.) Matias dragged Smith outside of the cell into the hallway when he could not do it himself. (*Id.* 167-68.) Matias testified that officers saw Smith during the day shift when they come to unlock the cell doors, and they knew he was sick. (*Id.* at 61-62.) Matias further testified that while he was in Cermak getting his methadone treatment, he brought with him a written request form for Smith. (*Id.* at 78.) He either gave the form to the guard or to an African-American Cermak nurse. (*Id.* at 78, 80-81.) He testified that he also spoke with an Indian Cermak staff member about Smith and gave the medical person Smith's name and cell number. (*Id.* at 79.)

On April 28, 2004, Officer Houston was assigned to monitor Division 5, Tier 1-M between the hours of 11:00 p.m. and 7:00 a.m., supervised by Sergeant Monczynski. (R. 262,

Defs.' Facts ¶ 49.)  Houston does not remember Smith or any inmate appearing lethargic, lying around, or vomiting that night.  (R. 368, Defs.' Resp., Ex. 22, Houston Dep. at 72.)

## G.  April 29, 2004

On Thursday, April 29, 2004, the video monitor for Tier 1-M in the Tier L-1 interlock was still inoperable.  (R. 262, Defs.' Facts ¶ 39.)  Facundo was the officer assigned to monitor both Tier 1-M and Tier 1-L during the day shift, and Hernandez was the area supervisor.  (R. 368, Defs.' Resp. to Pl.'s Facts ¶¶ 93-94.)  Facundo stated on the tier log that cross-watching Tiers 1-M and 1-M was a "Major Safety and Security Risk!"  (R. 348, Pl.'s Ex. 7, 4/29/04 day shift tier log.)  His log represents he performed 16 security checks on both tiers during his shift. (*Id.*)  There is no record of any medical person visiting Tier 1-M on April 29, 2004.  (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 130.)  No daily encounter forms for Division V, Tier 1-M on April 29, 2004, have been found.  (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 129.)  On April 29, 2004, only CMT Bradley was present from the regular Division 5 Cermak staff.  (Ex. 45, Lacy Dep. at 53.)

Detainee Robotis attested that on April 29, 2004, he complained to every guard on Tier 1-M that Smith was sick, and he recalls several other detainees doing the same during the day and evening shifts.  (R. 348, Pl.'s Ex. 8, Robotis Aff. ¶¶ 3, 6.)  Cellmate Matias recalls asking Officer Facundo for medical request forms and filling them out for Smith.  (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 18-19.)  Matias testified that he accompanied Smith when he slid his completed medical request form through the interlock door.  (*Id.* at 19-20.)  Matias remembers Facundo because "he is always trying to help people."  (*Id.* at 15-16.)  The morning of April 29, Matias testified that he also told a social worker that Smith was very sick and throwing up, but no one came to check on Smith or take him to the dispensary.  (*Id.* at 48-50.)

27

Toomey was assigned to Division 5, Tier 1-M for the 3:00 p.m. to 11:00 p.m. shift., and Stroner was the area supervisor. (R. 348, Ex. 7, afternoon shift 4/29/04 Tier Log.) No medical staff visited during the afternoon shift. (*Id.*) Toomey noted that the "Video monitor for 1M does not work," and that he was cross watching 1L and 1M from 6:00 p.m. to 7:00 p.m. and from 10 p.m. to 11:00 p.m. (*Id.*) Two detainees were moved into or out of Cermak that afternoon. (*Id.*) Toomey recalls locking Smith back up in his cell before the end of his shift on April 29, 2004, but he never saw Smith vomit, and he does not remember whether Smith was coughing or sneezing that evening. (R. 262, Defs.' Facts ¶¶ 27-28.)

Detainee Gilbert Yorke became Smith's and Matias's cellmate in Division V, Tier 1-M during the afternoon shift on April 29, 2004, after cellmate Mitchell was discharged around 6:30 p.m.. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 3; R. 262, Defs.' Facts ¶ 70.) When Yorke first entered the cell, Smith was laying on the mattress on the floor. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 22.) Yorke testified that Smith appeared sick and coughing. (R. 369, Def.'s Supp'l Ex. 12, Yorke Dep. at 18.) Smith was covered in his blanket the whole time. (*Id.*) Yorke did not see Smith vomit, moan, or groan. (R. 262, Defs.' Facts ¶ 71.)

Smith's sister spoke with him again by telephone on April 29. Stubbs testified that during that call, Smith told her he had not been feeling well, and that he had been asking to go to the hospital all week and was hoping to go the next day. (R. 369, Defs.' Supp'l Ex. 10, Stubbs Dep. at 29, 36.) Smith said he felt like he had the flu or a very bad cold. (*Id.* at 37.) Smith also spoke with his girlfriend and Darius Williams that night and informed them that he was still ill. (*Id.* at 31-32.)

The record contains a Detainee Health Service Request Form, dated April 29, 2004, and

filled out by, or on behalf of Smith. (R. 348, Ex. 30, Smith Med. Request.) The form states that Smith's problems are: "fever, bad cough, chest hurts when I breath in, problem sleeping, vomiting," and had been occurring for two weeks. (*Id.*) The Sheriff's Incident Report states that the medical request form for Smith was found in Tier 1-M's interlock medical box. (R. 348, Ex. 18, Sheriff's Report.) Furthermore, in his interview for the Sheriff's report, Matias stated that Smith had complained of not seeing the paramedics or doctors, and Matias had helped Smith fill out a detainee medical form on April 29 and put it in the interlock medical request box. (*Id.*) Dr. Raba, chief medical officer at Cermak in April 2004, testified in his deposition that Matias showed Raba a sick call request he had helped Smith fill out, but had not submitted it yet. (Ex. 70, Raba Dep. at 110.)

