

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MARLITA THOMAS, as Mother, Next )
Friend, and Special Administrator of )
NORMAN L. SMITH, JR., deceased, )
                     )    **No. 04 C 3563**
       **Plaintiff,**       )
                     )    **Judge Ruben Castillo**
   **v.**                   )
                     )
COOK COUNTY SHERIFF, MICHAEL F. )
SHEAHAN; COOK COUNTY; JOHN STROGER, )
JR.; SGT. MONCZYNSKI; SGT. HERNANDEZ; )
SGT. STRONER; SGT. DEW; LT. KRZYZOWSKI; )
OFR. SANCHEZ; OFR. DAVIS; OFR. FACUNDO; )
OFR. HOUSTON; OFR. JOHNSON; OFR. )
THIEMECKE; OFR. TOOMEY; P. WESTBROOK, )
                     )
       **Defendants.**      )

### MEMORANDUM OPINION AND ORDER

Plaintiff Marlita Thomas ("Plaintiff") brought this suit against Cook County, the Sheriff of Cook County ("Sheriff"), and various officers and medical technicians at the Cook County Department of Corrections ("CCDOC" or "Jail") after her son, Norman Smith ("Smith"), died of pneumococcal meningitis on April 30, 2004, while being held as a pretrial detainee at the CCDOC. Plaintiff brought suit under 42 U.S.C. § 1983; the Illinois Wrongful Death Act, 740 ILCS 180/1 (2005); the Illinois Survival Act, 755 ILCS 5/27-6 (2005); and Illinois common law, alleging that her son died because the Sheriff's officers and medical staff at the Jail ignored his obvious symptoms of meningitis and his and his fellow inmates' repeated requests for medical help. Three and a half years later, after a two-week trial, the jury found in favor of Plaintiff and against certain defendants in the total amount of $4,450,000. (R. 471, 12/13/07 Jury Verdict.) Following the jury verdict, Defendants Cook County, the Sheriff, and Officers Jesus Facundo

("Facundo"), Terrence Toomey ("Toomey"), and Alex Sanchez ("Sanchez") (collectively, "Defendants") timely filed a joint motion for judgment as a matter of law or, alternatively, a new trial. (R. 480, Defs.' Post-Verdict JMOL Mot.)

## PROCEDURAL HISTORY

Plaintiff's Fifth Amended Complaint ("Complaint") alleged five counts: (1) a Section 1983 claim against the individual officer and medical technician defendants for a violation of Smith's Fourteenth and Eighth Amendment rights; (2) a Section 1983 claim against the institutional defendants (the Sheriff and Cook County) for policies and practices that violated Smith's constitutional rights; and state law claims for (3) wrongful death; (4) a survival action; and (5) intentional infliction of emotional distress. (R. 150, Compl.) In its opinion on summary judgment, this Court dismissed the claims against Lieutenant Raymond Krzyzowski, Sergeant Steven Stroner, Sergeant Gerald Dew, Sergeant James Monczynski, and Sergeant Ivan Hernandez, but upheld the Section 1983 and state law claims against the remaining individual defendants: Officers Sanchez, Toomey, Facundo, Donetta Davis ("Davis"), Douglas Johnson ("Johnson"), Louis Thiemecke ("Thiemecke"), and Darryl Houston ("Houston"), and Correctional Medical Technician ("CMT") Peggy Westbrook ("Westbrook"). *Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1092-93, 1100 (N.D. Ill. 2007).[1] The Court also found that Plaintiff presented a genuine issue of material fact that Cook County had a policy or practice of: failing to maintain a system in place so that medical requests of detainees are reviewed promptly by properly trained medical staff and acted upon in a reasonable manner; severely understaffing

---

[1] The Court incorporates into this opinion the undisputed facts recited at length in its opinion on summary judgment.

2

officers; failing to fix broken video monitors at the Jail; and allowing officers to falsify their daily tier logs. *Id.* at 1095. The Court dismissed the state law claims against Cook County. *Id.* at 1100.

Before the case was submitted to the jury, Defendants filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a)(2), which this Court denied without prejudice. (R. 462, Defs.' Initial JMOL Mot.) After deliberating, the jury found that as to Plaintiff's denial of medical care claim against the individual defendants, Officers Facundo, Sanchez, and Toomey were liable, but Officers Davis, Houston, Johnson, Thiemecke, and CMT Westbrook were not. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 2, Verdict Form A.) The jury awarded Plaintiff $150,000 in compensatory damages on this claim. As to Plaintiff's federal policy and practice, or *Monell*, claim,[2] the jury found that Cook County was liable: (1) for the failure to have a system in place so that the medical requests of the detainees were reviewed promptly by properly trained medical staff and acted upon in a reasonable manner; (2) for the practice of severely understaffing correctional officers; and (3) for the failure to timely fix broken video monitors at the Jail. (*Id.*) The jury found the Sheriff also liable for the practice of severely understaffing correctional officers, but not liable for the falsification of daily tier logs. (*Id.*) On these federal policy and practice claims, the jury awarded Plaintiff $3,000,000 from Cook County, and $1,000,000 from the Sheriff. (*Id.*) On the state law claims, the jury did not find any defendant liable for intentional infliction of emotional distress and awarded Plaintiff zero damages on this claim. (*Id.*) The jury found only Officers Facundo, Sanchez, and Toomey liable

---

[2] A municipality can be found liable under § 1983 if the municipality itself, through a municipal policy or custom, deprives someone of their constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

3

on Plaintiff's wrongful death and survival claims and awarded Plaintiff $150,000 in compensatory damages on each of those claims. (*Id.*)

Following the jury verdict, the remaining Defendants—Officers Facundo, Sanchez, and Toomey, Cook County, and the Sheriff—renewed their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), adding to and incorporating the arguments set forth in their initial motion and in the alternative, requesting a remittitur or a new trial. (R. 480, Defs.' Post-Verdict JMOL Mot. at 1.)

## ANALYSIS

In their motion for judgment as a matter of law, Defendants argue that: (1) there was insufficient evidence presented at trial for Plaintiff to succeed on any of her claims; (2) the jury failed to follow this Court's instructions; (3) it was error to allow the jury to assess liability against both the Sheriff and Cook County for the *Monell* claims; (4) the jury's finding of liability on the *Monell* claims is inconsistent with their finding of liability on the individual claims; (5) there is no evidence of proximate cause between the alleged policies and Smith's death; (6) the jury's verdict on the *Monell* claim alleging failure to review and act on detainee medical requests is against the manifest weight of the evidence; (7) the jury's verdict is excessive and not based upon the evidence; (8) it was error to allow the deposition testimony of Carlos Matias to be read to the jury; (9) the Court's evidentiary rulings deprived Defendants of a fair trial; (10) damages for future earnings and loss of support were speculative; (11) special interrogatories should have been given as Defendants requested; (12) the Court erred in accepting certain of Plaintiff's instructions over Defendants' objections; (13) the Court's bias denied Defendants a fair trial; and (14) Plaintiff's counsel recanted on representations made to this Court regarding not mentioning

4

any "delay" in transporting Smith to the hospital the day he died. (R. 480, Defs.' Post-Verdict JMOL Mot.; *see also* R. 462, Defs.'Initial JMOL Mot.)

## I.    Legal Standard

On a motion for judgment as a matter of law, the Court views the facts in the light most favorable to the non-moving party; that is, in the light that supports the jury's verdict. *Molnar v. Booth*, 229 F.3d 593, 597 (7th Cir. 2000). The Court is "obliged to leave the judgment undisturbed unless the moving party can show that no rational jury could have brought in a verdict against it." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007) (internal citations omitted). In other words, the record must demonstrate no "legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004) (internal citations omitted). "Although the court reviews the record as a whole, it must disregard all evidence favorable to the moving party that the jury was not required to believe." *Hossack*, 492 F.3d at 859 (internal citations omitted). The Court must give credence only to "uncontradicted and unimpeached" evidence supporting the moving party. *Id.* at 859-60.

## II.    Plaintiff's Federal Claims

### A.    Claims Against the Individual Defendants

The jury found Officers Facundo, Toomey, and Sanchez liable for violating Smith's constitutional rights by failing to provide him with medical care. Defendants argue that based on the evidence, no rational jury could have found them liable; that is, no rational jury could have found that: (1) the danger to Smith was objectively serious or posed a substantial risk of serious harm; and (2) the officers showed "deliberate indifference" to Smith's health or safety by failing

5

to take reasonable measures to abate the risk. *Davis v. Carter*, 452 F.3d 686, 695-96 (7th Cir. 2006) (setting out standards for finding liability under Section 1983).

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Defendants do not dispute that the jury had a legally sufficient evidentiary basis for finding that Smith had an objectively serious medical need. Indeed, several detainees and Smith's visitors at the Jail testified that they viewed or heard Smith complaining of headaches, chills, extreme weight loss, vomiting, lethargy, inability to walk, and other visible symptoms. In addition, both Plaintiff's and Defendants' experts testified that people who die of pneumococcal meningitis often exhibit these symptoms.

To prove deliberate indifference, Plaintiff must have presented sufficient evidence at trial for the jury to conclude that Defendants were subjectively aware of the substantial risk of serious harm to Smith and disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "'Deliberate indifference' is simply a synonym for intentional or reckless conduct, and can be established indirectly through circumstantial evidence." *Davis*, 452 F.3d at 696. Plaintiff need not prove that the defendant was "exposed to information concerning the risk," because "actual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996).

Defendants argue that this Court should grant judgment as a matter of law in their favor

because during trial, none of the defendant officers were specifically identified as committing any wrongful conduct. (R. 462, Initial JMOL Mot. at 2.) Defendants point to testimony that Facundo tried to help Smith, (*id.* at 7-8), but that does not negate other evidence that medical requests were made during Facundo's shift and not responded to. The documentary evidence showed that Facundo was the officer assigned to monitor both Tier 1-M and Tier 1-L during the day shift on Thursday, April 29, 2004, the day before Smith died. (*See* April 29, 2004 Daily Tier Logs.) The evidence further showed that during that shift, Smith exhibited vomiting, nausea, coughing, lethargy, and other symptoms of serious illness. (*See* 4/29/04 Detainee Health Service Request Form for Smith; Trial Tr. at 222-27 (testimony of detainee Titus Haynes ("Haynes")); Trial Tr. at 285-87 (testimony of detainee Corey Mitchell ("Mitchell")); Trial Tr. at 432-33 (testimony of detainee Alan Robinson ("Robinson")); Trial Tr. at 466-67 (testimony of detainee Stevie Wallace ("Wallace")).) Thus, Plaintiff presented abundant evidence from which the jury could conclude that Facundo was deliberately indifferent to Smith's needs, leading to his death in custody.

Likewise, although Defendants argue that "there has been no accurate identification of any correctional officers that acted improperly toward Norman," there was sufficient evidence presented at trial for the jury to conclude that Officers Toomey and Sanchez were also deliberately indifferent to Smith's serious medical needs. As explained above, Plaintiff need not prove that the defendant was "exposed to information concerning the risk." *Fromm*, 94 F.3d at 260. The jury could infer "actual knowledge of a substantial risk of serious harm" from the "obviousness of the risk." *Id.* As with Facundo, the evidence showed that these other officers were working during shifts—*i.e.*, responsible for monitoring Tier 1-M inmates—when witnesses testified that Smith was exhibiting obvious signs of serious illness and when medical requests

were made by Smith or on his behalf. (*See* 4/26/04 Daily Tier Logs, 4/27/04 Daily Tier Logs, 4/29/04 Daily Tier Logs, 4/30/04 Daily Tier Logs; *see also* Trial Tr. at 161-62 (testimony of detainee George Robotis ("Robotis")); Trial Tr. at 222-27 (Haynes testimony); Trial Tr. at 260-62 (testimony of Maurice Merritt ("Merritt"), Smith's cousin); Trial Tr. at 280-81, 286-87 (Mitchell testimony); Trial Tr. at 432-33 (Robinson testimony); Trial Tr. at 466 (Wallace testimony); Trial Tr. at 1030 (testimony of Marlita Thomas ("Thomas"), Smith's mother); Trial Tr. at 1534 (testimony of Shania Stubbs ("Stubbs"), Smith's sister); Trial Tr. at 1645 (testimony of detainee Gilbert Yorke ("Yorke")).

Since the officers testified that they performed physical security checks of the tier every 30 minutes, the jury could rationally have concluded that the officers on duty were aware of Smith's illness. In addition, several inmates testified that they directly informed the officers on duty of Smith's illness. (*See* Trial Tr. at 162-63, 178-79 (Robotis testimony); Trial Tr. at 433-34 (Robinson testimony); Trial Tr. at 467-68 (Wallace testimony); *see also* 4/29/04 Detainee Health Service Request Form for Smith.) The jury could thus rationally conclude that Defendants learned of Smith's signs of severe illness before April 30, 2004, and that this amounted to reckless or deliberate conduct which proximately caused Smith's death. *See Foelker v. Outagamie County*, 394 F.3d 510, 513 (7th Cir. 2005); *see also Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (opining that deliberate indifference may be shown when a non-medical prison official ignores an inmate's complaints). Therefore, Defendants' motion for judgment as a matter of law as to the individual defendants' failure to provide medical care is denied.

### B.    Claims Against the Government Defendants

Defendants also argue that the Court should grant their motion for judgment as a matter

8

of law as to Plaintiff's policy claims. To succeed on a Section 1983 action against a municipality, the plaintiff must prove that: "(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury." *Ienco v. City of Chicago*, 286 F.3d 994, 997 -998 (7th Cir. 2002) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)). As discussed above, there was ample evidence for the jury to find that the deceased suffered a deprivation of his constitutional right to receive adequate medical attention as a pre-trial detainee. In addition, there was sufficient evidence for the jury to find that Cook County and the Sheriff had exhibited widespread deliberate indifference to its officers' violations of jail policies and procedures, constituting a practice or policy that endangered the life and health of sick inmates, including Smith. *See Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927-29 (7th Cir. 2004) (holding that where supervisors of a jail medical facility knew of their employees' disregard for written policies and yet did nothing to ensure that they followed those procedures, a reasonable jury could find that the actual practice of repeatedly failing to follow proper procedures caused its employees to be deliberately indifferent to the inmate's serious health needs). Based on the evidence presented at trial, the jury could reasonably find that "a reasonable policymaker [would] conclude that the plainly obvious consequences" of the government's actions would result in the deprivation of a federally protected right. *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 411 (1997) (quotations omitted). The Court reviews the evidence presented as to each of Plaintiff's policy and practice claims below.