**H.    April 29, 2004 (night shift) to early morning April 30, 2004**

Matias testified that by the night of April 29, Smith was not even talking. Matias dragged Smith back into the cell when it was time to be locked up for the night, and Smith just laid down on his mattress on the cell floor "like he was dead." (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 56-57.) Sanchez was assigned to monitor Division 5, Tier 1-M between the hours of 11:00 p.m. and 7:00 a.m. that night. (R. 262, Defs.' Facts ¶ 58.) Monczynski was the area supervisor. (*Id.*) When Officer Sanchez's shift began at 11:00 p.m., the inmates were already locked in their cells. (*Id.*) That evening, Smith was sleeping on a mattress or cot on his cell floor. (*Id.*) The Tier Log stated that Sanchez was assigned to cross-watch Tiers 1-L and 1-M, and that he performed a security check every half-hour on both tiers. (R. 348, Ex. 24, 4/29/04 night shift tier log.) Sanchez noted that cross-watching was a "*security risk*" and that the monitor for 1-M was not operating. (*Id.*) Sanchez took a break from 1:00 a.m. to 2:00 a.m., and

Officer Burks relieved him. (*Id.*)

From 11:00 p.m. to 3:00 a.m., Sanchez testified that he did not hear any screaming, moaning, or gurgling sounds, or recall any inmate disturbances. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 14, Sanchez Dep. at 46.) Sanchez testified that he performed his security checks and that he recalls shining his flashlight on Smith at 3:00 a.m. and seeing Smith stir. (*Id.* at 80.) Sanchez clarified that Smith must have moved when he shined his flashlight because otherwise, Sanchez would not have "gone by him." (*Id.* at 14-15.)

That night, as on other nights, Matias had placed a cookie box in the peephole in the cell door after the doors were locked at night. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 70.) When the officers do their rounds counting inmates at night, they poke out the cookie box to look inside the peephole. (*Id.*) However, when Matias woke up the morning of April 30, 2004, the cookie box was still in the peephole. (*Id.*)

At approximately 3:35 a.m. on April 30, 2004,[13] the cell doors were unlocked (via a control panel in the interlock) for breakfast. (R. 262, Defs.' Facts ¶ 60.) At that time, no inmate approached Sanchez to report that Smith was ill. (*Id.*) After the inmates were all out of their cells, at approximately 3:40 a.m., Sanchez began the process of re-locking all the cell doors one at a time. (*Id.* ¶ 61.) Minutes later, an inmate allegedly approached Sanchez and told him that there was something wrong with another inmate. (*Id.*) Matias claims that he had tried to get the officer's attention before the doors were unlocked for breakfast by kicking the cell door, but

---

[13] In Defendant Cook County's Rule 56.1 statement of facts, they refer to the time of unlocking the cell doors as 3:55 a.m., yet the next paragraph explains that the doors were afterwards locked at 3:40 a.m. (R. 326 , Def. Cook County's Facts ¶¶ 8-9.) The Court presumes that this was a typographical error by Cook County.

Sanchez was sleeping in the interlock with his legs on the deck and did not wake up until Matias started screaming. (*Id.* at 57-58, 60, 70.)

When Sanchez arrived at Smith's cell, he found Smith on the floor flanked by his two cellmates. (R. 262, Defs.' Facts ¶ 61.) Smith's eyes were wide open; he was breathing, but was non-responsive and twitching. (*Id.* ¶ 62.) Matias said Smith was "shaking, and his eyes went back to the head. . . . You could just see white." (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 13, Matias Dep. at 56-57.) When Yorke woke up for breakfast around 4:00 a.m., he heard Smith moaning, and Smith appeared to be having seizures. (R. 368, Defs.' Resp. to Pl.'s Facts ¶ 24; R. 348, Ex. 18, Sheriff incident report.)

Sanchez contacted his supervisor, Sergeant Monczynski, via radio at about 3:50 a.m. or 3:55 a.m. (R. 262, Defs.' Facts ¶ 62; R. 348, Ex. 18, Sheriff's Report.) Although Sanchez did not tell him it was an emergency, Monczynski arrived at Smith's cell within minutes. (R. 262, Defs.' Facts ¶ 62; R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 23, Monczynski Dep. at 85.) At 3:55 a.m., upon seeing Smith, Monczynski went to the interlock and called Cermak. (*Id.* ¶ 63; R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 23, Monczynski Dep. at 92.) He returned to Smith's cell and noted that Smith was still twitching, but not groaning or making any other noises. (*Id.*) Monczynski returned to the interlock and called Cermak again and told them to send someone. (*Id.*; R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 23, Monczynski Dep. at 94, 145.)

CMT Myvett received the call informing him of a sick inmate. (R. 368, Def.'s Resp. to Pl.'s Facts ¶ 26.) Myvett stated that the call came at approximately 4:06 a.m., and the caller stated that the detainee was conscious. (R. 348, Ex. 18, 5/5/04 Supp'l Sheriff's Report.) According to the Sheriff's incident report, it took Myvett 15-20 minutes to arrive after the

Sergeant called them. (*Id.*, Sheriff's Report.) Myvett stated that he arrived at 4:09 a.m. (*Id.*, 5/5/04 Supp'l Sheriff's Report.) Myvett arrived at the cell without a medical bag and attempted, without success, to get Smith to respond. (R. 262, Defs.' Facts ¶ 64; R. 348, Ex. 18, Sheriff's Report.) Myvett stated that he checked Smith's vitals with medical equipment he had in his fannie bag. (*Id.*, 5/5/04 Supp'l Sheriff's Report.) Monczynski told the Sheriff's investigator that he wanted Myvett to call 911, but Myvett said there was no need. (*Id.*; R. 348, Ex. 18, Sheriff's Report.) Lieutenant Germany, Monczynski's supervisor, or Myvett, called for a gurney to be brought to Tier 1-M. (*Id.*) A female paramedic arrived with the gurney 10 minutes later. (*Id.*)

Smith was transferred from Cook County Jail to Cermak at approximately 4:27 a.m, arriving at 4:35 a.m. (*Id.*) The Sheriff's Report stated that Smith was unresponsive upon arrival in the Cermak emergency room. (*Id.*) He had a fever of 104, high blood pressure (176/100), and a pulse of 116. (*Id.*) Cermak notified Chicago paramedics of Smith's condition at 4:55 a.m., and at about 5:05 a.m., Smith began having difficulty breathing. (*Id.*) He went into respiratory arrest before leaving the ER. (R. 348, Ex. 22., Katz Dep., Ex. 12, ER note by Dr. Anaglate.) Smith was transported from Cermak to Mt. Sinai Hospital at 5:10 a.m. (*Id.*, Ex. 18, Sheriff's Report.)