9

### 1. Policy of failing to review and act on detainee medical requests[3]

First, Defendants argue that there was insufficient evidence presented at trial that medical request forms for Division V of the Jail (where Smith was housed as a pre-trial detainee) were not picked up or that medical access was being denied in the days prior to Smith's death. (R. 480, Defs.' Post-Verdict JMOL Mot at 8.) Defendants contend that because the jury found that CMT Westbrook—the only CMT on trial as a defendant—did not violate the constitutional rights of Smith, then the County cannot, as a matter of law, be held liable for a policy of failing to review and act on detainee medical requests. (R. 480, Defs.' Post-Verdict JMOL Mot. at 7; R. 499 Reply at 7.) This argument ignores the fact that Plaintiff also argued and presented evidence that the jail officers had a policy of failing to review and act on detainee medical requests. The officers played a role in "acting on" detainee medical requests because they had a duty to make physical checks on the detainees every half hour; however, none of the Defendant officers claimed to have observed Smith's serious illness despite the evidence that he was exhibiting visible symptoms. In addition, officers were supposed to hand out and pick up the medical request forms, and only the officers could allow the detainees to enter the interlock portion of Division V to put the medical request forms in the medical request box. Furthermore, if an inmate requests medical attention on behalf of himself or another inmate, the officer has a duty to seek medical attention for the sick inmate or contact the sergeant on duty. (*See, e.g.,* Trial Tr. at

---

[3] Defendants argue that the jury's verdict on the *Monell* claim alleging failure to review and act on detainee medical requests is against the manifest weight of the evidence. (R. 480, Defs.' Post-Verdict JMOL Mot. at 7-8.) As explained above, however, the standard for reversal of a jury verdict is not whether it is against the manifest weight of the evidence, but whether Defendants have shown that "no rational jury could have brought in a verdict against [them]." *Hossack*, 492 F.3d at 859.

360-63 (testimony of Officer Douglas Johnson ("Johnson"); Trial Tr. at 923 (testimony of Officer Darryl Houston ("Houston"); Trial Tr. at 958-59 (testimony of Officer Louis Thiemecke ("Thiemecke"); Trial Tr. at 989. 991-92 (testimony of Officer Donnetta Davis ("Davis").) Because the officer Defendants were on duty throughout the week when witnesses testified that they wrote out medical requests for Smith and that Smith looked very ill, the jury could rationally conclude that the County had a policy of failing to review and act on detainee medical requests.

In addition, evidence presented at trial showed that it was common for officers to ignore sick inmates. Inmate Darius Parker ("Parker"), a clean-up worker during his incarceration in Division 5, testified that he often saw unanswered medical request slips in the interlock garbage, and that he had put in five unanswered medical request forms himself. (*See* Trial Tr. at 675-77 (Parker testimony).) In addition, Parker and 52 other Division V detainees filed a written grievance on April 19, 2004—the week before Smith's death—complaining that medical request forms were not being picked up or responded to.[4] (*Id.* at 672-73; *see also* 4/19/04 Group Grievance.) Detainee George Robotis also testified that in his experience, the jail officers tended to ignore inmate requests for medical attention, including his own. (Trial Tr. at 169-70, 199 (Robotis testimony).)

Defendants point to evidence showing that some detainees on Smith's tier did receive

---

[4] Defendants further argue that the Court erred in allowing into evidence this group grievance about the failure to provide medical care to detainees. (R. 480, Defs.' Post-Verdict JMOL Mot, at 11.) They contend that because the group grievance was from a different tier in Division V than the one Smith was housed in, the grievance's probative value was outweighed by its prejudicial effect. In weighing the probative against the prejudicial under Federal Rule of Evidence 403, "the discretion of the district court is broad." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 764 (7th Cir. 2003). The probative value as to an alleged policy of failing to provide adequate medical care far outweighed any prejudicial effect, as explained above.

medical attention during the week Smith was in custody. Robotis and detainee Carlos Matias

("Matias"), for example, received methadone treatment at Cermak Health Services ("Cermak"),

the organization which provides medical care to detainees at the Jail. Unlike Smith, however,

Matias was on a regular methadone program to treat his drug addiction, whereby he had regularly

scheduled appointments at the clinic. Robotis was also seeking methadone treatment, but

received it only after repeatedly and forcefully complaining verbally to different officers and

sergeants for treatment. (Trial Tr. at 169-70 (Robotis testimony).)[5] By contrast, ample evidence

at trial showed that for someone like Smith—who because of his weakness and serious illness

had to primarily rely on other inmates to ask officers or fill out written requests for medical

attention on his behalf—medical attention was much harder to come by. (*See* Trial Tr. at 162-63,

178-79 (Robotis testimony); Trial Tr. at 222-26 (Haynes testimony); Trial Tr. at 281-83 (Mitchell

testimony); Trial Tr. at 433-34 (Robinson testimony); Trial Tr. at 467-68 (Wallace testimony)

(testifying that they and other inmates requested medical attention for Smith in writing and/or

verbally); *see also* 4/29/04 Detainee Health Service Request Form for Smith; Trial Tr. at 675-77

(Parker testimony).)[6]

Thus, there was ample evidence from which a rational jury could conclude that Cook

---

[5] Defendants also point to an inmate who had complained of dental problems and received medical attention. (Trial Tr. at 1000.) This too is distinguishable from Smith's situation for the aforementioned reasons.

[6] Defendants also contend that because some CMTs had been disciplined in the past when they did not pick up medical request forms, Cook County could not have had a policy of failing to have a system in place to review detainee medical requests promptly and properly. (R. 462, Initial JMOL Mot. at 2-3.) The fact that some CMTs were disciplined, however, does not negate the evidence detailed above showing that officers had a policy of ignoring and failing to pick up medical requests.

County was liable for the policy of failing to review and act on detainee medical requests and was deliberately indifferent to the dangers imposed by it.

### 2. Policy of understaffing the jail

Next, Defendants argue that there was no evidence presented at trial of a policy of understaffing the jail that violated Smith's constitutional rights. (R. 462, Initial JMOL Mot. at 4.) Defendants summarily claim that there was "no evidence that cross watching has ever caused a problem getting medical attention." (*Id.* at 4.) This misstates the evidence presented at trial. Cross-watching is where one officer is assigned to watch two tiers at the same time because of a shortage of officers on duty. *Thomas,* 499 F. Supp. 2d at 1077. Cross-watching is allowed under jail policy if there is a clear sightline between the two tiers and they are close together. *Id.* Cross-watching both tiers 1-M and 1L was a common occurrence in April 2004. *Id.*

Plaintiff presented evidence of understaffing at the jail through officers' written reports and officer and CMT testimony, many of whom admitted cross-watching was a chronic problem and believe that it is a safety risk to both detainees and officers. (*See, e.g.,* Trial Tr. at 375-77, 385-86 (Johnson testimony); Trial Tr. at 486-87, 491 (Toomey testimony); Trial Tr. at 918 (Houston testimony); Trial Tr. at 955 (Thiemecke testimony); Trial Tr. at 1194-95 (Facundo testimony); *see also* Daily Tier Logs.) In addition, Plaintiff presented evidence that municipal policymakers were deliberately indifferent as to the known or obvious consequences of the understaffing and problems caused by cross-watching. *Brown,* 520 U.S. at 406-07. Sheriff department policy requires that correctional officers perform physical security checks to monitor detainee living units every thirty minutes; however, the officers testified that when cross-watching with no back-up officer available, sometimes they must do a visual security check

13

through the interlock window or wait until back-up becomes available. (*See, e.g.*, Trial Tr. at 380, 385 (Johnson testimony); Trial Tr. at 493-94 (Toomey testimony); Trial Tr. at 648 (Sanchez testimony); Trial Tr. at 989 (Davis testimony); Trial Tr. at 1309-12 (testimony of Sergeant James Monczynski).) Without a physical security check, the officer could not see every area in the tier where prisoners could be, including the stairwells, the hallways by the cells, inside the cells, and certain areas of the dayroom. (*See, e.g.*, Trial Tr. at 364-65, 376-79.) Further, jurors heard testimony that CMT supervisors were aware of CMT complaints that they sometimes could not get onto the tier to pick up detainee medical request forms because there was no officer on duty in the interlock. (*See* Trial Tr. at 796-97 (testimony by Steven Fullilove, CMT supervisor); Trial Tr. at 1092-93 (testimony by Woodroe Winfrey, CMT supervisor); Trial Tr. at 1218-20 (testimony by Jean Kiriazes, director of Continuous Quality Improvement and Risk Management at Cermak).)[7]

Therefore, there was ample evidence from which a rational jury could conclude that the County and the Sheriff had a policy of understaffing the jail and was deliberately indifferent to the dangers imposed by it.

### 3. Policy of failing to timely fix broken video monitors

Next, Defendants attack the jury's verdict finding a policy by Cook County for the failure

---

[7] Defendants also argue that since some of Plaintiffs' witnesses testified that they complained to officers on every shift, officers must have been available so there could not have been a policy of understaffing. This fact, however, does not negate all of the aforementioned trial testimony and documentary evidence that understaffing and cross-watching were chronic problems which caused serious safety risks. An inmate's ability to complain to an officer on each shift proves only that an officer stepped on the tier at least once per shift, and that at least that particular inmate was in the right place at the right time and was vocal enough to get an officer's attention.



to timely fix broken video monitors. (R. 462, Initial JMOL Mot. at 5.) Notably, Defendants do not argue that there was no policy of failing to fix broken video monitors; indeed, multiple officers testified that in April 2004 it was routine for several monitors to be broken every day, sometimes for more than a day or two. (*See, e.g.*, Trial Tr. at 486-87, 501-02 (Toomey testimony); Trial Tr. at 649 (Sanchez testimony); Trial Tr. at 956 (Thiemecke testimony); Trial Tr. at 1195 (Facundo testimony).) Indeed, despite the fact that cross-watching Tiers 1-L and 1-M was a common practice, the video monitor on Tier 1-L, which was used to monitor Tier 1-M while the officer was on Tier 1-L, was broken for almost the entire week that Smith was at the Jail.

Nevertheless, Defendants argue that "the monitors are no substitute for physical inspections." (*Id.* at 5.) Ironically, that is one of the arguments Plaintiff made as to why Smith was denied adequate medical care: officers did not complete the physical inspections as required, opting instead to complete visual checks through the interlock window or relying on the monitors, when they were not broken, to supervise inmates when they were cross-watching another tier. This presents an obvious potential for violating inmates' constitutional right to adequate medical care because officers could not always observe sick detainees like Smith. Since the officers and their supervisors knew the monitors often did not work—and filed reports to that effect—the jury reasonably concluded that Cook County's policy of failing to fix broken video monitors led to the unconstitutional deprivation of adequate medical care for Smith.[8]

---

[8] Defendants also argue that "it is illogical to conclude that the failure to fix a video monitor is a constitutional violation in any context." (R. 480, Defs.' Post-Verdict JMOL Mot. at 7.) The Court rejects this argument. If a broken video monitor caused the deprivation of medical care which led to Smith's death, then a policy of failing to fix the video monitors can be a constitutional violation.

### 4. Proximate Cause

Defendants also argue generally that there is no evidence that Cook County's policies proximately caused Smith's death. (R. 480, Defs.' Post-Verdict JMOL Mot. at 7-8.) The Court disagrees. As explained above, there was ample evidence presented at trial that the policies of understaffing, failing to fix video monitors, and failing to properly act on and review medical requests proximately caused Smith's death from meningitis. The parties' experts, Doctors Ben Katz ("Katz") and Thomas Vescio ("Vescio"), testified that pneumococcal meningitis, of which Smith died, is nearly always fatal if not treated. (Trial Tr. at 569-71 (Katz testimony); Trial Tr. at 1679-81, 1707 (Vescio testimony).) With the appropriate therapy in an otherwise healthy young adult, mortality is no more than 30%. (Trial Tr. at 571 (Katz testimony); Trial Tr. at 1707 (Vescio testimony).)

The parties' experts disagree, however, as to when Smith began exhibiting symptoms of meningitis or pneumonia. Smith's autopsy detected both, and both have similar symptoms, such as vomiting, nausea, fever, bad coughing, and sleep problems. Dr. Vescio, Defendants' expert, opined that Smith did not begin exhibiting these signs until the evening of April 29, 2004, while Dr. Katz, Plaintiff's expert, opined that Smith began exhibiting these symptoms by the evening of April 27, 2004. (Trial Tr. at 581-82 (Katz testimony); Trial Tr. at 1702 (Vescio testimony).) Both experts agree, however, that at least 24 hours before Smith's death on the morning of April 30, 2004, appropriate antibiotic treatment probably would have saved his life. (Trial Tr. at 573 (Katz testimony); Trial Tr. at 1702-03 (Vescio testimony).) Dr. Katz opined that antibiotics would have saved Smith until at least eight hours before his death. (Trial Tr. at 573 (Katz testimony).)

Based on these facts, a rational jury could find that Plaintiff demonstrated a "direct causal link" between Smith's death and Cook County's policies of understaffing, broken video monitors, and failure to adequately respond to medical requests at the Jail. *See Brown*, 520 U.S. at 404 (there must be an "affirmative link" or "direct causal link" between the policy and the particular constitutional violation alleged). The jury could rationally find that by failing to make physical checks of the tier, cross-watching two tiers while video monitors were broken, and failing to properly account for or ignoring inmate medical requests, Cook County permitted Smith's health to deteriorate until it was too late to save him.[9]

## III. Evidentiary Rulings During Trial

Next, Defendants argue that their motion for judgment as a matter of law should be granted because: (1) the Court erred in allowing the deposition testimony of Carlos Matias to be read to the jury; and (2) the Court's other evidentiary rulings deprived Defendants of a fair trial.

### A. Deposition Testimony of Carlos Matias

Defendants argue that the Court erred in allowing the transcript of Carlos Matias' ("Matias") deposition testimony to be read at trial where he: (1) was located in Chicago; (2) had contact with Plaintiff's counsel; (3) had been served with a subpoena; and (4) was never compelled by the Court to appear. (R. 499, Defs.' Reply in Support of JMOL Mot. at 9.) Federal

---

[9] Defendants make the curious argument that because Defendants could only be found liable if they had actual knowledge of the risk of serious harm, Cook County's alleged policies of understaffing the Jail or not repairing video monitors could not have proximately caused Smith's injuries because the Jail staff did not detect his condition. (R. 480, Defs.' Post-Verdict JMOL Mot. at 6.) As explained above and in the jury instructions, however, actual knowledge of a substantial risk of serious harm can be inferred from the obviousness of the risk in the deliberate indifference analysis. (R. 475 Court Jury Instructions at 26.) Otherwise, Defendants would be rewarded for turning a blind eye to the risk of serious harm.