The Chicago Fire Department pre-hospital care report from April 30, 2004, stated that there was a delay transporting Smith from the Jail to the hospital because no escort was available. (*Id.*, Ex. 21, Pre-Hospital Report.) Smith became pulseless and stopped breathing while waiting for information from Cermak, but Cermak staff did not know how long Smith was unresponsive before they found him. (*Id.*) The ambulance crew intubated him, but Smith remained unresponsive while CPR continued en route to the hospital. (*Id.*)

Smith arrived at Mt. Sinai Hospital at approximately 5:20 a.m. with no response. (R.

348, Ex. 18, Sheriff's Report.) Smith was pronounced dead at the hospital at 5:40 a.m. (*Id.*) At

Smith's autopsy on April 30, 2004, the doctor determined that Smith died of meningitis and

pneumonia. (*Id.*, 5/5/04 Supp'l Sheriff's Report.) Smith's death certificate states that he was

"D.O.A.", or dead on arrival, at Mount Sinai. (*Id.*, Ex. 25, Death Cert.)

## V.    Investigation into Smith's Death

After Smith died, Dr. Anaglate, a Cermak ER doctor who worked on Smith, stated that he

had "heard that inmate Smith had been complaining of being sick, and he seemed to be in a coma

state and was not responsive to anything." (R. 348, Ex. 18, Sheriff's Report.) Detainee Yorke

testified that after Smith died, inmates were discussing whether any officers would get into

trouble for ignoring Smith's medical requests. (R. 369, Def.'s Supp'l Ex. 12, Yorke Dep. at 43.)

In investigating Smith's death, Dr. Raba interviewed only one detainee: Matias. (R. 368,

Defs.' Resp. to Pl.'s Facts ¶ 135.) Matias told investigators that Smith had been sick a lot lately;

he could not get up, was sleeping a lot, not eating, and vomited three times. (R. 348, Ex. 18,

Sheriff's Report.) In his first of two meetings with Matias, Raba testified that Matias was mainly

concerned about his own health—fearing that he had contracted meningitis—but he indicated

that Smith had not been sick long, perhaps showing symptoms of a cold that week. (Ex. 70,

Raba Dep. at 113-15.) The second time Raba spoke with Matias, to check on him after he took

prophylactic antibiotics, Raba testified that Matias told him Smith had been sick for a couple of

days. (*Id.* at 129.) Raba wrote an opinion letter on March 30, 2006, concluding that there was no

failure by Cermak or CCDOC to provide access to medical care to Smith. (*Id.* at 164, 167.)

Raba and CMT Patton also met with a group of Tier 1-M inmates to calm their fears

about meningitis and offer antibiotics in case the meningitis was contagious (which it turned out

33

not to be). Patton recalls an inmate at the meeting stating that Smith died because he did not get proper medical care, but Raba does not. (R. 348, Pl.'s Ex. 73, Patton Dep. at 20, 27-28.)

## VI. Meningitis

Fever, cough, problems sleeping, vomiting, fever, and chest pain could be symptoms of meningitis and pneumonia. (R. 368, Defs.' Resp. to Pl. Facts ¶ 48.) Pneumococcal meningitis, of which Smith died, is nearly always fatal if not treated. (*Id.* ¶ 50.) Nevertheless, with the appropriate therapy in an otherwise healthy young adult, mortality is no more than 15 to 30%. (R. 348, Ex. 33, Katz Report.) Based on this review of the evidence in this case, Plaintiff's expert, Dr. Ben Katz, a professor of pediatrics with a sub-specialty in infectious disease, opined that Smith was exhibiting noticeable symptoms of meningitis at least since the daytime of April 29, 2004, and that if he had been treated with appropriate antibiotics nearly anytime on April 29, 2004 or before, he would not have died. (*Id.*; *id.*, Ex. 23, Katz Dep. at 50.) Dr. Katz further testified that meningitis and pneumonia can precede each other. (*Id.* at 22.) Most patients have obvious symptoms that no one would miss a day or two before the onset of meningitis, but some patients do not present until 12 to 24 hours before death. (*Id.* at 26, 32, 91.) As of 4 a.m. on April 30, 2004, however, it was probably too late to save Smith. (*Id.* at 76.)

Defendants' expert, Dr. Thomas Vescio, a specialist in internal medicine and adult infectious disease, agrees with Dr. Katz that antibiotic therapy perhaps earlier in the day on the 29th likely would have saved Smith. (*Id.*, Ex. 8, Vescio Dep. at 133-35.) Dr. Vescio testified that more than 50%—later stated as 25% to 75%—of pneumococcal meningitis cases only onset with severe symptoms such as coma and seizure within 24 hours of death if not treated, yet symptoms of pneumonia might present earlier. (*Id.*, Ex. 8, Vescio Dep. at 51-52, 55, 90.) Vescio

testified that the way the disease progresses can be markedly different in each individual. (*Id.* at 64.) Vescio opined that Smith's pneumococcal pneumonia started on April 29, 2004, and then progressed overnight to fulminant bacterial meningitis that resulted in his death. (*Id.* at 182.)

## LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999).

"Summary judgment cannot be used to resolve swearing contests between litigants," and a "court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. . . ." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (citations omitted). Accordingly, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (internal citations omitted). Summary judgment is not appropriate if there are disputed issues of fact remaining, or if the court must make "a choice of inferences" arising from undisputed facts. *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). "The choice between reasonable inferences from facts is a function of a fact-finder,

35

and when multiple reasonable inferences exist on a genuine issue of material fact, summary judgment will not be appropriate." *Id.*

## ANALYSIS

Plaintiff's Complaint alleges five counts against Defendants: (1) a Section 1983 claim against the individual Defendants for a violation of Smith's Fourteenth and Eighth Amendment rights; (2) a Section 1983 claim against the institutional Defendants for policies and practices that violated Smith's constitutional rights; and state law claims for (3) wrongful death, (4) a survival action; and (5) a claim for intentional infliction of emotional distress. (R. 150, Compl.)