Rule of Civil Procedure 32(a)(3)(D) allows a party to use for any purpose the deposition of a witness if the court finds that "the party offering the deposition could not procure the witness's attendance by subpoena." Fed. R. Civ. P. 32(a)(3)(D). "For a party to be 'unable' to procure a witness's attendance at trial by subpoena implies that the party used reasonable diligence to get him to attend, and it is up to the district judge, within broad limits, to decide whether, in the circumstances, this condition has been satisfied." *Griman v. Makousky*, 76 F.3d 151, 154 (7th Cir. 1996) (internal citations omitted).

### 1.     Reasonable Diligence

Plaintiff issued a subpoena to compel Matias' attendance at trial and made numerous telephone calls to confirm that he would comply with the subpoena. Plaintiff's attorneys represented to the Court two days before Matias was expected to testify that Plaintiff expected his attendance at trial. (Trial Tr. at 1259-60) Accordingly, the Court did not enter an arrest warrant for Matias. (*Id.*) Nevertheless, the Court suggested that the parties review his prior deposition in case he did not appear. (*Id.* at 1260.) On the day Matias was to testify at trial, he did not appear in court, and this Court allowed Matias' deposition testimony to be read to the jury pursuant to Rule 32(a)(3)(D). The Court carefully reviewed each page of Matias' deposition testimony and sustained several of Defendants' objections to certain portions of it. (Trial Tr. at 1323-26.) The deposition testimony included extensive cross-examination of Matias by two of Defendants' attorneys.

Nevertheless, Defendants argue that this Court erred by declaring Matias unavailable before entering a bench warrant for him and that they were prejudiced as a result. (R. 499, Defs.' Reply in Support of JMOL Mot. at 9-10.) Defendants argue that "simple phone calls to confirm

compliance with a subpoena is not reasonable diligence." (*Id.* at 10.) Contrary to Defendants' arguments, Plaintiff's attorneys' subpoena and phone calls to Matias constituted "reasonable diligence" to secure his presence in court. There is no indication that Matias' failure to appear was in any way Plaintiff's fault. Further, "[a]s long as the deposition testimony meets the requirements of the Federal Rules of Evidence, admission of deposition testimony is within the sound discretion of the trial court." *Smith v. Equitable Life Assur. Soc. of U.S.*, 67 F.3d 611, 617 n.3 (7th Cir. 1995) (quoting *Rascon v. Hardiman*, 803 F.2d 269, 277 (7th Cir. 1986)). Accordingly, this Court properly exercised its discretion in allowing Matias' testimony to be read to the jury.[10]

## 2.     Harmless Error

Even if it was error to allow Matias' deposition testimony to be read to the jury, it was harmless error that does not support granting Defendants' motion. Federal Rule of Civil Procedure 61 states that "no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order," unless justice requires otherwise or the error affected a party's substantial rights. Fed. R. Civ. P. 61. "Even where the jury has been exposed to evidence that is not properly before it, a defendant is not automatically entitled to a new trial. A new trial is in order only if the evidence had a prejudicial effect." *Bintz v. Bertrand*, 403 F.3d 859, 869 (7th Cir. 2005) (internal citations omitted). In this case, where the jury heard

_____

[10] Defendants further argue that Plaintiff's petition for attorneys' fees and costs—filed long after the trial was over—shows that Plaintiff's investigator transported Matias on December 7, 2007, but that he ultimately refused to attend court. Although the Court was not aware of this at the time, it supports, rather than negates, the fact that Plaintiff used reasonable diligence to secure Matias' attendance at court.

19

the extensive cross-examinationsof Matias during his deposition, Defendants have not shown that they were prejudiced by the admission of Matias' deposition testimony.

In addition, the challenged evidence did not have a substantial effect in determining the jury's verdict because of the other evidence presented at trial," which supported the jury's findings. *See Bintz*, 403 F.3d at 869. The testimony of Smith's other cellmates, Mitchell and Yorke, as well as detainees Robotis, Haynes, and Robinson, and Smith's family and friends, together with the testimony of the parties' meningitis experts, show that the jury's verdict was amply supported by the other evidence at trial. Like Matias' deposition testimony, these witnesses testified that during the week of Smith's detention, he complained of being severely ill, had lost an extreme amount of weight, was vomiting, and could barely walk, among other visible symptoms. *(See supra.)* Some of these witnesses also testified that they requested medical attention for Smith, which requests went unheeded. *(See supra.)* Accordingly, Matias' testimony was cumulative of the other evidence presented.

**B.  Investigator Raher's testimony**

Defendants also argue that the Court erred by admitting Investigator Kenneth Raher's ("Raher's") testimony about his April 30, 2004 report on his investigation into Smith's death. As part of his investigation, Raher interviewed Sergeant Monczynski (the sergeant on duty the morning of April 30, 2004), Officer Sanchez (the officer on duty the morning of April 30, 2004), Matias (Smith's cellmate of one week), Yorke (Smith's cellmate of less than one day), Howard Hradek (the Cermak supervisor and CMT interim director in April 2004), Dr. John Raba (chief medical officer at Cermak in April 2004), and Dr. Anaglate (the emergency room doctor who worked on Smith on April 30, 2004). Raher recorded these interviews in his report. Defendants

20

argue that Raher should not have been allowed to testify as to the statements in his report because the report was based on inadmissible hearsay. The report itself was not admitted into evidence.

## 1. Sergeant Monczynski's Statements

First, Raher testified about his interview with Sergeant Monczynski, who worked on the tier where Smith died. Specifically, he testified that Monczynski told him that he found a detainee medical request form filled out by or for Smith on the medical request box in the interlock of Tier 1-M. (Trial Tr. at 82.) While Defendants argue that this statement was inadmissible hearsay, Plaintiff correctly asserts that the statement went to "notice" or "state of mind" of Defendants. (R. 492, Pl.'s Resp. to Defs.' JMOL Mots. at 5.) Any error in admitting this portion of Raher's report was harmless because the parties examined Monczynski during trial on this very issue. Moreover, Monczynski disputed the hearsay assertions in Raher's report, testifying that he has "not found no medical request forms," and he denies telling Raher that he found a detainee medical request form for Smith on Tier 1-M's interlock box. (Trial Tr. at 1302, 1304-05.) In light of Monczynski's testimony and the wealth of other evidence supporting the jury's verdict finding the individual and government Defendants liable for failing to provide adequate medical care to Smith, the Court finds Raher's testimony as to Monczynski's statements in the report to be harmless error under Federal Rule of Civil Procedure 61.

## 2. Dr. Anaglate's Statements

Defendants also object to Raher's testimony about the statement he recorded by Dr. Anaglate (the emergency room doctor) in his report, that Dr. Anaglate "had heard that inmate Smith had been complaining of sickness." (Trial Tr. at 88-89.) Defendants argue that these statements were inadmissible hearsay. (R. 499, Defs.' Reply in Support of JMOL Mot. at 10-11.)

21

Plaintiff responds, however, that Dr. Anaglate's statements were not used to prove the truth of the matter asserted—that Smith had been complaining of sickness—but went to notice and state of mind of Defendants. The Court agrees. Raher's testimony as to Dr. Anaglate's statement was probative of Cook County's policy of failing to properly respond to inmate requests for medical attention whether or not the matter asserted was true. Although Raher thus became aware that Smith may have been complaining of sickness, he failed to interview any witnesses to Smith's behavior before April 30, 2004, besides his cellmate, Matias. (Trial Tr. at 86-87.) This is a proper, non-hearsay use of Raher's testimony. *See Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000) (holding that statements describing details of alleged altercation in arrest report and criminal complaint were admissible where defendants offered them not for their truth, but to show the effect that the statements had on the officers).

### 3. Matias' Statements

Raher also testified that Matias told him that Smith had been complaining of not seeing paramedics or doctors, and that Matias had helped Smith fill out the April 29, 2004 detainee medical form. (Trial Tr. at 100-01.) Nevertheless, Raher did not investigate Matias' claims further or seek to corroborate his claims that Smith had been complaining of being sick. (*Id.* at 101-02.) As with Dr. Anaglate's statement, Matias' statements here do not go to the truth of the matter asserted, but rather go to the policy of failing to follow through on inmates' requests for medical attention as shown by Raher's failure to investigate Matias' claims further. Moreover, even if it was error to admit Matias' statements, it was harmless error in light of all of the other evidence presented that medical requests were submitted on behalf of Smith and ignored.

22

## C.    Gilbert Yorke's Testimony

Defendants argue that the Court also erred when it allowed the statement of Carlos Matias through Gilbert Yorke into evidence. (R. 480, Defs.' Post-Verdict JMOL Mot. at 11.) Yorke testified that when he first arrived at the cell on the evening of April 29, 2004, Matias told him to take the top bunk because Smith might need to throw up. (Trial Tr. at 1645.) The next morning, when Smith woke up appearing to be having seizures, Yorke testified that Matias stated that he had put in three medical requests for Smith because Smith had been sick for a while. (Trial Tr. at 1645-46.) Yorke further testified that other detainees corroborated that Smith had been sick for a while. (Trial Tr. at 1647, 1649, 1651.)

Yorke's testimony as to Matias' statement the evening of April 29, 2004, may be admissible as a statement of Matias' existing state of mind at the time: his belief, whether or not true, that Smith would throw up that night. *See* Fed. R. Evid. 803(3). Regardless, the Court finds that the admission of Yorke's testimony as to Matias' statements was harmless error under Rule 61 because of the wealth of other evidence presented at trial that Smith had exhibited signs of illness before he died.

## D.    List of Inmate Names

Defendants further argue that the Court erred when it allowed into evidence a list of inmate names who allegedly wanted to talk to Plaintiff about Smith. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 13.) Plaintiff, Smith's mother, testified that she was handed this two-page list of names and prisoner numbers by Maurice Merritt ("Merritt"), Smith's cousin, right after Smith's burial. (Trial Tr. at 1058.) Plaintiff testified that these were names of inmates "who wanted [her] to know what had happened to [her] son." (*Id.* at 1059.) The Court disagrees with

Defendants that Plaintiff did not sufficiently authenticate this document. Federal Rule of Evidence 901(a) states that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Plaintiff's testimony as to what Merritt told her about the document does satisfy this minimal standard. Regardless, this document was of limited probative value, and any error in its inclusion was harmless, because numerous inmates actually did testify at trial to what they believed happened to Plaintiff's son.

### E.  Smith's Resume

Defendants also argue that Smith's resume was not properly authenticated and constituted inadmissible hearsay. To the contrary, Smith's mother demonstrated through her testimony that she was a witness with knowledge of Smith's resume sufficient to satisfy the requirements for authentication and identification under Federal Rule of Evidence 901(b)(1). (Trial Tr. at 1038-39.) However, the document appears to have been used to prove the truth of the matter asserted on the resume; that is, Smith's education and occupations prior to his death. Admission of the document into evidence, however, was harmless error as Plaintiff testified through her own personal knowledge of Smith's educational and occupational history, including testifying to at least one additional job that was not even listed on Smith's resume. (*See* Trial Tr. at 1035-40.)

### F.  Lost Wages Claim/Damages Based on Loss of Future Earnings and Support

Defendants also argue that the Court erred in not barring Plaintiff's claim for Smith's lost wages, future earnings, and support, because Defendants contend that there "is no evidence" of Smith's employment before his death. (R. 480, Defs.' Post-Verdict JMOL Mot. at 11; R. 499, Defs.' Reply at 11-12.) This misstates the evidence. Contrary to Defendants' contentions,

damages based on Smith's future earnings and support were not speculative.

## 1. Loss of Wages/Future Earnings

Several witnesses testified to Smith's employment and educational history prior to his death. As explained above, Smith's mother testified to his employment at a Clark gas station and McDonald's among other places of employment, as well as Smith's education. (Trial Tr. at 1034, 1040.) In addition, Angela Magsby ("Magsby"), Smith's former girlfriend, testified to Smith's employment at the Clark gas station, McDonald's, and Dominicks, as well as his education at Kennedy King College. (Trial Tr. at 319-21.) Cassandra Bersamin Talmadge ("Talmadge"), an earlier girlfriend of Smith's, also testified as to Smith's employment at various places, including his working at a Clark gas station, Dominicks, and Commander Packaging. (Trial Tr. at 344-46.) This provided sufficient evidence for the jury to determine Smith's past and future earnings, despite the fact that Plaintiff did not present evidence of Smith's tax filings, pay stubs, or bank records.

## 2. Loss of Support

Plaintiff also presented ample evidence as to Smith's close relationship with his children, and their loss of support due to his death. Magsby and Smith had two children together, and she testified Smith used to work nights at the Clark gas station so he could take care of the children during the day. (Trial Tr. at 324-25.) During the day, Smith would take care of all the kids' needs, including getting them dressed, changing diapers, cooking breakfast, lunch, and dinner—he was a "spectacular cook"—as well as playing games with them and taking them to the park. (*Id.* at 322-25.) After Magsby and Smith separated, he made sure to see the children every other weekend and spend quality time with them. (*Id.* at 327.) Talmadge and Smith also

25

had a child together, Kalaiah. (*Id.* at 328, 342.) Smith took care of Talmadge when she was pregnant with Kalaiah; Talmadge stated "He's a great cook, so I ate good during that time." (*Id.* at 342.) Smith helped take care of Kalaiah until she was two years old. (*Id.*) Smith asked Talmadge to marry him, but she refused and they lost touch for several years; nevertheless, when Kalaiah turned eight, they reconnected and Smith "received [them] with open arms." (*Id.* at 344-45.) Smith and Kalaiah would talk about once a week and see each other often. (*Id.* at 345-46.) Smith's mother confirmed his close relationship with and support of his children. (*Id.* at 1041-43, 1055-57.) In addition, Plaintiff testified that Smith was a good son who helped her with his younger siblings. (Trial Tr. at 1033.) Plaintiff thus presented ample evidence as to the loss of support caused by Smith's death, and the Court will not grant Defendants' motion for judgment as a matter of law on this ground.

## IV. Closing Arguments

Defendants also claim that Plaintiff's counsel's closing argument was improper and prejudiced the jury. Defendants' contentions are inaccurate. Defendants wrongly claim that Plaintiff's counsel improperly told the jury to "send a message." (R. 480, Defs.' Post-Verdict JMOL Mot. at 4.) Plaintiff's counsel never stated this. Rather, Plaintiff's counsel argued that: "Norman Smith was ignored. His symptoms were ignored. He wasn't given the treatment. His death was ignored. It was ignored, but they won't ignore your verdict." (Trial Tr. at 1883.) Contrary to Defendants' arguments, this statement does not ask for punitive damages; rather, it appropriately asks the jury to hold Cook County responsible for the damages its policies caused to Smith and his family.