## I. Section 1983 Claim Against Individual Defendants

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law. *Christensen v. Boone County, Ill.*, 483 F.3d 454, 459 (7th Cir. 2007). Plaintiff claims that Defendants violated Smith's Eighth and Fourteenth Amendment rights. The Eighth Amendment proscription on the infliction of cruel and unusual punishment requires that the government "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Among other things, these principles prohibit jail guards from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). The Due Process Clause of the Fourteenth Amendment extends this protection to pre-trial detainees, like Smith. *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005) (citing *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002)).

36

To establish a claim for violation of Smith's Eighth Amendment rights, Plaintiff must show that: (1) the danger to Smith was objectively serious or posed a substantial risk of serious harm; and (2) the prison official showed "deliberate indifference" to Smith's health or safety by failing to take reasonable measures to abate the risk. *Davis v. Carter*, 452 F.3d 686, 695-96 (7th Cir. 2006). Defendants argue that Plaintiff's claim fails on both prongs, and that a reasonable jury could not find that Smith's condition was objectively serious or that Defendants were deliberately indifferent to Smith's condition. Objective seriousness and deliberate indifference are generally questions for the jury. *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004).

### A.    Objectively Serious

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (internal quotations omitted). This encompasses medical conditions "far less critical than 'life threatening,' and includes conditions that may result in further significant injury or unnecessary pain and suffering." *Id.* at 1370-73. Indications of a serious medical need include: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *Id.* at 1373.

The testimony of Smith's cellmates (Matias, Mitchell, and Yorke), detainee Robotis, Smith's sister, and Darius Williams, as well as the testimony of the parties' meningitis experts, is sufficient to create a material issue of fact that Smith's illness was objectively serious. The detainees, Smith's sister, and Williams testified that Smith was complaining of being so ill that

he felt as if he would die; that Smith had lost an extreme amount of weight, that he was vomiting, that he could barely walk; and that he had other visible symptoms. The failure to treat such symptoms is not simply a refusal to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (holding that a failure to treat these symptoms does not rise to the level of a constitutional violation).[14]  In fact, the Seventh Circuit has recognized a variety of similar, and even less severe, medical conditions to be objectively serious. *See, e.g., Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (openly dislocated finger); *Johnson v. Doughty*, 433 F.3d 1001, 1003-04 (7th Cir. 2006) (hernia); *Norfleet v. Webster*, 439 F.3d 392, 394-95 (7th Cir. 2006) (arthritis); *O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (minor burns from lying in vomit); *Greeno v. Daley*, 414 F.3d 645, 649-51 (7th Cir. 2005) (heartburn and vomiting); *Zentmyer*, 220 F.3d at 810 (ear infection requiring prescription painkillers and antibiotics); *Cooper*, 97 F.3d at 916 (cuts, severe muscular pain, and a burning sensation in eyes and skin); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (broken wrist).[15]  The issue of the credibility of Plaintiff's witnesses' testimony is for the trier of fact, and is bolstered by the testimony of the parties' experts, who agree that the date of onset of symptoms of meningitis and pneumonia varies widely between people, rarely manifesting less than 24 hours before death, and

---

[14] Defendants' cite to a case describing preconditions for FMLA leave—*Miller v. AT&T Corp.*, 250 F.3d 820, 832 (4th Cir. 2001)—is irrelevant to our Eighth Amendment analysis.

[15] Defendants further argue that Smith's condition was not serious because he waited until April 29, 2006, to complete a detainee medical request form. (R. 261, Defs.' Mem. of Law in Supp. of Summ J. at 3.) As stated above, however, Plaintiff has presented evidence from multiple witnesses that either Smith or other detainees completed medical request forms for Smith even before April 29, 2004.

sometimes can appear up to 5 days before death. Accordingly, Plaintiff has presented a genuine issue of material fact as to the objective seriousness of Smith's condition.

### B.   Deliberate Indifference

Defendants next argue that even if Plaintiff established that Smith's condition constituted an objectively serious medical need, Plaintiff has not shown that Defendants acted with deliberate indifference to Smith's medical needs. (R. 366, Defs.' Reply at 7.) To prove deliberate indifference, Plaintiff must show that Defendants were subjectively aware of the substantial risk of serious harm to Smith and disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This is more than negligence, but need not be a purposeful or knowing infliction of harm. *Davis*, 452 F.3d at 695-96. "'Deliberate indifference' is simply a synonym for intentional or reckless conduct, and can be established indirectly through circumstantial evidence." *Id.* at 696. Plaintiff need not prove that the defendant was "exposed to information concerning the risk," because "actual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996). A string of negligent acts can also evidence a prison official's awareness of an inmate's exposure to a serious risk, but "showing deliberate indifference through a pattern of neglect entails a heavy burden." *Zentmyer*, 220 F.3d at 811 (quoting *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999)).

Defendants argue that Smith has not presented sufficient evidence that Defendants were aware Smith was sick. First, Defendants claim that Plaintiff's inability to specify which guards

and Cermak personnel received complaints about Smith's medical condition dooms Plaintiff's claim. (R. 366, Defs.' Reply at 8.) Defendants cite to *Harper v. Albert*, 400 F.3d 1052, 1065-66 (7th Cir. 2005), which held that the plaintiff must identify the individuals that violated his rights in order to satisfy the subjective indifference standard. In that case, the Seventh Circuit affirmed a judgment as a matter of law after a jury trial and clarified that it was the plaintiff's burden to identify, either through discovery or through evidence submitted at trial, those guards that allegedly violated his constitutional rights. *Id.*

While Plaintiff has not yet conclusively demonstrated that any of the named Defendants were aware of Smith's serious medical symptoms, Plaintiff has raised a genuine issue of material fact that the defendant officers and CMT Westbrook were aware. Contrary to Defendants' arguments, Plaintiff is not claiming that the prison officials were "collectively" responsible for responding to his alleged requests for medical attention. *See Zentmyer*, 220 F.3d at 811 (holding that deliberate indifference not shown where no evidence that any individual defendant failed to administer medication, but rather that officers were collectively were responsible for administering it.) Rather, Plaintiff is claiming that because the individual defendant officers and CMT Westbrook were on duty at the times when Plaintiff's witnesses testified that Smith was exhibiting obvious signs of serious illness, each of them must have been aware of Smith's illness. Officers were supposed to perform physical security checks of the entire tier every 30 minutes, and CMT Westbrook was supposed to make daily tier visits. In addition, several inmates testified that they directly informed the officers and CMT Westbrook (the African-American female Cermak CMT) of Smith's illness. While only Officer Facundo was specifically identified by name, some inmate witnesses were able to identify the specific shift during which they or

Smith allegedly made medical requests on Smith's behalf. Combined with the officer's daily tier schedules, this creates a genuine issue of material fact.