## V.    "Delay" in Transporting Smith to the Hospital

Defendants next argue that Plaintiff's counsel recanted on representations made to this Court that he would not mention any "delay" by Defendants in transporting Smith to the hospital on April 30, 2004. (R. 480, Defs.' Post-Verdict JMOL Mot. at 14.)  In response to Defendants' motion in limine to bar testimony related to the delay in transporting Smith off the jail compound on the date of his death, Plaintiff's counsel stated that Plaintiff did not intend to argue that the delay in transporting Smith caused his death, so the Court denied the motion in limine.  (Id.)  At trial, however, Plaintiff's counsel questioned Dr. Vescio about this delay, as mentioned in a Chicago Fire Department ambulance report from April 30, 2004.  (R. 499, Defs.' Reply at 13.)  The Court sustained all of the Defendants' objections to this line of questioning, but Defendants argue that the damage was already done; i.e., that Plaintiff's questioning prejudiced the jury and inflamed their passions such that this Court should grant Defendants' motion for judgment as a matter of law.  (Id.)  The Court disagrees with Defendants.  The Court instructed the jury that it should disregard testimony about which it sustains objections, and the Court presumes that the jury follows its instructions.  See, e.g., Havoco of Am., Ltd. v. Sumitomo Corp. of Am., 971 F.2d 1332, 1346 (7th Cir. 1992).  Moreover, Plaintiff's error in raising this subject was harmless because delay in transporting Smith to the hospital was not an issue in the case.  Both parties' meningitis experts testified that by the morning of April 30, 2004, it was already too late to save Smith.  In addition, in light of the evidence that Smith died after requests for medical help on his behalf were denied, the Court finds that the evidence of a few minutes delay noted on the morning of April 30, 2004, did not affect the jury's findings on liability or damages.

27

## VI. Verdict Forms and Jury Instructions

Next, Defendants argue that the Court erred in accepting Plaintiff's jury instructions and verdict forms over Defendants' objections or suggestions. This contention is somewhat misleading, as the Court accepted some of Defendants' and Plaintiff's instructions in putting together the jury instructions. The district court has substantial discretion in choosing the precise language of its jury instructions. *United States v. Wiszowaty*, 506 F.3d 537, 541 (7th Cir. 2007); *see also Heller Int'l Corp. v. Sharp*, 974 F.2d 850, 860 (7th Cir. 1992) (same standard applied in civil case). On a motion for a new trial based on improper jury instructions, the question is "whether the instructions, when considered in their entirety and not in isolation, were sufficient to inform the jury of the applicable law." *Alcala v. Emhart Indus., Inc.*, 495 F.3d 360, 363 (7th Cir. 2007).

The formulation of verdict questions is also a matter within the trial court's discretion. Fed. R. Civ. P. 49(a); *Mattson v. Schultz*, 145 F.3d 937, 939 (7th Cir. 1998). Verdict forms satisfy this standard if they "accurately, adequately, and clearly state the relevant issues." *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 701 (7th Cir. 2007). The verdict form in this case, "Verdict Form A," contained five pages corresponding to Plaintiff's five claims: Plaintiff's federal denial of medical care claim, Plaintiff's federal policy and practice claim, Plaintiff's wrongful death claim, Plaintiff's survival claim, and Plaintiff's intentional infliction of emotional distress claim. (*Id.*, Ex. 2, Verdict Form A.) Defendants argue that the damages the jury awarded as to the first four of these claims (the jury found Defendants not liable for intentional infliction of emotional distress) were duplicative of each other. (R. 499, Defs.' Reply at 2.) In each claim, Plaintiff sought compensatory damages only, and not punitive damages. (*Id.*)

28

## A. Special Interrogatories

Defendants contend that the Court erred in rejecting the special interrogatories that Defendants requested and in accepting Plaintiff's verdict forms over Defendants' objections. "Whether or not to grant a party's request to submit special interrogatories (either on all issues or on a subset of issues like damages) is committed to the sound discretion of the district court." *Cruz v. Town of Cicero, Ill.*, 275 F.3d 579, 591 (7th Cir. 2001). Defendants proposed eight special interrogatories, which asked whether each individual defendant was deliberately indifferent to Smith during the hours they were on duty in Division V, Tier 1-M of the CCDOC during the relevant period. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 4, Defs.' Proposed Jury Instructions at 67-68.) This Court determined that the special interrogatories were unnecessary. There was documentary evidence provided as to the exact shifts each individual Defendant worked, and the jury instructions explained and defined in detail the deliberate indifference requirement along with the other elements necessary to prove liability in this case. Indeed, the verdict, finding only three of the eight defendant officers liable, demonstrated the jury's careful review of the evidence to determine which officers were liable for deliberate indifference to Smith's medical needs, and which were not.

## B. Determining Damages Before Liability

Defendants also argue that the verdict forms improperly provided a space for the damages to be awarded above the question of whether Defendants were liable. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 5, Defs.' Joint Objections to Pl.'s Proposed Jury Instructions at 5.) Defendants contend that this format improperly "presumes that an award is warranted prior to a finding of liability," and suggests "that an award must be made in this matter regardless of

29

whether there is a finding of liability." (*Id.*) Where the verdict form provides a space for damages, however, it specifically states that "if you find against the plaintiff on her particular claim fill in the number 0 [zero]." Moreover, verdict forms commonly place the damages determination before the liability determination. Accordingly, the Court finds that the verdict forms in this case "accurately, adequately, and clearly state the relevant issues." *Chlopek*, 499 F.3d at 701.

### C. Juror Signatures

Defendants also argue that the jury's verdict should not stand because out of the five pages to Verdict Form A, only the last page contains the jurors' signatures. Defendants contend (without citation to any relevant case law) that to be valid, the jurors must sign each page of the verdict form. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 2, Verdict Form A at 5.) The Court disagrees. All eight jurors signed the bottom of the last page of the verdict form, and after receiving the verdict, the Court went through each page of the verdict form on the record and then polled the entire jury to verify that all of the jurors were in agreement as to the entire verdict. (Trial Tr. at 2024-28.) As all of the jurors stated that they were in agreement, reversal on this ground is not warranted.

### D. Federal Denial of Medical Care Claim Against Individual Defendants

The first page of the Verdict Form addressed Plaintiff's federal denial of medical care claim against the individual Defendants. The jury awarded Plaintiff $150,000 in compensatory damages on this claim. Defendants argue that the jury should not have been allowed to assess compensatory damages separately against the individual and government defendants, as Plaintiff's injury was indivisible and the estate was entitled to only one recovery. (R. 480, R.

480, Defs.' Post-Verdict JMOL Mot. at 1.) The purpose of compensatory damages is to make the plaintiff whole. *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1146 (7th Cir. 1985). Liability for compensatory damages is joint and several among multiple defendants. *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1296 (7th Cir. 1989). A plaintiff is entitled to only one recovery when it seeks damages for the same harm from multiple defendants. *Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark,* 39 F.3d 812, 821 (7th Cir. 1994). It follows that a plaintiff may not recover duplicate compensatory damages on both a *Monell* claim and on individual Section 1983 claims. *See Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *8 (N.D. Ill. Nov. 29, 2007); *Elrod v. City of Chicago*, Nos. 06 C 2505, 07 C 203, 2007 WL 3241352, at *3 (N.D. Ill. Nov. 1, 2007); *see also Spanish Action Comm. of Chicago v. City of Chicago*, 766 F.2d 315, 321 (7th Cir. 1985) (opining that Section 1983 plaintiff's award would not be increased by increasing the number of defendants because they are jointly and severally liable for compensatory damages).

Indeed, although the jury instructions in this case warned against duplicative compensatory damages, the verdict form asked the jury to award compensatory damages separately for Plaintiff's federal denial of medical care claim against the individual Defendants and Plaintiff's federal policy and practice claim against the government. The jury instructions explained that the two claims went toward the same injury to Plaintiff:

> As to Plaintiff's federal claims of denial of medical care and her policy and practice claims, if you find in favor of the Plaintiff, then you must determine the amount of money that will fairly compensate Plaintiff for any injury that you find Norman Smith sustained and is reasonably certain to sustain in the future as a direct result of the failure to provide Norman Smith with medical care or any policy and practice failures. . . . You should consider the following types of compensatory damages, and no others: (1) The earning capacity that Plaintiff has

> lost and the present value of the earning capacity that Plaintiff is reasonably
> certain to lose in the future because of his inability to work; . . . (2) The physical
> and mental/emotional pain and suffering that Norman Smith experienced.

(R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 1, Jury Instructions at 32-33.) The jury instructions

also warned against allowing Plaintiff double recovery for the same injury:

> You must not award compensatory damages more than once for the same injury.
> For example, if the plaintiff prevails on two claims and establishes a dollar
> amount for his injuries, you must not award him any additional compensatory
> damages on each claim. The plaintiff is entitled to be made whole once, and may
> not recover more than he has lost. Of course, if different injuries are attributed to
> separate claims, then you must compensate the plaintiff fully for all of his injuries.
> . . .

(*Id.* at 46.)

Somewhat contradictorily, the jury instructions as to the policy and practice claims stated

that the jury "must consider whether The Cook County Sheriff's Office or the County of Cook *is*

*also* liable to Plaintiff." (*Id.* at 27 (emphasis added).) In addition, the first and second pages of

the verdict form provided separate spaces for the jury to award compensatory damages for

Plaintiff's individual claim for denial of medical care and her policy and practice claims.[11] Thus,

despite the jury instructions, the verdict form asked the jury to award duplicative damages for the

same injury—denial of medical care.

Nevertheless, despite this discrepancy between the jury instructions and the verdict form,

the jury's verdict was not inconsistent. The Court presumes that the jury followed the Court's

instructions, *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1346 (7th Cir.

_____

[11] Notably, even in Defendants' proposed verdict forms, they, like Plaintiff, proposed
separate compensatory damages for Count I—Deliberate Indifference To Serious Medical Need
Against Individual Defendants and Count II—Monell Policy Claims. (R. 480, Defs.' Post-
Verdict JMOL Mot., Ex. 4, Defs.' Proposed Instructions at 70, 72.)

1992), and here, the instructions informed the jury that damages for the federal denial of medical care claims—both the individual and policy and practice claims—were the same and admonished the jury not to award duplicative damages. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 1, Jury Instructions.) In conforming their responses on the verdict form to the Court's instructions, the jury appears to have attempted to allocate the damages between the individual defendants in the first claim and the government defendants in the second claim. Allocating damages among defendants who are jointly and severally liable, however, is not proper. The Seventh Circuit has provided guidance in these situations. In *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987), the Seventh Circuit opined that the court "could decide that the highest assessment of compensatory damages against any of the jointly liable defendants placed a ceiling on the recovery of compensatory damages." Similarly, in *Transcraft, Inc. v. Galvin*, 39 F.3d 812, 821 (7th Cir. 1994), the Seventh Circuit opined that where the jury improperly assessed damages separately against two defendants who were jointly and severally liable, the proper damage award would not be the cumulation of the two damages awards, but the amount of the higher award. Accordingly, the Court finds that the total amount of compensatory damages awarded to Plaintiff on her federal denial of medical care claims is the higher amount of damages awarded for her policy or practice claim, $4 million, and the Court remits the jury's total damage award from $4,450,000 to $4,300,000.

## E.    Federal Policy and Practice Claims

Defendants also dispute the amount of damages awarded on Plaintiff's policy or practice claim.

33

### 1. Duplicative Damages

Defendants argue that the Court erred in allowing the jury to assess liability against both the Sheriff and Cook County for the practice of severely understaffing correctional officers at the Jail. (R. 480, Defs.' Post-Verdict JMOL Mot. at 5.) Defendants contend that either Cook County did not provide proper funding *or* the Sheriff did not properly use its resources to adequately staff the jail, but that both of them could not be liable for the same wrongful policy. (R. 499, Defs.' Reply at 4-5.) While Plaintiff may not recovery duplicative damages from these defendants, both defendants can be—and are, according to the jury's verdict—jointly and severally liable for the practice of severely understaffing correctional officers at the Jail. As a consequence of finding both the Sheriff and Cook County liable for understaffing, where the verdict form provided space for the jury to award compensatory damages for Plaintiff's policy or practice claims, the jury wrote "Cook County - $3,000,000 [;] Sheriff of Cook County - $1,000,000." (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 2, Verdict Form A at 2.) Defendants contend that this verdict resulted in duplicative damages for Plaintiff because the jury found the government defendants liable twice for the same harm caused by the same wrong. (R. 480, Defs.' Post-Verdict JMOL Mot. at 6.)

Indeed, "a plaintiff is entitled to only one recovery when it seeks damages for the same harm from multiple defendants." *Transcraft*, 39 F.3d at 821. The issue here is akin to the one discussed above: did the jury intend for the Court to cumulate the damage awards (for a total award of $4 million on this claim) or did the jury apportion $1 million to the Sheriff out of a total damages award of $3 million? As explained above, the jury was instructed not to award compensatory damages more than once for the same injury, and the verdict form is more

34

reasonably read as awarding $4 million total to Plaintiff. The jury found the Sheriff and Cook County liable in the amount of $4 million to Plaintiff, but improperly attempted to allocate the damages between them. In this situation, "[s]ince we normally presume that juries follow the court's instructions, we must presume that the damages the jury awarded on each of the [] counts are not duplicative awards for the same injury, and thus cumulation of the awards was proper." *Havoco*, 971 F.2d at 1346 (citing *United States v. McKinney*, 954 F.2d 471, 478 (7th Cir. 1992)). Accordingly, the Court finds that the total amount of compensatory damages awarded to Plaintiff on her federal denial of medical care claims is $4 million.

Defendants argue, however, that the jury disregarded the jury instructions and awarded inconsistent, cumulative damages. Indeed, a jury is not free to disregard the Court's instructions, especially when doing so impermissibly leads to inconsistent verdicts. *Thomas v. Stalter*, 20 F.3d 298, 303 (7th Cir. 1994). A party claiming that inconsistent verdicts have been returned is not entitled to a new trial "unless no rational jury could have brought back" the verdicts that were returned. *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005). In fact, if possible, the court must reconcile apparently inconsistent verdicts, rather than overturn them. *Id.* In determining whether the jury's verdicts can be reconciled, the district court looks closely at its own instructions. *Id.* Contrary to Defendants' contentions, cumulating the damages awarded against the Sheriff and Cook County is consistent with this Court's instructions.