If Defendants learned of Smith's signs of severe illness, a jury may find that Defendants' failure to give Smith medical care until April 30, 2004, was reckless or deliberate conduct. *See Davis*, 452 F.3d at 696. Accordingly, drawing all inferences in Plaintiff's favor as the Court must at this stage, we find that a reasonable jury could conclude that the individual Defendants recklessly or intentionally allowed Smith to die from meningitis and pneumonia. *See Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005); *see also Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (opining that deliberate indifference may be shown when a non-medical prison official ignores an inmate's complaints).

The cases cited by Defendants are distinguishable. First, in *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999), medical officials actually responded to the inmate's complaints of illness, yet failed to diagnose him as having a serious ailment. *Id.* Likewise, in *Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006), the defendant inmate grievance counselor was not deliberately indifferent where, after becoming aware of the inmate's complaints of pain, he investigated the situation and made sure that the medical staff was monitoring and addressing the problem. Second, in *Zentmyer*, 220 F.3d at 811, the defendants were not found to be deliberately indifferent because plaintiff admitted that none of the defendants noticed any signs of physical injury from his ear infection. In contrast, Plaintiff claims that Smith's signs of illness were so obvious that the defendants must have been aware of them. Accordingly, Plaintiff has established a genuine issue of material fact for trial as to the individual Defendants.

## C. Supervisor Liability

Liability under Section 1983 arises only when the plaintiff can show that the defendant was "personally responsible for a deprivation of a constitutional right." *Zentmyer*, 220 F.3d at 811 (quoting *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996)). Accordingly, the doctrine of *respondeat superior* does not apply to § 1983 actions; supervisors may be held liable only if they caused or participated in the alleged constitutional violation. *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Thus, Plaintiff must offer some evidence that the defendant supervisors knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated. *Vance*, 97 F.3d at 993-94 (citing *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)).

Except for Sergeant Monczynski, Plaintiff does not allege that the other defendant supervisors in this case—Sergeant Stroner, Sergeant Dew, Sergeant Hernandez, Sergeant Monczynski, and Lieutenant Krzyzowski—had any personal knowledge of or responsibility for the circumstances leading to Smith's death. While Defendant officers in this case admit that it is their responsibility to contact either their supervisor or Cermak directly if an inmate is in need of medical attention, it is undisputed that no officer contacted their supervisor regarding Smith until the morning of April 30, 2004, at which time they obtained medical care for him. In addition, because the supervisors do not make security checks of the tier, there is insufficient evidence for a jury to infer that the supervisors must have been aware of Smith's symptoms. Furthermore, each of the supervisors testified that they never met Smith. (R. 368, Defs.' Resp. to Pl.'s Facts, Ex. 28, Hernandez Dep. at 123; *id.*, Ex. 26, Stroner Dep. at 13-14; *id.*, Ex. 31, Krzyzowski Dep. at 61; *id.*, Ex. 19, Dew Dep. at 92.)

Plaintiff argues that she has presented evidence that the supervising officers failed to take steps to remedy serious health and security risks of which they were aware, including cross-watching and broken videos monitors, which directly contributed to Smith's death. Without awareness of Smith's sickness, however, knowledge of cross-watching and broken monitors does not rise to the level of personal participation in the alleged violation of Smith's constitutional rights. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" necessary to establish an Eighth Amendment violation. *Farmer*, 511 U.S. 837-38.

There is also no evidence that Monczynski, the only supervisor who admittedly had contact with Smith, was deliberately indifferent to his medical needs. Monczynski called Cermak right after he observed Smith the morning of April 30, and requested that CMT Myvett call 911. Thus, Plaintiff has not presented a genuine issue of material fact that Defendants Krzyzowski, Stroner, Dew, Monczynski, and Hernandez were deliberately indifferent to Smith's medical needs, and the Section 1983 claims against them cannot survive summary judgment.

## II.    Section 1983 Claim Against Cook County, the *Monell* Claim

In Count II, Plaintiff alleges that the institutional defendants—Cook County, the Cook County Sheriff, and the Cook County Board president[16]—violated Smith's and other detainees' constitutional rights by failing to provide adequate medical care to detainees through enforcement of the following customs, policies, and practices:

---

[16] When a plaintiff sues a government employee in his official capacity, the suit is treated as if the plaintiff has sued the municipality itself. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

(1) fostering an atmosphere at the Cook County Jail where correctional and medical personnel were encouraged to disregard serious medical needs of detainees; and (2) knowingly failing to ensure that serious emergent medical needs of detainees could be treated in a reasonable time frame, by (a) failing to provide any medical services in the night hours, (b) failing to have an adequate plan to respond to emergency medical needs, including a plan to move prisoners up stairways, (c) failing to have a reasonably equipped or staffed emergency medical response team, (d) failing to have a system in place so that medical requests of detainees are reviewed promptly by properly trained medical staff and acted upon in a reasonable manner, (e) severely understaffing correctional officers at Cook County Jail, in violation of accepted practices and court orders, despite knowing that such understaffing greatly increases the chance that detainees' serious medical needs go untreated, (f) failing to correct serious safety problems such as broken video monitoring systems, despite knowing that such problems greatly increase the chances that detainees' serious medical needs go untreated; and (3) failing to have an adequate assessment of incoming detainees' health situation by qualified physicians; and (4) encouraging the destruction of documents and false writing of reports to cover up inadequacies in the medical care of detainees.

(R. 150, Compl. ¶¶ 37-38.)

A municipality can be found liable under § 1983 if the municipality itself, through a municipal policy or custom, deprives someone of their constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Such liability may be demonstrated in three ways: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with final policymaking authority." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (internal quotations omitted). "[M]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999).