### 2. Punitive Damages

Defendants also argue that the total jury award of $4 million for the policy and practice claims amounts to improper punitive damages because the amount is out of sync with the $150,000 awarded against the individual Defendants. (R. 499, Defs.' Reply at 4-5.) However,

35

the jury did not determine that the individual Defendants only caused $150,000 in damages to Plaintiff, while punishing the County and Sheriff with $3,850,000 in damages. The jury instructions repeatedly informed the jury that only compensatory damages could be awarded in this case. (*See, e.g.*, R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 1, Jury Instructions at 46.) Moreover, the evidence showed that a young father died in police custody from a treatable disease: $4 million is a reasonable compensatory award for such a tragedy. Although "[t]here is always the danger that the 'deep pocket' of the municipality's tax base will tempt a jury to succumb to an unprincipled determination," the Court cannot indulge in such speculation, but rather must presume that the jury followed the Court's instructions. *Deloughery*, 422 F.3d at 619 (citing *Am. Nat'l Bank & Trust Co. of Chicago v. Reg'l Transp. Auth.*, 125 F.3d 420, 431 (7th Cir. 1997); *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 977 (7th Cir. 2002).)[12] For the reasons discussed above, the Court upholds the jury's award of $4 million in compensatory damages for Plaintiff's federal denial of medical care claims.

### 3. Excessive and Speculative Damages

Defendants further contend that the $4 million awarded for Plaintiff's federal denial of medical care claims was excessive and speculative. In ruling on a motion for remittitur, the district court must grant proper deference to the jury's verdict and limit its inquiry to three questions: "whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered

---

[12] Defendants also argue that this Court's comments *after* the jury's verdict—that the jury "sent a message" to the County—showed that the jury's verdict amounted to punitive damages. (R. 480, Defs.' Post-Verdict JMOL Mot. at 5.) This, of course, could not be the case, as a statement after the jury verdict could not have impacted the jury verdict.

36

imaginings or personal vendettas; and whether the award is roughly comparable to awards made in similar cases." *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566-67 (7th Cir. 2006). "A jury has wide discretion in determining damages." *Liu v. Price Waterhouse LLP*, 302 F.3d 749, 756 (7th Cir. 2002) (internal citations omitted). The Court reviews the damages evidence in the light most favorable to the jury's verdict. *Deloughery*, 422 F.3d at 619.

The jury award here is sufficiently commensurate with other Section 1983 cases in this Circuit, such that remittitur of the $4 million award is not warranted. For example, in *Estate of Moreland v. Dieter*, 395 F.3d 747, 751 (7th Cir. 2005), the Seventh Circuit upheld the jury award of $29 million in compensatory damages for the wrongful death of an inmate caused by the defendants' use of unnecessary and excessive force. In addition, in *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 689 (7th Cir. 1995), where the plaintiff had to have his left arm amputated, the Seventh Circuit upheld the jury verdict of $4,201,000 in compensatory damages. In this case, a 32-year-old father died from a treatable disease because of what the jury found to be constitutional violations of Defendants. Contrary to Defendants' contentions, as reviewed above, there was adequate evidence presented at trial to support the jury's verdict in this case.

### F. State Law Claims

On the remaining state law claims, the jury awarded Plaintiff $150,000 for her wrongful death claim and $150,000 for her survival claim, but found against Plaintiff on her intentional infliction of emotional distress claim. (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 2, Verdict Form A at 3-5.)

#### 1. Duplicative Damages

Defendants argue that the state law damages of $300,000 are duplicative of the federal

damages and also duplicative of each other, such that the jury's verdict is inconsistent unless read as awarding only $150,000 total for all of Plaintiff's claims, or at most $300,000. (R. 480, Defs.' Post-Verdict JMOL Mot. at 3-4.) Thus, Defendants ask for a remittitur to $150,000 or $300,000, or, alternatively, a new trial on damages. (*Id.* at 5.)

The jury instruction as to Plaintiff's wrongful death claim instructs that "if you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the children of the decedent Norman Smith for the pecuniary loss proved by the evidence to have resulted to the children from the death of Norman Smith. 'Pecuniary loss' may include loss of money, benefits, goods, services, and society." (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 1, Jury Instructions at 38.) The term "society" means "the mutual benefits that each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort, guidance and protection." (*Id.* at 39.) By contrast, damages on the survival claim compensated the "pain and suffering" and "emotional distress" experienced by *Smith*. (*Id.* at 43.) These damages compensate entirely different injuries and are thus not duplicative of each other.

Neither are the state damages completely duplicative of the federal damages. The jury instructions stated that as to Plaintiff's federal claims of denial of medical care, the jury should consider the following compensatory damages: (1) "The earning capacity that Plaintiff has lost and the present value of the earning capacity that Plaintiff is reasonably certain to lose in the future because of his inability to work;" and (2) "The physical and mental/emotional pain and suffering that Norman Smith experienced." (*Id.* at 32.) The instructions further explained that: "No evidence of the dollar value of physical or mental/emotional pain and suffering has been or

38

needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering." (*Id.*) "Present value" was defined as "the sum of money needed now which, together with what that sum may reasonably be expected to earn in the future, will equal the amounts of those monetary losses at the time in the future where they will be sustained." (*Id.*) By contrast, compensatory damages on the wrongful death claim cover pecuniary loss, including the loss to Smith's children of his money, benefits, goods, services, and society. (*Id.* at 38.) This goes beyond Smith's earning capacity as defined in the jury instructions for the federal claims.

The damages as to Plaintiff's survival claim, however, do appear to be included within a subset of the "physical or mental/emotional pain and suffering" damages included in the federal claims. The jury instructions stated that in determining damages for Plaintiff's state survival claim, the jury should consider the "pain and suffering" and the "emotional distress" Smith experienced. (*Id.* at 43.) Defendants argue that because of this duplication, the Court should remit the jury's total damage award to the $150,000 awarded as to the survival claim rather than the $4 million awarded on the federal claims. This result, however, would be contrary to the plain language of the jury instructions. The damages awarded for the federal claims, by their terms, are broader than those awarded for the survival claim. In fact, the full potential compensatory damages for the survival claim are included within the compensatory damages award for the federal claims. Accordingly, the Court finds that the damages awarded for the survival claim are duplicative of the federal damages award of $4 million, and the jury's total damage award is remitted further to $4,150,000.

## 2. Excessive and Speculative Damages

Defendants further argue that the damages awarded for the state law claims were speculative and excessive. Illinois law governs review of the damages award for Plaintiff's state law claims. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th Cir. 2006). Under Illinois law, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *Id.* (internal citations omitted). Accordingly, a damages award will not be subject to remittitur if it "falls within the flexible range of conclusions which can be reasonably supported by facts because the assessment of damages is primarily an issue of fact for jury determination." *Id.* As explained above, Plaintiff presented the jury with sufficient, competent evidence at trial to establish $150,000 in damages with a fair degree of probability.

## G. Bias

Finally, Defendants contend that this Court was biased against them, thus denying them a fair trial. Defendants argue that the Court: (1) during pre-trial conferences, stated that Plaintiff's attorneys' fees already exceeded Defendants' offer of judgment of $500,000 (inclusive of attorneys' fees and costs), and urged the Cook County Board to reassess its settlement position (R. 480, Defs.' Post-Verdict JMOL Mot., Ex. 16, 11/7/07 Tr. at 5-6); (2) "chastised" Defendants' witnesses CMT James Myvette and Dr. Raba in front of the jury for repeatedly failing to answer a question "yes" or "no"; (3) refused to allow defense counsel to redirect Dr. Raba; (4) did not allow defense counsel to cross-examine Plaintiff about the existence of Smith's fourth child, after she testified to having only three grandchildren; and (5) after the verdict, commented to the jury that "by this verdict you intend a serious message that things need to change at the Cook County Jail," and expressed agreement with the verdict. (R. 480, Defs.' Post-Verdict JMOL

Mot. at 13.)

None of these arguments demonstrate bias by this Court. First, as to the Court's comments about Defendants' offer of judgment, a judge may properly form an opinion "on the basis of facts introduced or events occurring in the course of the current proceedings . . . unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). In this case, Plaintiff had refused Defendants' offer of judgment in part because her attorney's fees exceeded the offer of judgment. Based on Plaintiff's representations, this Court properly formed an opinion about the fees that Plaintiff's attorneys would likely seek if Plaintiff was successful in this matter. The Court's statement during pre-trial proceedings thus did not indicate bias.

Second, this Court's direction to witnesses Myvette and Raba to answer the question before them did not display any favoritism or antagonism by this Court. As the Supreme Court recognized:

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible . . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Liteky*, 510 U.S. at 555-56 (emphasis in original). The Court's direction to Myvette and Raba was "ordinary efforts at courtroom administration" and nothing more.

Third, this Court did not refuse to allow defense counsel to redirect Dr. Raba. The Court

allowed *two* of Defendants' attorneys to separately conduct a direct examination of Dr. Raba, both Cook County's attorney and the attorney for the individual defendants even though there was some overlap in their questions. (Trial Tr. at 1464-1503.) In addition, the Court allowed only a very brief redirect by one of the defense attorneys because Dr. Raba—Defendants' own witness—was squeezed in at the middle of Plaintiff's case to accommodate *Defendants*, who represented that Raba was only available that particular day at that particular time. (*See* Trial Tr. at 1463-64, 1521.) In addition, it was nearing the end of the day, and Defendants had already examined Dr. Raba extensively. (*Id.*)

Fourth, Defendants claim that this Court's decision to grant Plaintiff's motion in limine to bar Defendants from questioning Plaintiff as to Smith's undiscovered heirs—in particular, an alleged fourth child of Smith—demonstrated this Court's bias against Defendants. Defendants' displeasure with some of the Court's rulings is an insufficient basis to support their accusation of bias. *See Liteky*, 510 U.S. at 555. In fact, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* "[O]nly personal animus or malice on the part of the judge can establish bias." *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 718 (7th Cir. 2004). This Court determined that inquiring into Smith's undiscovered heirs was irrelevant and prejudicial as the discovery of an unknown fourth grandchild by Defendants would not have attacked Plaintiff's credibility, as Defendants argue.

Fifth, Defendants argue that this Court's comment after the jury verdict was read demonstrated that this Court was biased against them. The Court stated:

> I will tell you, this is a verdict that I agree with, having presided over this trial and presided over this case. I think by this verdict you intend to send a serious message that things need to change at

the Cook County Jail.

(Trial Tr. at 2028.) This comment does not reflect any bias on the part of this Court. As explained above, a judge may properly form an opinion "on the basis of facts introduced or events occurring in the course of the current proceedings." *Liteky*, 510 U.S. at 555. In this case, where the Court issued numerous rulings in favor of and against both parties, sustaining many of Defendants' evidentiary objections and denying several of Plaintiff's motions in limine, as well as granting in part Defendants' motion for summary judgment, Defendants' argument that this Court showed "such a high degree of favoritism or antagonism as to make fair judgment impossible," borders on the frivolous. *Liteky*, 510 U.S. at 555-56.

## VII. Plaintiff's Counsel's Fee Petition

Finally, Plaintiff's counsel has also submitted a petition for fees. Defendant Cook County filed a response and objections to Plaintiff's fee petition, and the remaining Defendants adopted Cook County's response and objections. (R. 495, Cook County's Resp. and Objection to Fee Pet.; R. 497, Defs.' Adoption of Cook County's Resp. and Objection.) Plaintiff's attorneys seek a total of $1,287,815, accounting for 2,634.75 hours of attorney work. (R. 491, Pl.'s Pet. for Fees, Ex. A.) Defendants argue that this Court should reduce Plaintiff's requested fees and costs by $824,199.99.[13] (R. 495, Cook County's Resp. and Objection to Fee Pet. at 1.)

Section 42 U.S.C. § 1988 provides that in a Section 1983 actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's

_____

[13] Defendants' argument that the timing of Plaintiff's filing of its Fee Petition is untimely is without merit, as this Court granted Plaintiff's motion for an extension of time and specifically set a briefing schedule on this matter, to which Plaintiff complied. (*See* R. 489, 2/19/2008 Min. Order and R. 490, 2/20/2008 Min. Order.)

fee as part of the costs." 42 U.S.C. § 1988(b). The parties agree that Plaintiff is the "prevailing party" in this case,[14] but they disagree as to what a "reasonable attorney's fee" and costs should be in this case. The fee applicant bears the burden of establishing and documenting the appropriate hours expended and hourly rates. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The district court has "wide latitude" in setting awards of attorney's fees. *Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003). Where litigants cannot settle the amount of a fee, "the most useful starting point for [court determination of] the amount of a reasonable fee [payable by the loser] is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," the so-called "lodestar" determination. *Gisbrecht v. Barnhart*, 535 U.S. 789, 802 (2002) (quoting *Hensley*, 461 U.S. at 433.) The Court may then adjust this "lodestar" calculation by other factors. *Hensley*, 461 U.S. at 440.

## A.    Reasonableness of Number of Hours Billed

The Court has an "obligation" to exclude from the fee petition hours that were "not reasonably expended on the litigation." *Spegon v. The Catholic Bishop of Chicago*, 175 F.3d 544, 550 (7th Cir. 1999) (internal citations omitted). Fees "not reasonably expended" include "hours that are excessive, redundant, or otherwise unnecessary." *Id.* (citing *Hensley*, 461 U.S. at 434); *see also F. John Stark III v. PPM Am., Inc.*, 354 F.3d 666 (7th Cir. 2003) (same). The Court must disallow "not only hours spent on tasks that would not normally be billed to a paying client, but also those hours expended by counsel on tasks that are easily delegable to non-professional assistance." *Spegon*, 175 F.3d at 553 (internal citations omitted). The Court has

---

[14] A "prevailing party" is one that "succeed[s] on any significant issue in the litigation which achieves some of the benefit [he or she] sought in bringing the suit." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791-92 (1989).

carefully reviewed Plaintiff's counsel's petition for fees, as well as Defendants' detailed response and has determined the following.