Plaintiff's evidence primarily attempts to show that a "widespread practice" caused a

violation of Smith's constitutional rights. In order to sufficiently allege that a policy or custom has the force of law, a plaintiff must allege that municipal policymakers were "deliberately indifferent as to [its] known or obvious consequences." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 406-07 (1997) (quotations omitted). Deliberate indifference in this context means that "a reasonable policymaker [would] conclude that the plainly obvious consequences" of the government's actions would result in the deprivation of a federally protected right. *Id.* at 411; *see also Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000) (finding that deliberate indifference requires a showing that policymakers "were aware of a substantial risk" of a constitutional violation and "failed to take appropriate steps to protect [plaintiffs] from a known danger.") To establish a widespread custom or policy, Plaintiff is not required to show that Cook County's alleged unconstitutional widespread practices actually caused pain and suffering to other inmates besides Smith who were in need of medical intervention. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). Instead, it is enough that Plaintiff provides competent evidence tending to show that the alleged practices were, indeed, widespread. *Id.* (holding that, despite lack of evidence of suffering by other inmates, plaintiff had presented enough evidence from which a reasonable jury could conclude that Cook County had a widespread custom or practice of failing to provide timely methadone treatment). While generally the existence of a policy is shown through application to several different individuals, a policy may also be shown through repeated actions directed at one person so long as the repeated actions truly evince the existence of a policy. *Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006).

Defendant Cook County seeks summary judgment on Plaintiff's claim that the County has a policy, practice, or custom of providing constitutionally inadequate medical care to

detainees at the Jail. Cook County argues that Plaintiff cannot prove that it has a widespread practice of denying medical care to inmates because Cermak medics and nurses are available in every building in the jail compound and assigned to each division; inmates were receiving medical care on a daily basis between April 24 and April 30, 2004; and Cermak's policy is to evaluate every inmate who presents with a medical complaint. (R. 325, County Mot. for Summ J.) These facts, however, do not neutralize Plaintiff's claim that certain practices at Cook County Jail are so widespread that, although not authorized by written law or express municipal policy, are so well-settled as to constitute a custom or usage with the force of law.

Out of the litany of practices Plaintiff recites as causing Cook County's alleged unconstitutional denial of adequate medical care to detainees, four rise to the level of being "widespread." Plaintiff has presented a genuine issue of material fact that Cook County failed to have a system in place so that medical requests of detainees are reviewed promptly by properly trained medical staff and acted upon in a reasonable manner; that Cook County had a practice of severely understaffing officers and failing to fix broken video monitors at Cook County County Jail; and that Cook County had a policy of officers falsifying their daily tier logs. (R. 150, Compl. ¶ 38.)

Plaintiff's claim that Cook County's medical request system in the jail is a failure rests on the alleged understaffing of correctional officers at the jail and on Cook County's alleged failure to adequately train its employees on how to handle detainees' medical requests. A municipality will be held liable for the violation of an individual's constitutional rights under *Monell* for failure to adequately train or supervise its officers only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into

46

contact. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference may be shown in one of two ways. First, a municipality shows deliberate indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)). Second, a municipality shows deliberate indifference if it fails to provide further training after learning of a pattern of constitutional violations by the officers. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029-30 (7th Cir. 2006); *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997).

In the instant case, inmate medical requests—either written or verbal—are obviously a recurring situation. Nevertheless, it is apparent from the deposition testimony that none of the multitude of officers and CMTs deposed in this case are quire sure how these requests are handled. Only one CMT interviewed had a key to the box that was supposed to house completed medical request forms, and the CMT supervisors were aware that most CMTs were unable to open the locked box. The officers, however, assumed the CMTs had keys, and thus many of them testified that they put completed medical request forms—without looking at them—in the box. The CMTs and officers also testified that CMTs do not always make their daily tier rounds—not just in the instant case—but as a matter of practice. Even Callie Baird, the executive director of the CCDOC when Smith was incarcerated, knew of the CMTs' failure to make daily tier visits and attempted to rectify the problem. Without tier visits, the CMTs would not hear of inmates' medical requests unless informed by officers, who themselves disagree as to

the extent of evaluation they may make of an inmate requesting further medical attention.[17]

Plaintiff alleges that this is more than a failure by CMTs and officers to follow the Jail's policies; rather, she argues that Cook County systematically failed to enforce its written policies on medical requests and maintains informal policies that violate the Constitution. *See Bradich ex rel. Estate of v. City of Chi.*, 413 F.3d 688, 690 (7th Cir. 2005) (to show *Monell* violation where city's policies were constitutional, the city's failure to ensure that its employees consistently followed policies is not sufficient; plaintiff must show that the city systematically fails to enforce written policies and maintains unconstitutional informal policies); *see also Davis*, 452 F.3d at 692-93 (upholding *Monell* claim where there were essentially no policies or procedures in place at Cook County to ensure that the verification of an inmate's outpatient methadone treatment program was conducted in a timely fashion, or that once such verification is obtained, security personnel are informed in a timely fashion and inmates are brought to the pharmacy within a reasonable time period); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927-29 (7th Cir. 2004) (where supervisors of a jail medical facility knew of their employees' disregard for written policies and yet did nothing to ensure that they followed those procedures, a reasonable jury could find that the actual practice of repeatedly failing to follow proper procedures caused its employees to be deliberately indifferent to the inmate's serious health needs). Thus, Plaintiff has presented a genuine issue of fact as to whether Cook County was deliberately indifferent to its widespread practice of failing to train its employees on how to handle inmate medical requests,

---

[17] Because Plaintiff's *Monell* claim regarding staffing at the Jail survives summary judgment, Defendants' motion in limine regarding testimony about jail staffing is denied. (R. 272.)

which caused Smith's alleged constitutional injury.[18]