### 1. Secretarial/Clerical Work

Plaintiff's counsel's fee petition includes numerous hours expended by counsel on tasks "that are easily delegable to non-professional assistance." *Spegon*, 175 F.3d at 553. This includes secretarial and clerical work, such as filing and service, as well as work properly reserved for an investigator, such as locating witnesses. In addition, parts of the fee petition improperly lump together non-professional work with attorney work, and the Court has reduced the number of hours billed accordingly. The following hours listed in Plaintiff's counsel's time sheets were *not* reasonably billed for these reasons (*see* R. 491, Pl.'s Pet. for Fees, Ex. B, Time Sheets):

| | | | |
|---|---|---|---|
| 5/17/04 | Fax to Marlita Thomas | DSA | .25 |
| 5/21/04 | Filing of Complaint | DSA | .75 |
| 5/21/04 | Preparation of Summons and Cover Sheet, final draft of Complaint | CRS | 2 |
| 5/21/04 | Service on County | DSA | .5 |
| 5/21/04 | Filing of Complaint | DSA | .75 |
| 5/21/04 | Preparation of Summons and Cover Sheet, final draft of Complaint | DSA | 2.75 |
| 8/23/04 | Draft Summonses | CRS | 2 |
| 8/23/04 | Draft Summons | PLC | .5 |
| 8/25/04 | Review Amended Complaint, Summons, Draft Cover, file Complaint | CRS | 2 |
| 8/25/04 | Review Amended Complaint, Summons, Draft Cover, file Complaint | DSA | 4 |
| 9/14/04 | Obtain Service information and serve Cermak defendant and Cook County | CRS | 2.25 |
| 9/14/04 | Obtain Service information and serve Cermak defendant and Cook County | PLC | 2.25 |
| 10/14/04 | Locate Ruth Rotherstein | PLC | 2.25 |
| 2/8/05 | Preparation of 2nd Amended Complaint and Filing Docs. | CRS | 2 |

| 2/9/05 | Preparation and Filing Second Amended Complaint | DSA | 3.75 |
|---|---|---|---|
| 4/22/05 | Edit and send out Demand Letter | DSA | 1 |
| 10/24/05 | Fax to Thomas | PLC | .25 |
| 10/25/05 | Fax to Client | CRS | .25 |
| 1/5/06 | Preparation of summons | CRS | .5 |
| 1/26/06 | Calls re: address of Johnson and Facundo | DSA | .5 |
| 1/29/06 | Service of Remaining Sheriff Department | DSA | 1.5 |
| 1/30/06 | Review of Letter re: Addresses | DSA | .5 |
| 4/10/06 | Review of correspondence, discovery and location of witnesses search for other cases re: failure to provide medical care (reducing hours for location of witnesses) | JSK | 1.5 |
| 4/10/06 | Review of correspondence, discovery and location of witnesses search for other cases re: failure to provide medical care | CRS | 1.5 |
| 5/5/06 | Deposition notices | JSK | .5 |
| 6/27/06 | Location and conference with Carlos Matias (reducing hours for location of Matias) | CRS | .75 |
| 6/27/06 | Location and conference with Carlos Matias | JSK | .75 |
| 7/17/06 | Letter re: deposition and location of Carlos Matias | JSK | .5 |
| 7/26/06 | Correspondence re: discovery addresses and deposition | JSK | .5 |
| 9/6/06 | Correspondence re: address of Titus Haynes | JSK | .25 |
| 9/6/06 | Call re: witness location, meeting and interview Titus Haynes (reducing hours for location of Haynes) | JSK | 1.5 |
| 9/6/06 | Call re: witness location, meeting and interview Titus Haynes | PLC | 1.5 |
| 9/8/06 | Correspondence regarding witness addresses | JSK | .75 |
| 9/8/06 | Location of witness | CRS | 2 |
| 9/8/06 | Location of witness | JSK | 2 |
| 9/8/06 | Notice of deposition | JSK | .5 |
| 9/8/06 | Notice of deposition | CRS | .5 |
| 10/23/06 | Call and correspondence to arranging telephone conference with Darius Parker | JSK | 1 |
| 10/27/06 | Locate, meet and interview witness Titus Haynes (reducing hours for locating) | CRS | 1 |
| 10/27/06 | Locate, meet and interview witness Titus Haynes | JSK | 1 |
| 11/8/06 | Setting up deposition of Patton and Hladick [sic] | JSK | .5 |

| 11/9/06 | Locating, meeting and interviewing George Robotis (reducing hours for locating) | CRS | 1 |
|---------|------------------------------------------------------------------------------------|-----|------|
| 11/9/06 | Locating, meeting and interviewing George Robotis | JSK | 1 |
| 11/15/06 | Reviewing discovery, locating important witnesses | JSK | 1.5 |
| 11/15/06 | Reviewing discovery, locating important witnesses | CRS | 1.5 |
| 12/5/06 | Setting up deposition | JSK | .5 |
| 12/8/06 | Letter and communication regarding deposition and scheduling | JSK | 1.75 |
| 2/14/07 | Drafting letter and calls re: scheduled motions and depositions | DSA | 1.5 |
| 3/7/07 | Review correspondence re: Johnson dep. scheduling | CRS | .25 |
| 4/25/07 | Preparation and filing of motion to compel HIPPA documents | JSK | 2 |
| 7/11/07 | Preparation demand letter and notice of deposition | CRS | 1.5 |
| 11/4/07 | Witness location | CRS | 2.5 |
| 11/7/07 | Information and witness location | CRS | 1 |
| 11/8/07 | Locating witnesses | CRS | 2 |

## 2. Excessive Billing

The Court also finds that some of the hours Plaintiff's counsel billed are excessive.[15] The Court thus finds that the following hours billed were unreasonable; the hours listed are portions of the total hours billed by Plaintiff's attorneys. Although "block billing"—billing many hours under one general heading—is not a prohibited practice, *see Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 569 (7th Cir. 2006), it is Plaintiff's counsel's burden to establish and document the appropriate hours expended, *Hensley*, 461 U.S. at 437. In this case, Plaintiff's counsel's time sheets were often insufficiently detailed to permit adequate review of the time billed to specific tasks, and the Court reduced the hours billed accordingly. *See Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008) (holding that district court did not abuse discretion in

---

[15] Contrary to Defendants' arguments, however, the Court does not find billing in .25 hour increments inherently objectionable, and the Seventh Circuit has not yet addressed this issue.

rejecting allegation of block billing where invoices were sufficiently detailed to permit adequate review). Accordingly, the Court has reduced the hours Plaintiff's counsel billed by the hours listed below next to the corresponding entry listed in Plaintiff's counsel's time sheets. (*See* R. 491, Pl.'s Pet. for Fees, Ex. B, Time Sheets.) The reasons for the Court's decrease in the number of hours is described in parentheses in the table below where the time entry itself is not self-explanatory. A parenthetical description next to a certain time entry applies to the same or similar entries listed beneath it.

| 12/27/04 | Discussion regarding filing motion for extension (reducing hours billed because motion was only 2 pages, with no case law) | CRS | .25 |
|---|---|---|---|
| 12/27/04 | Discussion regarding filing motion for extension | DSA | .25 |
| 12/27/04 | Discussion regarding filing motion for extension | PLC | .25 |
| 12/29/04 | File a Motion for Extension of Time; Amended | CRS | .5 |
| 12/30/04 | Review/re-draft and file motion for extension of time to file Amended Complaint | DSA | .75 |
| 3/11/05 | Review of Motion and Memorandum to Dismiss and Planning Meeting (reducing hours because no response to motion ever filed) | PLC | 1.25 |
| 3/11/05 | Review of Motion and Memorandum to Dismiss and Planning Meeting | CRS | 1.25 |
| 3/15/05 | Meeting re: Motion to Dismiss - Review & Research | CRS | 1.5 |
| 3/15/05 | Meeting re: Motion to Dismiss - Review and Research | DSA | 3.5 |
| 3/15/05 | Meeting re: Motion to Dismiss | PLC | .5 |
| 8/4/05 | Research and Preparation of Memorandum regarding Russ Cases impact on Motion to Dismiss (reducing hours because 2 page simplistic memo) | DSA | 2.5 |
| 8/8/05 | Drafting Memorandum/Russ v. Watts | DSA | 2 |
| 8/8/05 | Draft and filing of Memorandum on Russ v. Watts | DSA | 2.25 |
| 12/6/05 | Preparation motion for leave to conduct in excess of ten depositions (1.5 pages long); 4th Amended Complaint, and Motion for leave to file | DSA | 1.5 |
| 12/10/05 | Review of Motion for Leave to Amend and Depositions | CRS | .25 |
| 12/11/05 | Review of Responses and discussion re: Leave to Amend Complaint | DSA | .5 |
| 12/27/05 | Drafting and Filing reply to Defendants Response to Motion for Leave to file and serve affidavit (2 pages long) | CRS | 1.5 |

| | | | |
|---|---|---|---|
| 12/27/05 | Drafting and Filing reply to Defendants Response to Motion for Leave to File and serve affidavit | DSA | 1.75 |
| 2/1/06 | Review and conference re: motions to strike and motion to dismiss 4th amended complaint and continue discovery (Plaintiff's response only 3.5 pages, no case law cited) | CRS | 1.5 |
| 2/1/06 | Review and conference re: motions to strike and motion to dismiss 4th amended complaint and continue discovery | DSA | 2.5 |
| 2/1/06 | Review and conference re: motions to strike and motion to dismiss 4th amended complaint and continue discovery | PLC | 1 |
| 2/15/06 | Preparation for Responses to Motions to Dismiss or Strike | CRS | 2 |
| 2/15/06 | Drafting and filing combined responses to motions to dismiss or strike | DSA | 2.5 |
| 2/15/06 | Drafting and filing reply re: Leave for Additional Deps and Defendants response to Compel (mere 2.5 pages) | DSA | 1.75 |
| 3/20/06 | Review of file and Organization (6 hours is excessive for this vague description) | JSK | 4 |
| 3/23/06 | Preparation of case binders (8 hours is excessive) | JSK | 4 |
| 3/25/06 | Preparation of summaries and tables (6 hours is excessive) | JSK | 3 |
| 3/26/06 | Preparation of binders and log summaries (4 hours is excessive) | JSK | 1.5 |
| 4/3/06 | Preparation and filing of Motion re: Protective Order (1.5 pages) and motion deposition of keeper of records (1.5 pages) | DSA | 1 |
| 4/18/06 | Preparation and filings of motion to compel by date (2.5 pages) | DSA | 3 |
| 4/24/06 | Review and conference responses and motion to bar (plaintiff did not file response to this) | CRS | .5 |
| 4/24/06 | Review and conference responses and motion to bar | DSA | .5 |
| 4/24/06 | Review and conference responses and motion to bar | JSK | .5 |
| 6/9/06 | Letter re: outstanding discovery, depositions, missing interrogatory responses (excessive time spent on letter; counsel already billed for letter's research.) | DSA | 1.5 |
| 6/9/06 | Correspondence 3 pages letter re: deposition and discovery | JSK | .75 |
| 6/9/06 | Correspondence 3 pages letter re: deposition and discovery | CRS | .75 |
| 6/14/06 | Draft pleading re: deposition of Sheriff Sheahan | DSA | .75 |
| 7/14/06 | Draft motion for rule to show cause (2.5 pages, no case law cited) | DSA | 2 |
| 7/14/06 | Exhibits and preparation for rule to show cause | JSK | .75 |
| 7/19/06 | Preparation of reply for discovery, jail visit motion (5 pages, no case law cited) | JSK | 2 |
| 7/19/06 | Preparation of reply for discovery, jail visit motion | DSA | 2.5 |

| | | | |
|---|---|---|---|
| 9/6/06 | Research and drafting memorandum in support of motion to depose Sheriff (excessive, duplicative hours) | JSK | 2 |
| 9/6/06 | Research and drafting memorandum in support of motion to depose Sheriff | DSA | 1.5 |
| 9/6/06 | Drafting motion for default judgment of Hernandez and preparing exhibits (2 pages, no case law cited) | DSA | 2 |
| 9/6/06 | Drafting motion for default judgment of Hernandez and preparing exhibits | JSK | .5 |
| 9/7/06 | Drafting and filing motion for discovery to depose Sheriff | DSA | .75 |
| 9/7/06 | Drafting memorandum in support of deposing Sheahan | DSA | 1 |
| 9/7/06 | Filing and editing motion to defendants and Hernandez | JSK | .5 |
| 9/15/06 | Preparation of filing of motion to compel (3.5 pages, no case law cited) | DSA | 1.5 |
| 9/15/06 | Preparation of filing of motion to compel | JSK | 1.5 |
| 9/18/06 | Preparation of motion for default judgment (3.5 pages, no case law cited) | DSA | 2 |
| 9/18/06 | Preparation of motion for default judgment | JSK | 1 |
| 9/23/06 | Review document and organize file for pre-trial (excessive billing for "organizing" files) | JSK | 1.5 |
| 9/25/06 | Review and organize file for pre-trial submission | CRS | 2 |
| 9/25/06 | Review and organize file for pre-trial submission | JSK | 3.5 |
| 9/27/06 | Preparation and filing of exhibit list, witness list, and motion in limine (cannot bill for filing, *see* above; motions in limine were very brief with a dearth of case law; and excessive time billed for exhibit and witness list) | CRS | 4 |
| 9/27/06 | Preparation and filing of exhibit list, witness list, and motion in limine | JSK | 4 |
| 9/27/06 | Preparation and filing of exhibit list, witness list, and motion in limine | DSA | 5 |
| 9/27/06 | Preparation of draft of motion in limine (motions in limine were very brief with a dearth of case law) | JSK | 2 |
| 9/27/06 | Review of documents and preparation of exhibit list | DSA | 3.5 |
| 9/27/06 | Review of witness list | DSA | 2 |
| 9/28/06 | Preparation and drafting motion in limine (not feasible that attorneys spent a total of *54* hours over two days on review and preparation of witness and exhibit lists and motions in limine) | DSA | 3.5 |
| 9/28/06 | Review and preparation of exhibits list | CRS | 3.5 |
| 9/28/06 | Review and preparation of exhibits list | JSK | 3 |
| 9/29/06 | Plaintiff's motion in limine, exhibit list, witness | CRS | .5 |
| 11/7/06 | Preparation and filing motion for rule to show cause (1.5 pages, no case law) | DSA | 1 |

| 11/7/06 | Preparation and filing motion for rule to show cause | JSK | .25 |
|---------|------------------------------------------------------|-----|-----|
| 11/9/06 | Preparation and filing of Rule 56 motion for additional discovery (.5 page, no case law cited) | DSA | .75 |
| 11/9/06 | Preparation and filing of Rule 56 motion for additional discovery | JSK | .25 |
| 11/20/06 | Prep and filing motion for discovery re: Cermak supervisors | CRS | .5 |
| 11/20/06 | Prep and filing motion for discovery re: Cermak supervisors | JSK | 1 |
| 10/2/06 | Review of summary judgment documents and case and motions in limine objection to witness list (excessive hours (over 250) billed regarding summary judgment motion, response to Defendants' statement of facts, and Plaintiff's statement of additional facts, where brief and facts failed to cite to record properly or at all and brief exhibited dearth of case research). | DSA | 3.5 |
| 10/2/06 | Review of summary judgment documents and case and motions in limine objection to witness list | CRS | 2.5 |
| 10/2/06 | Review of summary judgment documents and case and motions in limine objection to witness list | JSK | 2.5 |
| 10/26/06 | Review documents and deposition re: summary judgment issues | DSA | 2 |
| 11/7/06 | Planning meeting re: summary judgment issues | DSA | 1 |
| 11/7/06 | Planning meeting re: summary judgment issues | CRS | 1 |
| 11/7/06 | Planning meeting re: summary judgment issues | JSK | 1 |
| 11/13/06 | Preparation, review of documents and sheriff Rule 56 | DSA | 3.5 |
| 11/13/06 | Preparation, review of documents and sheriff Rule 56 | JSK | 2 |
| 11/13/06 | Preparation, review of documents and sheriff Rule 56 | CRS | 2 |
| 11/21/06 | Review of motions for summary judgment | CRS | 1.5 |
| 11/21/06 | Review of motions for summary judgment | JSK | 1.5 |
| 11/22/06 | Review of motion for summary judgment, research | DSA | 3.5 |
| 11/30/06 | Review of summary judgment in supporting documents and case documents | CRS | 3.5 |
| 11/30/06 | Review of summary judgment in supporting documents and case documents | JSK | 1.5 |
| 12/1/06 | Review document and support material and files for summary judgment responses and planning meeting | CRS | 2 |
| 12/1/06 | Review document and support material and files for summary judgment responses and planning meeting | JSK | 2 |
| 12/4/06 | Review document and support material and files for summary judgment responses and planning meeting | DSA | 3 |