Likewise, Plaintiff has presented a genuine issue of material fact as to whether Cook County was deliberately indifferent to its widespread practice of understaffing correctional officers at the jail, which caused Cook County to violate Smith's constitutional rights by failing to provide adequate medical care. Plaintiff provided evidence of understaffing at the jail through reports, cross-watching, and officer and CMT testimony, many of whom admit that the Jail is understaffed. In addition, Plaintiff has presented evidence that municipal policymakers were deliberately indifferent as to the known or obvious consequences of the understaffing. *Brown*, 520 U.S. at 406-07. Each officer and supervisor testified that understaffing regularly prevents them from making required physical security checks because either no back-up officer was available or the officer was cross-watching another tier. Yet physical checks are the only way to check on inmates when they are in their cells, or sleeping on the catwalks or other locations on the jail tier that are not visible from the interlock. In addition, Cermak supervisor Winfrey and at least one other CMT testified that some CMTs do not visit the jail tiers because there was no officer present on the tier to let them in. Plaintiff has thus demonstrated a "direct causal link" between the understaffing at the Jail and the alleged failure to provide adequate medical care to Smith. *See Brown*, 520 U.S. at 404 (there must be an "affirmative link" or "direct causal link" between the policy and the particular constitutional violation alleged). As such, Plaintiff has presented a genuine issue of fact as to whether Cook County was deliberately indifferent to its

---

[18] Because some of Plaintiff's *Monell* allegations survive—as more than allegations of *respondeat superior* liability—Defendants' motion in limine to bar Plaintiff from presenting any evidence on Count II (*Monell* claim) of the 5th Amended Complaint is denied. (R. 305.) For the same reasons, Defendants' motion in limine to bar reference and testimony relating to conduct of other employees of Cook County not named as defendants is also denied. (R. 310.)

widespread practice of understaffing the Jail, which caused Smith's alleged constitutional injury.

Plaintiff has also presented sufficient evidence to withstand summary judgment on her claim that Cook County had a practice of failing to correct broken video monitoring systems.[19] Despite the fact that cross-watching Tiers 1-L and 1-M was a common practice, the video monitor on Tier 1-L, which was used to monitor Tier 1-M while the officer was on Tier 1-L, was broken for almost the entire week that Smith was at the Jail, and it was not unusual for monitors to be broken for several days at a time. This broken monitor would make it impossible for a cross-watching officer on Tier 1-L to observe any part of Tier 1-M. This presents an obvious potential for violating inmates' constitutional right to adequate medical care because as illnesses like meningitis only get worse over time, the inability to observe a sick detainee, such as Smith, and procure corresponding medical care, is a direct causal link to the alleged unconstitutional failure to give adequate medical care to detainees.

Finally, and relatedly, Plaintiff has presented sufficient evidence of a policy or practice of writing false reports. Every daily tier log from April 24, 2004 through April 30, 2004 (except for the one missing from April 29, 2004) shows that the officers completed every one of their security checks. Many of the officers who were cross-watching Tiers 1 1-L and 1-M wrote that they performed each security checks for both Tiers at the exact same time, even when the video monitor on Tier 1-L was broken. Moreover, some officers admitted that they logged their visual as well as their physical security checks even though security checks are supposed to be physical. As explained above, if the officers were not performing their required security checks, the

---

[19] Plaintiff's allegation that Defendants failed to rectify other "serious safety problems" is dismissed as Plaintiff has given no indication as to what these other safety problems are.

medical needs of inmates could be at risk. Although the mis-logging of security checks could be due to mere sloppiness by the officers, the flawless record of security checks by every officer during the last week of April 2004—despite the repeated cross-watching and broken video monitors—raises a genuine issue of material fact as to whether there was a widespread practice of falsifying the daily tier logs to cover up missed security checks, which in turn failed to ensure that serious medical needs of Smith and other detainees were treated in a reasonable time frame.

The following alleged practices, however, either do not rise to the level of "widespread" as required to support a *Monell* claim, or Plaintiff has not presented sufficient evidence that such practices exist at all. First, Plaintiff claims that Cook County had a custom, policy, or practice of fostering an atmosphere at the Jail where correctional and medical personnel were encouraged to disregard serious medical needs of detainees. However, all correctional personnel testified that they do not diagnose illnesses; rather, they will refer any inmate who looks sick or who complains of sickness first to their supervisor and then to Cermak. Only Sergeant Dew testified that an officer should evaluate the seriousness of a request for medical attention before contacting their supervisor to assess the situation. *See Bradich*, 413 F.3d at 690 (that one lockup keeper was not retrained according to the City's policies was a shortcoming in the enforcement of sound policies, not an independent violation of the Constitution). Likewise, although the medical personnel have not had specific training on recognizing symptoms of meningitis or drug withdrawal, they testified they would refer any inmate exhibiting symptoms of sickness—including symptoms of drug withdrawal—to Cermak. Therefore, Cook County's motion for summary judgment as to Plaintiff's claim that they had a policy of fostering an atmosphere to encourage personnel to disregard detainees' medical requests is granted.

51

Second, as to Cook County's alleged failure to address the serious emergent medical needs of detainees in a reasonable time frame, Plaintiff provides no evidence of a policy whereby the County failed to provide medical services in the night hours. To the contrary, both Cermak staff and jail officers testified that during the night shift, if detainees are in need of medical attention, Cermak is contacted (sometimes via a correctional supervisor) and either someone comes to the tier or the detainee is taken to the Cermak emergency room. While Cermak staff do not make rounds at night, officers are supposed to make their every half-hour tier rounds, and if they did so they would presumably be aware if any inmate needed to be taken to Cermak. Plaintiff also has not provided sufficient evidence that Cook County Jail has a custom, policy, or practice of failing to have an adequate plan to respond to emergency medical needs, or to have a reasonably equipped or staffed emergency medical response team. Plaintiff has presented evidence of certain possible delays the morning of Smith's death: a delay transporting Smith to the Cermak ER because Myvett did not bring a gurney and only had his fannie pack, not a full medical bag with him, and a delay transporting Smith from the Cermak ER to the hospital because the paramedics were waiting for information about Smith from Cermak. Myvett's possible negligence in not bringing his bag and a gurney with him when he responded promptly to Smith and the delay by Myvett and the other CMT working the ER the morning of April 30, 2004, in getting information to the paramedics, does not show that Cermak was poorly staffed or equipped. *See, e.g., Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1998) (negligent administration of an otherwise sound program does not support *Monell* liability). Plaintiff has not presented any other evidence of emergency situations where Cermak staff has inadequately responded to a detainee's emergency. Moreover, these were delays of minutes, and the parties'

52

experts agree that those few minutes would not have saved Smith's life.