| 12/4/06 | Review document and support material and files for summary judgment responses and planning meeting | CRS | 2.5 |
|---------|--------------------------------------------------------------------------------------------------------|-----|-----|
| 12/4/06 | Review document and support material and files for summary judgment responses and planning meeting | JSK | 2.5 |
| 12/7/06 | Preparation for response to summary judgment | CRS | 2.5 |
| 12/7/06 | Research for summary judgment | JSK | 2.5 |
| 12/8/06 | Review of documents in support of summary judgment, review of draft, and outline and research | DSA | 3.5 |
| 12/8/06 | Responses for summary judgment and preparation for trial and review of file | DSA | 2.5 |
| 12/8/06 | Responses for summary judgment and preparation for trial and review of file | CRS | 2 |
| 12/8/06 | Responses for summary judgment and preparation for trial and review of file | JSK | 2 |
| 12/27/06 | Preparation of additional facts | CRS | 2.5 |
| 12/27/06 | Preparation of additional facts | JSK | 2.5 |
| 12/28/06 | Preparation of additional facts | CRS | 2.5 |
| 12/28/06 | Preparation of additional facts | JSK | 3 |
| 12/29/06 | Preparation of additional facts | CRS | 3 |
| 12/29/06 | Preparation of additional facts | JSK | 4 |
| 12/30/06 | Preparation for responses to Rule 56 statement | DSA | 4.5 |
| 12/30/06 | Preparation for responses to Rule 56 statement | CRS | 1.5 |
| 12/30/06 | Preparation for responses to Rule 56 statement | JSK | 1.5 |
| 1/2/07 | Preparation of responses to Sheriff Rule 56 Facts | CRS | 3.5 |
| 1/2/07 | Preparation of responses to Sheriff Rule 56 Facts | JSK | 3 |
| 1/3/07 | Preparation of responses to Rule 56 facts Sheriff | CRS | 3 |
| 1/3/07 | Preparation of responses to Rule 56 facts Sheriff | JSK | 2 |
| 1/4/07 | Preparation of additional facts | DSA | 2 |
| 1/4/07 | Preparation of additional facts | CRS | 1.5 |
| 1/4/07 | Preparation of additional facts | JSK | 1.5 |
| 1/4/07 | Preparation of responses to Rule 56 Facts Cook | CRS | 1.5 |
| 1/4/07 | Preparation of responses to Rule 56 Facts Cook | JSK | 2 |
| 1/5/07 | Preparation of additional facts and exhibits to summary judgment | CRS | 3 |
| 1/5/07 | Preparation of additional facts and exhibits | JSK | 2 |

| 1/5/07 | Review of facts and responses | DSA | 3 |
|---|---|---|---|
| 1/8/07 | Preparation and response to summary judgment motion | CRS | 2 |
| 1/8/07 | Preparation and response to summary judgment motion and exhibits | JSK | 1.5 |
| 1/9/07 | Review and edit of response to facts | CRS | 2 |
| 1/9/07 | Review and edit of response to facts | JSK | .5 |
| 1/10/07 | Review and edit of response to facts | CRS | .5 |
| 1/11/07 | Research and preparation of memorandum in opposition | JSK | 3 |
| 1/11/07 | Research and preparation of memorandum in opposition | DSA | 3 |
| 1/12/07 | Review of additional facts responses to additional facts and editing | DSA | 3 |
| 1/12/07 | Editing additional facts | JSK | 1.5 |
| 1/13/07 | Modify statement of additional facts | CRS | .75 |
| 1/13/07 | Modify statement of additional facts | DSA | 4.5 |
| 1/13/07 | Modify statement of additional facts | JSK | 1.5 |
| 1/14/07 | Preparation and research for memorandum in opposition to summary judgment | DSA | 4.5 |
| 1/14/07 | Preparation and research for memorandum in opposition to summary judgment | CRS | .5 |
| 1/14/07 | Preparation and research for memorandum in opposition to summary judgment | JSK | 1 |
| 1/15/07 | Preparation of memorandum in opposition to summary judgment | DSA | 4 |
| 1/15/07 | Preparation of additional facts and exhibits summary judgment | CRS | 4 |
| 1/15/07 | Preparation of additional facts and exhibits summary judgment | JSK | 4 |
| 1/16/07 | Preparation of exhibits for summary judgment | JSK | 3 |
| 1/16/07 | Preparation of exhibits for summary judgment | CRS | 3 |
| 1/17/07 | Preparation and filing Response to Rule 56 Statement of Sheriff | CRS | 1 |
| 1/17/07 | Preparation and filing Response to Rule 56 Statement of Sheriff | DSA | 2 |
| 1/17/07 | Preparation and filing Response to Rule 56 Statement of Sheriff | JSK | .5 |
| 1/17/07 | Preparation and filing Response to Rule 56 Statement of Cook | DSA | 1 |
| 1/17/07 | Preparation and filing Response to Rule 56 Hernandez | CRS | .25 |
| 1/17/07 | Preparation and filing Response to Rule 56 Hernandez | DSA | .25 |
| 1/17/07 | Preparation and filing Response to Rule 56 Hernandez | JSK | .25 |
| 1/17/07 | Statement of Additional Facts | CRS | 1 |

| 1/17/07 | Statement of Additional Facts | DSA | 1 |
|---------|-------------------------------|-----|---|
| 1/17/07 | Statement of Additional Facts | JSK | 1 |
| 1/17/07 | Exhibits to combine response for defendant motion for summary judgment | CRS | 1.5 |
| 1/17/07 | Exhibits to combine response for defendant motion for summary judgment | JSK | 1 |
| 1/17/07 | Exhibits to combine response for defendant motion for summary judgment | DSA | 1.5 |
| 1/17/07 | Response to motion of summary judgment | DSA | 1.5 |
| 2/2/07 | Preparation of response to reconsider | DSA | 7 |
| 2/2/07 | Preparation and filing of motion to hold Carlos Matias in contempt (1.5 pages, no case law cited) | JSK | .5 |
| 2/2/07 | Preparation and filing of motion to hold Carlos Matias in contempt | DSA | .5 |
| 2/18/07 | Preparation of Response in opposition to defendants motion to strike-Affidavits and experts (poorly researched and reviewed, no case law cited) | JSK | 1.5 |
| 2/20/07 | Preparation of Response in opposition to defendants motion to strike-Affidavits and experts | JSK | 2 |
| 2/20/07 | Preparation of Response in opposition to defendants motion to strike-Affidavits and experts | DSA | 3 |
| 2/23/07 | Review discovery and file organization (excessive hours for "file organization") | CRS | 3 |
| 2/23/07 | Review discovery and file organization | DSA | 3 |
| 2/23/07 | Review discovery and file organization | PLC | 3 |
| 2/28/07 | Preparation of additional facts | DSA | 2.5 |
| 4/4/07 | Preparation and filing of response in opposition of Hernandez (4 page response with no case law cited) | CRS | .75 |
| 4/4/07 | Preparation and filing of response in opposition of Hernandez | JSK | 1.75 |
| 8/22/07 | Preparation and research to response to motion in limine (short responses with little or no case law cited) | CRS | 2 |
| 8/22/07 | Preparation and research to response to motion in limine | JSK | 1.5 |
| 8/23/07 | Preparation of response to motion in limine | CRS | 1.5 |
| 8/23/07 | Research and preparation to response to motion in limine | DSA | 3 |
| 8/23/07 | Research and preparation to response to motion in limine | JSK | 1.5 |
| 8/24/07 | Filing and preparation of response to motion in limine | JSK | 1.5 |
| 8/24/07 | Filing and preparation of response to motion in limine | CRS | 1.5 |
| 8/24/07 | Filing and preparation of response to motion in limine | DSA | 2 |

| 9/6/07 | Response to motion to clarify (1 page) | CRS | .75 |
|--------|----------------------------------------|-----|-----|
| 9/28/07 | Review of exhibits list | DSA | 1 |
| 10/4/07 | Review of documents-relating to summary judgment and trial (exorbitant blocks of hours billed generically to trial preparation and review) | CRS | 1.25 |
| 10/4/07 | Review of documents-relating to summary judgment and trial | JSK | 1.25 |
| 10/5/07 | Trial preparation and planning meeting | CRS | 2 |
| 10/5/07 | Trial preparation and planning meeting | DSA | 2 |
| 10/5/07 | Trial preparation and planning meeting | JSK | 2 |
| 11/1/07 | Planning meeting; trial preparation, contacting client | CRS | 1.5 |
| 11/1/07 | Planning meeting; trial preparation, contacting client | JSK | 1.5 |
| 11/2/07 | Trial preparation and motion to amend witness list | JSK | .5 |
| 11/2/07 | Review deposition transcripts of witness for trial and trial preparation | DSA | 3 |
| 11/2/07 | Review deposition transcripts of witness for trial and trial preparation | JSK | 2 |
| 11/2/07 | Review deposition transcripts of witness for trial and trial preparation | CRS | 2 |
| 11/3/07 | Trial preparation | JSK | 1 |
| 11/4/07 | File organization | JSK | 2 |
| 11/6/07 | File organization and trial preparation | JSK | 2 |
| 11/6/07 | File organization and trial preparation | CRS | 1 |
| 11/6/07 | File organization and trial preparation | DSA | 3 |
| 11/7/07 | File organization and trial preparation | JSK | 3.5 |
| 11/7/07 | Trial preparation | DSA | 4 |
| 11/7/07 | Trial preparation | CRS | 3 |
| 11/8/07 | Trial preparation | JSK | 4 |
| 11/8/07 | Trial preparation review depositions | DSA | 4 |
| 11/8/07 | Trial preparation | CRS | 2 |
| 11/9/07 | Trial preparation | CRS | 4 |
| 11/9/07 | Trial preparation | JSK | 5 |
| 11/9/07 | Trial preparation | DSA | 3 |
| 11/10/07 | Trial preparation | JSK | 4 |
| 11/10/07 | Trial preparation | CRS | 1 |

| Date | Description | Initials | Hours |
|---|---|---|---|
| 11/11/07 | Trial preparation | DSA | 2.5 |
| 11/11/07 | Trial preparation | JSK | 5 |
| 11/11/07 | Trial preparation | CRS | 1 |
| 11/11/07 | Trial preparation review of deposition and file preparation | DSA | 2.5 |
| 11/12/07 | Trial preparation | DSA | 4 |
| 11/12/07 | Trial preparation | CRS | 2.5 |
| 11/12/07 | Trial preparation | JSK | 2.5 |
| 11/13/07 | Trial preparation review of deposition and file preparation | DSA | 5 |
| 11/13/07 | Trial preparation | CRS | 3.5 |
| 11/13/07 | Trial preparation | JSK | 5 |
| 11/14/07 | Trial preparation and file organization | DSA | 4 |
| 11/14/07 | Trial preparation | CRS | 5 |
| 11/14/07 | Trial preparation | JSK | 5 |
| 11/15/07 | Trial preparation review of deposition and file preparation | DSA | 5.5 |
| 11/15/07 | Trial preparation review of deposition and file preparation | JSK | 3 |
| 11/15/07 | Trial preparation | CRS | 3 |
| 11/16/07 | Trial preparation; witness examination preparation | DSA | 5 |
| 11/16/07 | Trial preparation | JSK | 4 |
| 11/16/07 | Trial preparation | CRS | 3 |
| 11/17/07 | Trial preparation | CRS | 4.5 |
| 11/17/07 | Trial preparation | JSK | 4.5 |
| 11/17/07 | Trial preparation | DSA | 4.5 |
| 11/18/07 | Trial preparation | CRS | 4 |
| 11/18/07 | Trial preparation | JSK | 4 |
| 11/18/07 | Trial preparation review of deposition and file preparation | DSA | 3.5 |
| 11/19/07 | Trial preparation and jury instructions; witness preparation | DSA | 4 |
| 11/19/07 | Trial preparation and jury instructions; witness preparation | JSK | 3 |
| 11/19/07 | Trial preparation and jury instructions; witness preparation | CRS | 3 |
| 11/20/07 | Trial preparation and jury instructions; review of documents | DSA | 4 |

| 11/20/07 | Trial preparation and jury instructions; review of documents | CRS | 3.5 |
|----------|----------------------------------------------------------------|-----|-----|
| 11/20/07 | Trial preparation and jury instructions; review of documents | JSK | 4.5 |
| 11/21/07 | Trial preparation | CRS | 4 |
| 11/21/07 | Trial preparation | JSK | 5 |
| 11/21/07 | Trial preparation review of deposition and file preparation and exhibits | DSA | 4 |
| 11/22/07 | Trial preparation review of deposition and file exhibits | DSA | 6 |
| 11/22/07 | Trial preparation | CRS | 4 |
| 11/22/07 | Trial preparation | JSK | 5 |
| 11/23/07 | Trial preparation | CRS | 5 |
| 11/23/07 | Trial preparation and jury instructions | DSA | 4 |
| 11/23/07 | Trial preparation and jury instructions | JSK | 3 |
| 11/24/07 | Trial Preparation | JSK | 5 |
| 11/24/07 | Trial Preparation | CRS | 4.5 |
| 11/24/07 | Trial Preparation | DSA | 4 |

The Court does not find excessive the hours Plaintiff's counsel billed during trial. While Plaintiff's counsel billed many hours during trial (for example, a total of 62 hours, not including the time spent by attorney Raymond Smith, on the day before trial and the first day of jury selection—November 25-26, 2007), the Court finds that those hours are reasonable, considering the hours in court and the hours spent preparing for court. Contrary to Defendants' contentions, the Court does not find anything inherently wrong with the fact that four attorneys attended the trial, or that two to three attorneys attended depositions, as this was a complex case with voluminous records, and Defendants had at least as many attorneys attend these proceedings.