Third, Plaintiff has not presented sufficient evidence that Cook County has a practice or policy of failing to conduct an adequate assessment of incoming detainees' health situation by qualified physicians. The evidence shows that Smith had a health assessment upon entering the jail, and as a result was prescribed blood pressure medication. In addition, Cermak staff testified that such health assessments were completed for each incoming detainee. That Smith may have told his cellmate he did not get a full physical does not show that the assessment was inadequate, much less that there was a policy or practice of inadequate assessments. Lastly, Plaintiff's claim that there was a policy of destroying documents cannot withstand summary judgment. Plaintiff points out a missing daily tier log from April 29, 2004, and the existence of only one medical request form for Smith. The absence of one form, and the absence of medical request forms that may or may not have existed, does not evidence a policy or practice of destroying documents. *See, e.g., Bradich*, 413 F.3d at 690.

## III.    State Law Claims

Counts III, IV and V of the Complaint are state law claims for wrongful death, survival action, and intentional infliction of emotional distress. Plaintiff claims that Smith suffered physical pain, mental anguish, and death as a result of the Defendants' deliberate indifference to Smith's medical needs. Defendants Cook County and Hernandez argue that each of these actions are barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/1 *et seq.*) ("Tort Immunity Act"). The remaining Defendants ask that this Court dismiss Counts III, IV, and V in the event that this Court dismisses Counts I and II of the Complaint, as an exercise of this Court's discretion to decline to exercise supplemental

53

jurisdiction over the state law claims. (R. 261, Defs.' Mem. of Law in Supp. of Summ J. at 14.)

The Tort Immunity Act bars Plaintiff's state law claims against Cook County.[20] Cook County claims immunity under Section 4-103 of the Tort Immunity Act, which provides that no entity that runs a jail, detention or correctional facility is liable for "failure to provide sufficient equipment, personnel, supervision or facilities therein." 745 ILCS § 10/4-103 (2005). There is no exception to this provision for willful or wanton conduct as alleged by Plaintiff; thus, the state law claims against Cook County are dismissed.

The state law claims are also barred against the supervisory Defendants (Monczynski, Dew, Krzyzowski, Stroner, and Hernandez), for the same reason that this Court granted summary judgment as to the Section 1983 claims against them. Section 2-204 of the Tort Immunity Act prohibits liability on the basis of *respondeat superior*: "a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS § 10/2-204 (2005). As explained above, Plaintiff has not presented any evidence that the supervisory Defendants were involved in the alleged deprivation of Smith's constitutional rights; accordingly, summary judgment is granted as to Plaintiff's state law claims against Defendants Monczynski, Dew, Krzyzowski, Stroner, and Hernandez. Summary judgment on the state law claims against the remaining Defendants is denied.[21]

---

[20] As explained in this Court's opinion on Defendants' motion to dismiss, "the Illinois Tort Immunity Act does not shield the defendants from Plaintiff's Section 1983 claims, because under the Supremacy Clause of the United States Constitution, federal laws are supreme to state laws." *Thomas ex rel. Smith v. Cook County Sheriff*, 401 F. Supp. 2d 867, 875 (N.D. Ill. 2005).

[21] Accordingly, Defendants' motion in limine to bar plaintiff from presenting any evidence on the state law claims of the Complaint is denied. (R. 308.)

54

## CONCLUSION

For the reasons set forth above, the motion for summary judgment by Defendants Monczynski, Sanchez, Cook County Sheriff Sheahan, Davis, Dew, Facundo, Houston, Johnson, Krzyzowski, Stroner, Thiemecke, and Toomey is granted in part and denied in part. (R. 260.) The motion is granted as to Monczynski, Dew, Krzyzowski, and Stroner, but is denied as to the remaining defendants. Hernandez's motion for summary judgment is granted. (R. 286.) Cook County's motion for summary judgment is also granted in part and denied in part. (R. 324.)

Defendants Cook County and Westbrook's motion to join in the Defendants' motion to strike is granted. (R. 358.) Defendants' motion to strike is granted in part and denied in part as stated above. (R. 352.) Hernandez's supplemental motion to strike is denied. (R. 373.)

The motion by Defendants Sheahan, Monczynski, Sanchez, Davis, Dew, Facundo, Hernandez, Houston, Johnson, Krzyzowski, Stroner, Thiemecke, and Toomey to adopt the motions in limine of their co-Defendants is granted. (R. 280.) Defendants Cook County and Westbrook's motion to adopt the motions in limine of co-Defendants is also granted. (R. 295.)

As stated above, the Court rules as follows on the parties' motions in limine:

- The motion in limine by Defendants Sheahan, Monczynski, Sanchez, Davis, Dew, Facundo, Hernandez, Houston, Johnson, Krzyzowski, Stroner, Thiemecke, and Toomey to bar Carlos Matias' testimony is denied as moot. (R. 270.)

- Defendants' motion in limine regarding testimony about jail staffing is denied. (R. 272.)

- Defendants' motion in limine to bar Plaintiff from presenting any evidence on Count II (*Monell* claim) of the 5th Amended Complaint is denied. (R. 305.)

- Defendants' motion in limine to bar the introduction and any testimony regarding 'Detainee Grievance' date April 19, 2004 is denied. (R. 306.)

55

- Defendants' motion in limine to bar plaintiff from presenting any evidence on the state law claims of the Complaint is denied. (R. 308.)

- The motion in limine by Defendants Westbrook, Bradley, Lacy, Nelson, Patton, West, and Cook County to bar testimony of Carlos Matias is denied as moot. (R. 309.)

- Defendants' motion in limine to bar reference and testimony relating to conduct of other employees of Cook County not named as defendants is denied. (R. 310.)

The Court orders that the remaining Defendants' responses to Plaintiff's motions in limine (R. 259), and Plaintiff's responses to Defendants' remaining motions in limine (R. 269, 271, 273, 274, 275, 276, 277, 278, 279, 300, 301, 307, and 312) be filed by August 24, 2007.

The parties are requested to exhaust all remaining settlement possibilities prior to the next status hearing, which will be held on September 11, 2007, at 9:45 a.m. A final trial date will be set at that time.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

**Dated: August 15, 2007**