### 3. Hours Billed by Attorney Raymond Smith

On the eve of trial, attorney Raymond Smith joined Plaintiff's trial team, yet he managed to bill 157.5 hours even though he only played a minor role at trial. (R. 491, Pl.'s Pet. for Fees,

Ex. A, time sheets at 21-24.)  The Court finds Raymond Smith's hours highly unreasonable, and cuts back his hours by the following amounts.

| 11/16/07 | Trial preparation | RJS | 3 |
|---|---|---|---|
| 11/19/07 | Trial preparation | RJS | 2 |
| 11/21/07 | Trial preparation | RJS | 4 |
| 11/22/07 | Trial preparation | RJS | 3 |
| 11/23/07 | Trial preparation and jury instructions | RJS | 3 |
| 11/24/07 | Trial preparation | RJS | 3 |
| 11/25/07 | Trial preparation | RJS | 1.5 |
| 11/26/07 | Preparation for trial, jury selection, assistance with opening | RJS | 4 |
| 11/27/07 | Trial and witness preparation; trial attendance | RJS | 4 |
| 11/28/07 | Trial and witness preparation; trial attendance | RJS | 4 |
| 11/29/07 | Trial and witness preparation; trial attendance | RJS | 5 |
| 11/30/07 | Trial preparation; witness preparation and trial attendance | RJS | 4 |
| 12/2/07 | Trial preparation | RJS | 4 |
| 12/2/07 | Trial preparation | RJS | .5 |
| 12/3/07 | Trial preparation | RJS | 2 |
| 12/5/07 | Preparation for trial and attendance at court, preparation for witnesses | RJS | 4 |
| 12/6/07 | Trial preparation | RJS | 4 |
| 12/7/07 | Preparation for witness; trial attendance; trial preparation | RJS | 4 |
| 12/8/07 | Preparation for trial | RJS | 4 |
| 12/9/07 | Preparation for trial | RJS | 5 |
| 12/10/07 | Preparation for witnesses; attend trial, jury instructions | RJS | 10 |
| 12/11/07 | Assisting with closing arguments | RJS | 2 |
| 12/12/07 | Attendance at trial, review plaintiff exhibits and conference | RJS | 6 |
| 12/13/07 | In Court for verdict | RJS | 1 |
| 12/13/07 | In Court jury questions | RJS | 2 |

### 4. Clearly Duplicative/Unnecessary

Furthermore, the following hours billed are duplicative and have been decreased accordingly as stated below.

| 10/13/06 | Review of Cook County Budget materials and financial documents B1-B123 | CRS | .75 |
| 10/13/06 | Review of Cook County Budget materials and financial documents B1-B123 | JSK | 1 |
| 10/13/06 | Review of Cook County Budget materials 2000-2004 | CRS | 1 |
| 10/13/06 | Review of Cook County Budget materials 2000-2004 | DSA | 2 |
| 10/23/06 | Prepare Correspondence re: missing discovery and disclosure of addresses | CRS | .75 |
| 10/23/06 | Prepare Correspondence re: missing discovery and disclosure of addresses | JSK | .75 |
| 11/12/06 | Review and correspondence re: document for Hernandez deposition and dismissal | DSA | .25 |
| 11/12/06 | Review and correspondence re: document for Hernandez deposition and dismissal | CRS | .25 |

### 5. Non-Billable Hours

Plaintiff's counsel also improperly billed for the following activities which are not billable, and the Court has reduced Plaintiff's counsel's hours billed by the amount stated below.

| 5/5/04 | Discussion regarding the possibility of a new case | CRS | .75 |
| 5/5/04 | Discussion regarding the possibility of a new case | DSA | .75 |
| 5/5/04 | Discussion regarding the possibility of a new case | PLC | .75 |
| 8/2/06 | Meeting regarding deposition and correspondence re: cost | CRS | .75 |
| 8/2/06 | Meeting regarding deposition and correspondence re: cost | JSK | .75 |
| 8/2/06 | Meeting regarding deposition and correspondence re: cost | DSA | .75 |
| 9/1/06 | Correspondence re: cost of Naber deposition | JSK | .5 |

### 6. Erroneous Billing

Plaintiff's counsel also improperly billed for filings that did not actually occur, and thus

the following hours must be deleted from the fee petition.[16]

| 6/14/06 | Draft and preparation/reply to motion for leave to depose Sheriff Sheahan (inaccurate - original motion not even filed yet) | JSK | .5 |
|---------|---|---|---|
| 4/25/07 | Preparation and filing of motion to compel HIPPA documents (erroneous billing; this document not filed here) | DSA | 1 |
| 2/1/07 | Preparation of response to reconsider (erroneous billing; no motion to reconsider, or response filed during this time) | DSA | 6 |
| 11/17/07 | Preparation and filing response to Rule 56 Statement of Cook | JSK | 2 |

## B. Reasonableness of Hourly Rates

After determining the number of hours "reasonably expended," the Court must now

determine a "reasonable hourly rate." *Spegon v. The Catholic Bishop of Chicago*, 175 F.3d 544,

554-55 (7th Cir. 1999) (citing *Hensley*, 461 U.S. at 433). The determination of an attorney's

"reasonably hourly rate" should be based on the "market rate" for the services rendered. *Id.*

(citing *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th

Cir. 1996)). "An attorney's market rate is the rate that lawyers of similar ability and experience

in the community normally charge their paying clients for the type of work in question." *Id.* at

555 (internal citations omitted). The burden of proving the market rate is on the fee applicant;

however, once the attorney provides evidence establishing his market rate, the burden shifts to

the defendant to demonstrate why a lower rate should be awarded. *Id.* at 554-55.

If the court cannot determine the attorney's actual billing rate because the attorney

accepts cases on contingency fee bases and has no fee-paying clients, the court should look to the

next best evidence of the attorney's market rate: rates similarly experienced attorneys in the

---

[16] The Court notes that Plaintiff did correct one of these errors, the entry for 12/1/07, explaining that the entry should have billed for "trial preparation" that Saturday, not trial attendance. (R. 502, Pl.'s Reply to Fee Pet. at 2.)

community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases. *Spegon*, 175 F.3d at 555. Specifically, an attorney who maintains a contingent fee practice should submit affidavits from similarly experienced attorneys attesting to the rates they charge paying clients for similar work. *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001). "An attorney's self-serving affidavit alone cannot satisfy the plaintiff's burden of establishing the market rate for that attorney's services." *Spegon*, 175 F.3d at 556 (citing *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984)). Moreover, "while hourly rates awarded to counsel in similar cases are evidence of an attorney's market rate, each court should certainly arrive at its own determination as to a proper fee." *Id.* at 557 (citing *People Who Care*, 90 F.3d at 1312).

Plaintiff's attorneys are contingent fee lawyers. (R. 502, Pl.'s Reply to Pet. for Fees at 2.) Plaintiff's attorneys, however, only provide the Court with their own vague, self-serving affidavits and two articles describing trends in attorneys' fees. (See R. 491, Pl.'s Pet. for Fees, Ex. D (Dan Alexander Aff.), Ex E (Christopher Smith Aff.), Ex. F (Phillip Coffey Aff.), Ex. G (Jared Kosoglad Aff.), Ex. H (Raymond Smith Aff.); Ex. I (Law.Com article); Ex. J (unidentified article).) In addition, Plaintiff's counsel rely on the so-called "Laffey Matrix," which a minority of courts use to determine attorney's market rates. (R. 491, Pl.'s Pet. for Fees, Ex. K, Laffey Matrix.) This Court declines to use the Laffey Matrix here, and instead follows the Seventh Circuit's clear guidance on the issue of reasonable hourly rates.

Aside from the materials referenced above, Plaintiff's fee petition lacks any other evidence of reasonableness, such as rates awarded in similar cases or to other Chicago lawyers doing similar work. Nevertheless, based primarily on their years of experience as attested to in

their affidavits, Plaintiff's counsel requests the following hourly rates: $555 for Dan Alexander; $555 for Christopher Smith; $275 for Jared Kosoglad; $555 for Phillip Coffey, and $670 for Raymond Smith. (R. 491, Pl.'s Pet. for Fees, Ex. A.) Defendants, by contrast, argue that the following hourly rates should be used: $250 for Dan Alexander; $250 for Christopher Smith; $250 for Phillip Coffey; $175 for Jared Kosoglad; and $250 for Raymond Smith. They point to the hourly rate for Special States' Attorneys (which tops out at $185 per hour), the case of *Entertainment Software Ass'n v. Blagojevic*, 05 C 4265, where the law firm Jenner & Block provided invoices showing their attorney billing rates ranging from $215 to $585, and a twelve year old case in which Dan Alexander's reasonable fee was $200, *Carter v. Chicago Police Officers*, 1996 Lexis 11093 (N.D. Ill. 1996). (R. 495, Defs.' Resp. to Pl.'s Pet. for Fees at 5; Ex. 1; Ex. 2.)

For the reasons explained above, Plaintiff's counsel does not meet its burden of showing that the hourly rates requested are the reasonable market rate, and the Court does not find that Plaintiff's counsel possesses such an "unusual amount of skill, the ability to emphasize with the jury, investigative abilities, or other qualities which command a premium." *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 743 (7th Cir. 2003). The rates suggested by Defendants, however, are too low, as the Court does not find the Special State's Attorney's rates persuasive here and the rates Defendants suggest are only minimally higher than the rates Plaintiff's attorneys billed over ten years ago. After considering all of the exhibits and affidavits attached to Plaintiff's fee petition and the cases and exhibits cited by Defendants, as well as this Court's own experience with Plaintiff's counsel during this lengthy case, and according them their deserved weight, the Court finds that the following hourly rates are reasonable for Plaintiff's counsel. $350 for Dan

Alexander; $350 for Christopher Smith; $225 for Jared Kosoglad; $325 for Phillip Coffey, and $325 for Raymond Smith. *See, e.g., Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 660 (7th Cir. 2007) (awarding $400 for lead counsel Alexander Polikoff--who had litigated the case for decades and has far more experience than Dan Alexander and Christopher Smith; $350 for the next senior attorneys; followed by rates ranging from $200 to $265 for the less senior attorneys).

Thus, the Court orders that the hours remaining in the fee petition after the Court's deductions detailed above be compensated at the reduced rates. The Court directs the parties to agree to the appropriate final sum owed to Plaintiff's attorneys pursuant to these explicit instructions.[17]

Once the district court reaches an amount using the lodestar determination, the Court may adjust this amount based on the extent of a Plaintiff's success. *Spegon*, 175 F.3d at 557 (citing *Hensley*, 461 U.S. at 436). The Court may consider: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Blanchard v. Bergeron*, 489 U.S. 89, 91-92 (1989) (citing *Hensley*, 461 U.S. at 430). While Plaintiff's success was substantial, the Court does not find that any additional adjustment

---

[17] This should not elicit further briefing nor billing, as the Court's instructions can yield but one number.

to the lodestar determination is warranted here. The Court's analysis above in determining Plaintiff's counsel's reasonable hours and rates has already addressed and applied these additional considerations, and thus the Court finds that the lodestar amount does not require any additional adjustment.

### D. Plaintiff's Bill of Costs

Plaintiff's counsel filed both a "Bill of Costs" (R. 493, Pl.'s Bill of Costs) as well as their list of "Costs Pursuant to 42 U.S.C. 1988," attached to Plaintiff's Petition for Fees and Costs. (R. 491, Pl.'s Pet. for Fees and Costs, Ex. L.) Defendants do not object to Plaintiff's Bill of Costs in the amount of $22,839.80, and indeed, this Court finds the Bill of Costs reasonable. Defendants object entirely, however, to Plaintiff's claimed Costs Pursuant to 42 U.S.C. § 1988, in the amount of $40,630.31. (R. 495, Defs.' Resp. and Objections to Plaintiff's Fees and Costs at 11.)

Section 1988 does not specifically address the nature of costs recoverable in a Section 1983 action. *See* 42 U.S.C. § 1988. Although the award of costs is committed to the discretion of the district court, *Spegon*, 175 F.3d at 559, the Supreme Court has held that certain costs sought by Plaintiff are not recover under Section 1988. First, Section 1988 does not empower a district court to award expert fees to a prevailing party. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 302 (2006) (citing *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 92, 102 (1991)). Accordingly, the Court must deduct the $27,142.06 from Plaintiff's bill for the costs of experts William Naber and Dr. Ben Katz. (R. 491, Pl.'s Pet. for Fees and Costs, Ex. L.)

Plaintiff's counsel also seeks to recover $10,475 in investigator costs, but Plaintiff makes

64

no argument in her reply as to why she should be entitled to these fees. Moreover, this Court is not aware of any authority for the award of investigation fees as costs, and Plaintiff has not advanced any basis for the request. The Court finds that pursuant to the reasoning of the Supreme Court, investigator fees are not recoverable under Section 1988. "[A]bsent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." *Arlington*, 548 U.S. at 301 (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987)). As there is no explicit statutory or other authorization for investigator fees, the Court further deducts the $10,475 in investigator fees from Plaintiff's fee request.

Plaintiff also attempts to recover $1,800 for reimbursement of fees paid out for the deposition of Defendants' expert, Dr. Vescio. Defense counsel swears in an affidavit that Plaintiff never paid these deposition fees in the first place. (R. 495, Defs.' Resp. and Objections to Plaintiff's Fees and Costs, Ex. 4, Creighton Dep.) Plaintiff cannot recover for "reimbursement" of fees it never paid out, despite Plaintiff's claim that it is "liable" for these fees. (R. 502, Pl.'s Combined Reply to Defs.' Objections to Fee Petition at 3.) Thus, this $1,800 must be deducted from Plaintiff's fee request.

Finally, Plaintiff seeks reimbursement for various courier and copy services. While these expenses may be recoverable, *see Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir.1994), Plaintiff provides no explanation as to the reasons for these FedEx and Staples receipts. (R. 491, Pl.'s Pet. for Fees and Costs, Exs. L10-L15.) Accordingly, Plaintiff may not recover any of the "Costs Pursuant to 42 U.S.C. 1988," attached to Plaintiff's Petition for Fees and Costs. (R. 491, Pl.'s Pet. for Fees and Costs, Ex. L.)

## CONCLUSION

For the reasons stated above, the Court thus orders a remittitur of the total damage award in favor of Plaintiff from $4,450,000 to $4,150,000. The Court thus denies Defendants' motion for judgment as a matter of law or a new trial. (R. 480.) In addition, the Court modifies Plaintiff's Petition for Fees and Costs as stated above. (R. 491.)

**ENTERED:**

**Judge Ruben Castillo**
**United States District Court**

**Dated: June 2, 2008**