In the

# United States Court of Appeals

### For the Seventh Circuit

---

Nos. 08-2232, 08-2233, 08-2482, 08-2597 & 08-2948

MARLITA THOMAS,

*Plaintiff-Appellee,*

*v.*

COOK COUNTY SHERIFF'S DEPARTMENT,
ALEX SANCHEZ, JESUS FACUNDO,
TERRENCE TOOMEY, and COOK COUNTY,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3563—**Ruben Castillo**, *Judge.*

---

ARGUED DECEMBER 9, 2008—DECIDED DECEMBER 1, 2009
AMENDED MAY 3, 2010 *

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

---

* On consideration of Defendant-Appellant Cook County's
petition for rehearing and rehearing en banc, the panel has
amended its opinion. A judge called for a vote on the petition
for rehearing en banc, but a majority of active judges voted to
deny rehearing. Circuit Judges Posner, Sykes, and Tinder
voted to grant en banc rehearing. Judge Sykes has written
an opinion, which Judges Posner and Tinder have joined,
dissenting from the denial of the petition.

(continued...)

—————

Before FLAUM, WOOD, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* Norman Smith, a thirty-two-year-old pretrial detainee, arrived at Cook County Jail on April 24, 2004, and died less than a week later from pneumococcal meningitis. His mother, Marlita Thomas, sued Cook County, the Cook County Sheriff, and a number of correctional employees under 42 U.S.C. § 1983, alleging that the defendants violated her son's constitutional rights by failing to respond to his serious medical needs. Thomas also alleged various state law claims. At trial, a number of Smith's fellow inmates testified that Smith's condition rapidly deteriorated while prison officials turned a blind eye. The jury agreed with this assessment. It returned a verdict in Thomas's favor and awarded damages in the amount of $4,450,000 against Cook County, the Sheriff, and three individual officers. The district court denied the defendants' motion for judgment as a matter of law and the defendants now appeal. Specifically, they challenge the sufficiency of the

—————

\* (...continued)

On consideration of the individual Defendants-Appellants' petition for rehearing and rehearing en banc, all members of the original panel have voted to deny the petition for rehearing. No judge in regular active service requested a vote on the petition for rehearing en banc. Judge Rovner did not take part in consideration of either petition.

evidence supporting each of the jury's liability determinations, the trial court's evidentiary rulings, and the jury's compensatory damages calculation.

We conclude that the jury had sufficient evidence to impose liability against the officers for their deliberate indifference to Smith's medical needs. The same is true for Cook County, as the evidence against it was sufficient for a reasonable jury to conclude that the County had a widespread policy of disregarding detainees' medical requests. We do not find sufficient evidence, however, to hold the Sheriff liable. The causal connection between the Sheriff's policies and practices and Smith's death is tenuous in light of the jury's finding that individual correctional officers deliberately disregarded Smith's medical needs. Nonetheless, the Sheriff's absence as a liable party does not affect the jury's compensatory damage award. The parties are jointly and severally liable for the entire award, which measures the amount required to compensate the plaintiff for her indivisible harm, and the Sheriff only added an additional source from whom the plaintiff could collect. That the Sheriff is no longer liable does not limit the amount of damages to which the plaintiff is entitled.

Nor is the amount affected by the jury's improper allocation among defendants. Because we presume that jurors follow the instructions given, we must interpret the jury verdict to be consistent whenever possible. As a result, we interpret the jury's allocation in this case as an attempt to split the total damages among the defendants, rather than an effort to issue duplicate awards

for the same injury. We also do not find a $4,000,000-plus damage award for constitutional violations that resulted in death to be excessive.

Finally, none of the defendants' evidentiary challenges warrant a reversal. Although we are somewhat troubled that the jury only heard the deposition testimony of a key witness and did not have the opportunity to assess his credibility on the witness stand, the district court's decision to admit the testimony was not an abuse of discretion. And even if it was, corroborating live testimony from other witnesses, along with the defendants' opportunity to cross-examine during the deposition, render its admission harmless. Therefore, we affirm the district court's order denying the officers and Cook County's motions for judgment as a matter of law and for a new trial. But we reverse its judgment denying the Sheriff's motion, and remand with instructions to enter judgment in the Sheriff's favor.

## I. BACKGROUND

The Cook County Department of Corrections ("CCDOC") maintains a procedure for examining inmates' health and a system designed to ensure that inmates receive appropriate medical care while incarcerated. Upon arrival at Cook County Jail, each inmate must undergo a medical examination conducted by medical personnel from Cermak Health Services of Cook County ("Cermak"), which runs the health service for detainees at Cook County Jail. Beyond the initial intake procedure, Cermak provides additional medical services to inmates as needed. Each

day, a Cermak medical technician is required to visit the tiers, where the inmates reside, and dispense medication, respond to inmate complaints, and collect medical request forms. The technicians then record, in daily contact sheets, the medications dispensed during their rounds, the medical request forms collected, and any other pertinent information, including reports of inmate sickness. In addition, Cermak maintains an infirmary, mental health facility, lab, pharmacy, and emergency room staffed by physicians, all onsite and within close proximity to the inmates.

For a number of reasons, this system did not always function as it should. First, the Supervisor for Cermak's medical technicians ("CMTs") acknowledged that Cermak had experienced problems with CMTs not picking up medical request forms every day. Some CMTs did not have the keys to access the lockbox where inmates deposited their completed medical request forms. Others simply failed to fill out or turn in their daily contact sheets. Further, a number of correctional officers reported that Cook County Jail was severely understaffed. The officers, who were employed by the Cook County Sheriff, kept daily logs in which they often made references to the dangers associated with cross-watching— a practice that required one officer to watch two tiers at the same time. One officer noted that cross-watching created a "major security risk." Another complained that he "[could] not be on both tiers at [the] same time." As a result of the understaffing and cross-watching in Cook County Jail, officers could not perform physical security checks with the frequency required by Sheriff

department policy. Also, with fewer officers on duty, CMTs were, at times, unable to gain access to the tiers to complete their rounds.

The plaintiff alleged that her son, Norman Smith, fell through the cracks created by the systemic problems in CCDOC. Smith's tragic story began on April 23, 2004 when Chicago police officers arrested him for possession of a controlled substance. The next day, he arrived at Cook County Jail, the facility where he was to remain until his trial date. Smith underwent the typical intake routine, which included a chest X-ray, blood pressure screening, psychological screening, and a review of his medical history. Those tests only revealed elevated blood pressure, for which Smith received a week's supply of medication. However, according to Smith's cellmate, Carlos Matias, Smith demonstrated symptoms of illness on the first day he arrived. Matias testified in his deposition that Smith appeared to be dizzy, began vomiting, and asked Matias to initiate a medical request for him.

Other detainees, along with Matias, testified to the rapid deterioration in Smith's condition through the week. For instance, Smith's other cellmate, Corey Mitchell, testified that Smith was vomiting for three to four days before Mitchell was released Thursday, April 29, 2004, and that he wasn't able to hold down any food or maintain conversations with his cellmates. Matias also testified that by Wednesday, April 28, 2009, Smith could no longer walk on his own. Instead, Matias would drag Smith outside of his cell where he remained on the floor.

Several inmates claimed to have filled out medical request forms on Smith's behalf. Others testified that they complained directly to correctional officers and medical technicians on duty at the time, and a few even witnessed or helped Smith fill out his own medical request forms. None of the inmates received a response to these requests.

Early Friday morning, April 30, 2004, Matias awoke to find Smith convulsing on the floor in his cell. He alerted Alex Sanchez, who was the officer on duty at the time, and Sanchez contacted his supervisor, Sergeant James Monczynski. However, the plaintiff contended that significant delays prevented Smith from receiving immediate care. First, Sergeant Monczynski did not arrive at the cell until about a half hour after Officer Sanchez notified him of Smith's condition. Next, Sergeant Monczynski contacted a Cermak paramedic, who was located in an adjacent building connected by a courtyard, and the plaintiff alleged that it took another half hour for the paramedic to arrive. The plaintiff also claimed that the paramedic spent a half hour in the tier office looking for Smith's I.D. before he called the other Cermak paramedics.

The delays allegedly continued as the paramedics did not have the manpower to lift Smith up the stairs in a gurney. So they waited at the top of the stairs. Fortunately, a few inmates intervened, carried Smith to the gurney, and the paramedics wheeled him out. Smith died later that morning. The Cook County medical examiner determined that he suffered from pneumococcal meningitis, a particularly deadly form of the disease.

Based on these events, Marlita Thomas, Smith's mother, sued a number of individual correctional employees, the Cook County Sheriff, and Cook County under 42 U.S.C. § 1983 for violating Smith's constitutional rights by ignoring his serious medical needs, along with other state law claims. After a two-week trial, the jury returned a verdict against Cook County, the Sheriff, and Officers Facundo, Sanchez, and Toomey for a total award of $4,450,000, comprised of $4,150,000 in federal § 1983 damages and $300,000 in state claim damages. On the § 1983 verdict forms, the jury apportioned the $4,150,000 award into three parts: $3,000,000 against Cook County, $1,000,000 against the Sheriff, and $150,000 against the individual defendants collectively. On the verdict form for the state wrongful death claim, the jury awarded $150,000 against the individual defendants collectively. On the verdict form for the state survival claim, it also awarded $150,000 against the same individual defendants collectively. The district court ordered a remittitur of the total award from $4,450,000 to $4,150,000,[1] resulting

---

[1] The $300,000 remittitur had two components. Half of the amount remitted was the $150,000 state survival claim award, on the basis that it was compensating the same injury as the damages awarded for the federal claim and was therefore duplicative. (The district court did not remit the $150,000 wrongful death award because the court determined that the wrongful death damages were different from the damages for the survival claim. The survival claim damages addressed the same injury as the federal damages and were thus duplicative;

(continued...)

in a final award made up of $4,000,000 in federal § 1983 damages, and $150,000 in state wrongful death damages. The defendants moved for judgment as a matter of law or for a new trial, which the district court denied. The defendants appeal these denials and also challenge the damage award.

## II. ANALYSIS

Following the jury verdict, the defendants filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), or, in the alternative, for a new trial under Rule 59. In that motion, the defendants argued that the evidence was insufficient to support

---

[1] (...continued)
the wrongful death damages addressed a different injury, suffered by a different party, and thus were not duplicative. See *Patch v. Glover*, 618 N.E.2d 583, 591 (Ill. App. Ct. 1993) ("A wrongful death action is brought to compensate the surviving spouse and next of kin of a decedent for the pecuniary loss that they sustained . . . . A survival action is brought . . . for the benefit of the decedent's estate . . . . [and] permits the representative of the estate to prosecute a claim for the personal injury that the defendant could have brought had he lived.") (internal citations omitted); see also *Will v. Northwestern University*, 881 N.E.2d 481, 495 (Ill. App. Ct. 2007) (same); *Johnson v. Provena St. Therese Medical Center*, 778 N.E.2d 298, 308 (Ill. App. Ct. 2002) (Wrongful Death Act compensates parents for their loss)). The other half of the remittitur was $150,000 of the § 1983 damages, which we discuss further in Section E, *infra*. Neither portion of the $300,000 remittitur is an issue on appeal.

both individual and municipal liability under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). We review de novo the district court's denial of judgment as a matter of law, but we do not weigh evidence or assess the credibility of witnesses. *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 393-94 (7th Cir. 2005). Instead, we draw all reasonable inferences in favor of the nonmoving party. *Tart v. Ill. Power Co.*, 366 F.3d 461, 478 (7th Cir. 2004). "Our job is to assure that the jury had a legally sufficient evidentiary basis for its verdict," *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quoting *Filipovich v. K & R Express Sys., Inc.*, 391 F.3d 859, 863 (7th Cir. 2004)), and the "verdict must stand unless the officers can show that no rational jury could have brought in a verdict against [them]." *Von der Ruhr v. Immtech Intern., Inc.*, 570 F.3d 858, 866 (7th Cir. 2009) (internal quotation marks omitted).

## A. Verdict Against Individual Officers

The individual defendants, Officers Facundo, Toomey, and Sanchez, first challenge the jury verdict finding them liable under 42 U.S.C. § 1983 for violating Smith's constitutional rights. The officers argue that the verdict was not supported by evidence or law because the officers' actions represent "inadvertence" at the most. Relying on *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003), the officers claim that the plaintiff must demonstrate both subjective knowledge and intentional disregard of the risk to the inmate's safety. *See also Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006).

Nos. 08-2232, 08-2233, 08-2482, 08-2597 & 08-2948          11

A prison official violates a prisoner's Eighth Amendment rights, and, in this case, due process rights, when he displays deliberate indifference to a serious medical need.[2] *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)). To establish such a violation, the plaintiff must first demonstrate that the condition was objectively serious. *Hayes*, 546 F.3d at 522. An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* Next, the plaintiff must show that the official "acted with a sufficiently culpable state of mind." *Id.* This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health and also must disregard that risk. *Collins*, 462 F.3d at 761. The officers do not contest that Smith suffered from a serious medical condition. Instead, they argue that the evidence was insufficient to establish that they both knew of and disregarded the risk of harm.

---

[2] The inmate in this case was a pretrial detainee. The Eighth Amendment, which prohibits cruel and unusual punishment, only applies to convicted prisoners, but we have held that pretrial detainees are entitled, under the Fourteenth Amendment's due process clause, to the same basic protection. *Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007). As a result, we apply the same legal standard to a claim alleging deliberate indifference to an inmate's medical needs, whether filed under the Eighth or Fourteenth Amendment. *Id.*

A brief overview of the record reveals testimony describing in detail Smith's condition on the days leading up to his death. A number of witnesses reported that Smith was vomiting, coughing and exhibiting other signs of serious illness including nausea and lethargy. A fellow inmate reported that on April 29, 2004, the day when all three officer defendants were working, Smith was "coughing a lot, running back and forth to the bathroom, throwing up, just laying on the floor, not moving, not eating . . . ." . Another inmate reported that Smith was lying on the floor in front of the cell—which would have placed him in the direct path of the officials when performing their rounds. Inmates testified that they complained or heard others complain to officers about Smith's condition during all three shifts: 7a.m.-3p.m., 3p.m.-11p.m., and 11p.m.-7a.m., that were covered by Officers Facundo, Toomey, and Sanchez respectively. Finally, Officer Toomey testified that he saw Smith that day, and, at one point, saw him lying in front of his cell.

Circumstantial evidence can be used to establish subjective awareness and deliberate indifference, *Hayes*, 546 F.3d at 524, and the examples above are just a few excerpts of testimony that placed a visibly ill Smith within plain view of the officers on duty the day before he died. The evidence suggests that the officers were aware of the risk to Smith's health, either from the inmates' complaints, or from his visible symptoms, *Farmer v. Brennan*, 511 U.S. 825, 522 (1970) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."), and their failure to act could have led a jury to find that they ignored this risk.

As we stated earlier, we do not reweigh the evidence nor do we substitute our own credibility determinations, so we cannot accept the officers' invitation to ignore the inmates' testimony. The officers do not explain why the evidence, which clearly supports a finding of subjective knowledge, is legally insufficient. They only argue that it is "conflicting and specious." This is an argument better suited for cross-examination and closing statements than appellate review. When faced with conflicting, or even inconsistent testimony, the jury is free to believe one side over another. *See Taylor v. Bradley*, 448 F.3d 942, 951 (7th Cir. 2006); *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003). And when the plaintiff's witnesses here provided conflicting testimony, the officers had the opportunity to, and did, bring it to the jury's attention. Ultimately, the inconsistencies the officers press seem slightly exaggerated as most of the inmates presented the same basic story: Smith was very ill, the three guards on duty on April 29 knew about it, and they did nothing.[3] As such, we find no error in the district court's decision to deny the officers' motion for judgment as a matter of law.

## B. Verdict Against Cook County

At trial, the plaintiff alleged that the following unofficial customs or practices caused the constitutional harm

---

[3] For example, Smith's cellmate, Corey Mitchell, testified that Smith was vomiting for three to four days before his release and that he was not able to hold down any food or maintain conversations.

and subsequent death of her son: the failure to have a system in place to allow for prompt review of inmates' medical requests, the practice of severely understaffing correctional officers, and the failure to fix the broken video monitors in Cook County Jail. The jury ruled in the plaintiff's favor and entered a verdict against both Cook County and the Sheriff. Any one of the alleged policies or practices may support a judgment against a governing body. Cook County, however, contends that the verdict cannot stand as a matter of law. It argues that the district court should have directed a verdict in its favor after all of its employees were acquitted, and that it cannot be held liable for the actions of the Sheriff's officers. The Sheriff and the County also dispute whether the evidence supports the grounds upon which the jury found them liable. So the questions we address are whether the plaintiff presented sufficient evidence of a widespread custom or practice, and, if so, whether the County can be held liable.

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Monell*, 436 U.S. at 690; *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 674 (7th Cir. 2009). To demonstrate that the County is liable for a harmful custom or practice, the plaintiff must show that County policymakers were "deliberately indifferent as to [the] known or obvious consequences." *Gable v. City of*

*Chi.*, 296 F.3d 531, 537 (7th Cir. 2002). In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff. *Id.* Therefore, in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable. *See Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990) (quoting *Jones v. City of Chi.*, 787 F.2d 200, 204-05 (7th Cir. 1986)).

We do not adopt any bright-line rules defining a "widespread custom or practice." As we stated in *Cosby v. Ward*, there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, "except that it must be more than one instance," 843 F.2d 967, 983 (7th Cir. 1988), or even three, *Gable*, 296 F.3d at 538 ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted). But the plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) (citing *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)), or "a series of violations to lay the premise of deliberate indifference." *Palmer*, 327 F.3d at 596 (citation omitted). Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that the alleged constitutional harm. *See Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 928 (7th Cir. 2004).

The plaintiff presented evidence of County customs and practices that caused Smith's death. There was evidence of a widespread practice of failing to review inmates' timely filed medical requests, such as testimony from the supervisor for Cermak's CMTs, Woodroe Winfrey, that medical request forms were not collected every day. The request forms were placed in a locked box, to which, at the time of Smith's death, many CMTs did not have keys. Further testimony suggested that many CMTs had not been told how to obtain keys to the lockboxes, that some CMTs were not turning in their daily encounter forms (which would disclose whether they collected medical request forms), and that Cermak did not have a reporting system for informing supervisors when CMTs failed to make their daily rounds. Jean Kiriazes, Cermak's director of continuous quality improvement and risk management, testified that she was aware the medical request forms were not collected each day, partly because guards were not available to allow the CMTs on the tier. A number of Cermak employees testified to, and other evidence corroborated, the practice of not retrieving medical requests on a daily basis, including on April 29, 2004, the day before Smith died. We are not dealing with an isolated act of an individual employee, which would be insufficient to establish a widespread custom or practice. *Monell*, 436 U.S. at 691-94. Instead, the jury heard a number of County employees, some of whom were policymakers, testify about a practice that went on for an extended period of time. The dangers of delayed responses to medical requests are readily apparent, and the former director

of Cermak seemed to acknowledge as much in his testimony.

The trial testimony also established a link between the failure to check medical requests and Smith's death. Fellow inmate George Robotis testified that on April 28, 2004, he filed a medical request form on Smith's behalf, which he submitted directly to an officer working the tier that morning. On the form, he wrote that because Smith could not move, he was writing on Smith's behalf, and that Smith was not eating, could not get out of bed, was throwing up, and was very ill. Corey Mitchell, who shared a cell with Smith for a short period, testified that he saw Smith fill out a medical request form (although he didn't remember if Smith submitted it to the guard). Alan Robinson, another inmate, testified that he completed a medical request form for Smith "at least three times," in which he reported that Smith was dizzy, nauseous, vomiting, and that he had seen others submitting written requests for Smith. And the list goes on. Two doctors further testified that pneumococcal meningitis is almost always fatal if not treated, but mortality is no more than 30% if treated. And the plaintiff's expert, Dr. Ben Katz, testified that Smith would have exhibited symptoms of meningitis (vomiting, nausea, fever) by the evening of April 27, 2004. The testimony at trial leads us to conclude that the jury had a sufficient basis to find a widespread practice of CMTs failing to collect medical request forms, and that this failure caused Smith's death.

Furthermore, we find unpersuasive the County's argument that it cannot be held liable under *Monell* because

none of its employees were found to have violated Smith's constitutional rights. In support of its argument, the County cites *Los Angeles v. Heller*, 475 U.S. 796 (1986). The Supreme Court in that case determined that a municipality could not be held liable for constitutional violations based on the actions of one of its police officers after the jury found that the individual officer did not inflict any constitutional harm. *Id*. at 799. The Court reached this conclusion, however, under different factual circumstances and for different reasons which do not apply here.

The plaintiff in *Heller* sued the City of Los Angeles and individual members of the police force for damages under § 1983, alleging that the officers arrested him without probable cause and used excessive force in making the arrest. *Id*. at 797. On the constitutional claims, the jury returned a verdict for the individual officer, and the Supreme Court agreed that the district court properly dismissed the claim against the City. *Id*. at 798-99. The Court noted that the jurors were not instructed on any affirmative defenses that the individual officer may have asserted, nor were they presented with any qualified immunity issues. *Id*. at 798. The absence of these defenses is significant. If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable. In that case, one can still argue that the City's policies caused the harm, even if the officer was not individually culpable. Without any affirmative defenses, a verdict in favor of the officer

necessarily meant that the jury did not believe the officer violated the plaintiff's constitutional rights. And since the City's liability was based on the officer's actions, it too was entitled to a verdict in its favor.

The County, in this case, appears to push for a rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*. This is an unreasonable extension of *Heller*. What if the plaintiff here had only sued the County, or didn't know, because of some breakdown in recording shifts, who the CMTs on duty were? The actual rule, as we interpret it, is much narrower: a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict. *See Heller*, 475 U.S. at 798-99; *see also id.* at 801 (Stevens, J., dissenting). So, to determine whether the County's liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth. *See Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). The plaintiff in this case alleged that the failure to respond to Smith's medical requests caused his death and violated his right to due process. The jury instructions on the claim listed three elements, each of which the jury had to find by a preponderance of the evidence: "1. Norman Smith had a serious medical need; 2. *[t]he [d]efendant was deliberately indifferent to Norman Smith's serious medical need*; and 3. [t]he [d]efendant's conduct caused harm to Norman Smith." (emphasis added). Based on these instructions, the jury could have found that the CMTs were not *deliberately indifferent* to Smith's medical needs, but simply could not respond

adequately because of the well-documented break-downs in the County's policies for retrieving medical request forms. It is not difficult to reconcile the verdicts in this instance, and we see nothing amiss in holding the County liable even though none of the CMTs were individually responsible.[4]

---

[4] The County also makes a somewhat undeveloped argument that it cannot be held liable based on the actions of the Sheriff's officers alone. That may be true because, in Illinois, the Sheriff is an independently elected officer who is accountable only to the people, rather than to the County board. *Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989) (citing Ill. Const. Art. VII, § 4(c); *see also Franklin v. Zaruba*, 150 F.3d 682, 686 (7th Cir. 1998) ("the lack of identity between the county sheriff's department and the general county government indicates that § 1983 suits against sheriffs in their official capacities are in reality suits against the county sheriff's department rather than the county board."); *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995) ("Illinois sheriffs are independently elected officials not subject to the control of the county."). However, because the jury had sufficient basis to find that the failure to retrieve and act on the detainees' medical requests (which implicates the County's unofficial practice or custom) caused Smith's death, we need not address the additional arguments. Nor must we decide whether the evidence supported the other allegedly harmful policies or practices. The evidence supported the plaintiff's first theory of liability, and we can uphold the jury's verdict on that ground alone. *Cf. Griffin v. United States*, 502 U.S. 46, 60 (1991) (noting that a jury verdict should not be set aside merely on the chance that it was not supported by sufficient evidence "when there existed other grounds for which the evidence was sufficient").

## C. Insufficient Evidence to Impose Liability Against Sheriff

The Sheriff also challenges whether he can be held liable for damages under *Monell*. The jury found the Sheriff liable based on the policy/practice of severely understaffing correctional officers, and the Sheriff believes the evidence is legally insufficient to sustain this verdict. The Sheriff argues that understaffing cannot be a basis for liability under § 1983, that there is no causal link between understaffing and Smith's death, and that the Sheriff has limited control of the budget so any fault lies with Cook County.

We begin with what appears to be the Sheriff's strongest argument: the absence of any causal link between its policies and Smith's death. *Monell* recognized that the premise behind a § 1983 action against a government body is "the allegation that official policy is *responsible* for the deprivation of rights." *Monell*, 436 U.S. at 690 (emphasis added). In applying the different theories of liability recognized under *Monell*, we have always required plaintiffs to show that their injuries were caused by the policies or practices complained of. *See Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). This is an explicit requirement of § 1983 and an uncontroversial application of basic tort law. But in cases such as this, where individual defendants are commingled with governmental bodies, and the plaintiff alleges a litany of policy failures that interact to create some constitutional harm, it is sometimes easier to obscure the causal links between different actors.

The individual officers in this case (the Sheriff's dep-
uties) were found liable because they displayed delib-
erate indifference to Smith's medical needs, yet the
Sheriff was also found liable for its policy of severely
understaffing the prison. The only way to reconcile these
two verdicts is to find that both the officers' deliberate
indifference *and* the policy of understaffing caused Smith's
death. We find the latter unsupported by the evidence
presented at trial. A number of inmates testified that they
either complained or witnessed others complain to the
officers about Smith's condition. At that point, the officers
should have taken the steps necessary to investigate
and ensure that Smith received medical attention.

The theory that understaffing may have also caused
Smith's death, on the other hand, is too remote to
support a verdict against the Sheriff. A governmental
body's policies must be the *moving* force behind the
constitutional violation before we can impose liability
under *Monell. Woodward*, 368 F.3d at 927. In § 1983 actions,
the Supreme Court has been especially concerned with
the broad application of causation principles in a way
that would render municipalities vicariously liable for
their officers' actions. *Brown*, 520 U.S. at 405 ("Where a
plaintiff claims that the municipality has not directly
inflicted an injury, but nonetheless has caused an
employee to do so, rigorous standards of culpability and
causation must be applied to ensure that the municipality
is not held liable solely for the actions of its employee.");
*see also City of Springfield v. Kibbe*, 480 U.S. 257, 267-68 (1987)
(O'Connor, J., dissenting). That is why some courts dis-
tinguish between the acts that caused the injury and those

Nos. 08-2232, 08-2233, 08-2482, 08-2597 & 08-2948          23

that were merely contributing factors. *See Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 625 (11th Cir. 2007).

We need not make such a distinction here because the evidence presented at trial does not even establish that understaffing was a contributing factor. Because the jury held the individual officers liable, it must have found that the officers deliberately ignored Smith's condition. But the evidence does not demonstrate that their actions had anything to do with understaffing. No one testified or even argued that the officers would have acted differently if more of them were on duty. How many officers would the Sheriff need to hire to ensure that no one deliberately ignores a complaint or medical request? We do not know.

One possible theory that the plaintiff proposes is that the Sheriff's policy of understaffing prevented the CMTs from retrieving the medical request forms submitted on Smith's behalf. Generally, inmates place their request forms in lockboxes, which are located within the tiers. The officers on duty must first grant the CMTs access into the tiers, after which the CMTs must use their own keys to retrieve the forms from the lockboxes. In other words, when the officers are understaffed, they may not be available to grant CMTs access to the tiers, and, by extension, the lockboxes. That is what the plaintiff suggests may have happened here. But the only evidence supporting this conclusion was testimony that CMTs have complained previously of being unable to access the tiers to retrieve the medical requests. Assuming the jury believed the witnesses who claimed to have

submitted request forms on Smith's behalf, the plaintiff presented no evidence as to why *those* forms were not retrieved. No one testified that they could not have access to the tiers on the days Smith or the other inmates submitted requests. Some CMTs reported not having keys to the medical request lockboxes, and others did not turn in their daily encounter forms, so there was no way of knowing if they picked up the request forms. The plaintiff even argues (albeit to establish a widespread practice of CMTs failing to retrieve request forms) that one of the CMTs on duty on April 29, 2004, did not have a key to the lockbox and could not have opened it anyways. The relevant question for the causation requirement is whether the Sheriff's policy of understaffing was the reason the CMTs could not access the forms *on those days* that Smith and the other inmates claimed to have submitted their requests. We see no evidence to suggest that it was.

Nothing occurs in a vacuum, and we have no doubt that additional factors, other than the officers' malfeasance, may be at play. Perhaps if the officers received better training, or if the jail was less crowded, they might not have ignored Smith's condition. All of this may be true, but it does not satisfy the causation requirement here. To hold otherwise would significantly expand *Monell* and lead us down the road to vicarious liability. So when individual officers are aware of, and make the conscious decision not to respond to, reports of an inmate's poor health, we cannot infer, without more evidence, that understaffing was the *moving* force behind the resulting injury.

### D. Trial Court's Evidentiary Rulings

Cook County, the Sheriff, and the individual officers provide a long list of evidentiary rulings that they claim amounted to an abuse of discretion and warrant a new trial. Among the testimony and other evidence challenged on appeal are: Carlos Matias's deposition testimony, which was read to the jury; a doctor's statements contained in the Sheriff's death investigation report; hearsay statements admitted through Gilbert Yorke, an inmate; and a list of names that the plaintiff obtained of other inmates who had information on Smith's death. We review the district court's decision to admit testimony for an abuse of discretion, and we will only reverse if the district court's evidentiary ruling was not harmless. *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 842 (7th Cir. 2001).

### 1. Carlos Matias's Deposition Testimony

Federal Rule of Civil Procedure 32 governs the use of deposition testimony during trial. That provision states, in part, that "a party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: . . . that the party offering the deposition could not procure the witness's attendance by subpoena . . . ." Fed. R. Civ. P. 32(4)(D). Implicit in this rule is an obligation to use reasonable diligence to secure the witness's presence, and the district court has broad discretion to determine whether the proponent has satisfied this requirement. *Griman v. Makousky*, 76 F.3d 151, 154 (7th Cir. 1996). After two subpoenas, a show cause order, numerous phone calls, and a search by a private investigator, the plaintiff

could not get Matias, who had since been released from custody, into court to testify. Pursuant to Rule 32, the district court allowed the plaintiff to read Matias's deposition testimony at trial, over the defendants' objections. The defendants argue that the plaintiff did not exercise reasonable diligence in procuring Matias's presence because: (1) the plaintiff was in constant contact with Matias, who was in Chicago, and should have been able to secure his presence; and (2) the district court should have compelled Matias to appear by issuing an arrest warrant but chose not to based on the plaintiff's reassurances that Matias would appear.

Neither Rule 32 nor our case law required the district court to issue an arrest warrant for Matias before admitting his deposition testimony. In *Rascon v. Hardiman*, for instance, we upheld the district court's decision to admit a potential witness's deposition testimony after a private investigator and a process server were unable to subpoena the witness. 803 F.2d 269, 277 (7th Cir. 1986). Their efforts had satisfied the magistrate judge that the plaintiff exercised reasonable diligence, and we found no abuse of discretion in the judge's determination. *Id*. The defendants, however, attempt to distinguish *Rascon* on the grounds that the plaintiff in this case knew that Matias was in Chicago, and the plaintiff represented that Matias would appear to discourage the district court from issuing an arrest warrant. But knowledge of Matias's whereabouts does not detract from the court's finding that the plaintiff exercised reasonable diligence. Matias's location was never in dispute. In fact, he was subpoenaed twice. The problem was that Matias

did not abide by court orders. And the district court found that the plaintiff's attempts to ensure Matias's compliance, including hiring a private investigator to transport Matias to the courthouse, met the reasonable diligence standard. We find no abuse of discretion here.

Reasonable diligence aside, it seems an additional step could have been taken to ensure Matias's presence in court. In most cases, courts understandably elect live or even recorded testimony over transcripts read to the jury. *See, e.g., Murillo v. Frank*, 402 F.3d 786, 790 (7th Cir. 2005); *Griman*, 76 F.3d at 153. This preference should be even more pronounced for witnesses, like Matias, who may be instrumental to a party's case. *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 17 (1st Cir. 2000) ("[T]he live testimony of [key] witnesses for the purposes of presenting demeanor evidence [is] essential to a fair trial.") (citation omitted). The court had anticipated the possibility that Matias would not appear, and advised the parties to review his deposition. Under these circumstances, where everyone has notice that the witness may not comply with court orders, and the plaintiff knows his whereabouts, it would make sense to issue an arrest warrant. Nonetheless, that we may have done things differently in hindsight is beside the point. The court had broad discretion to determine whether the plaintiff's actions satisfied Rule 32's requirements, and we see no reason to reverse its ruling.

And even if we did find error, a number of other *live* witnesses corroborated the more significant or prejudicial statements in Matias's testimony. For example,

Matias testified that, on April 24, 2004, Smith's first day in custody, Smith asked him to fill out a medical request form. Robotis said he had filled out a request form for Smith after Matias sent his form in, and Robinson stated that Smith was sick from the first day he arrived at jail. Both Matias and Mitchell also testified that they witnessed Smith fill out a medical request form. By Smith's second day in custody, Matias claimed that he cleaned the vomit Smith left behind in the day room, and Mitchell testified that he too saw Smith vomiting in the day room. Also, Matias said that on April 28, 2004, a number of inmates told officers that "a man was really sick," referring to Smith. Robotis made similar statements when he testified to personally informing the guards working on the 28th that Smith was ill, and Mitchell recalled witnessing inmates approach medical technicians to request help for Smith. Finally, Matias testified that Smith could not walk and was lying on the floor, but Mitchell corroborated this statement when he described Smith as lethargic and "not moving" on April 29, 2004. The defendants had the opportunity to cross-examine Matias during his deposition, as well as the other inmates whose testimony corroborated Matias's accounts. Under these circumstances, the minimal prejudice to the defendants does not warrant a new trial.

## 2.  Hearsay and Other Objections

The remaining evidentiary challenges can also be quickly resolved. Officer Raher testified that while investigating Smith's death, Dr. Analgate, the physician on duty

when Smith was transported to the emergency room, told him (Raher) that he had heard that Smith had been complaining of illness. The problem with this testimony is that it is not very probative at all. *See* Fed. R. Evid. 403. It only shows that Raher spoke to Dr. Analgate, and learned of Matias's complaints, on April 30—the day Smith was taken to the emergency room. His failure to interview more witnesses after the fact says nothing about the County's response to requests for medical attention. Similarly, Dr. Analgate did not indicate when he heard about Smith's complaints (whether before or on the 30th), so his statements do not tell us much about County policy either. Nonetheless, if any error occurred, it does not warrant a new trial. A number of inmates testified that they submitted medical request forms and complained directly to the officer, and it is unlikely that this testimony had an injurious effect on the verdict.

The other inmates' testimony also renders harmless the admission of Gilbert Yorke's statement and the alleged hearsay statements in Matias's deposition testimony. Yorke testified that Matias told him to sleep on the top bunk because Smith had been sick since he arrived on the tier (Smith and Yorke shared bunk beds), possibly inferring that the guards should have known that Smith was sick and responded. Even if Yorke's testimony could be read to allow this inference, the jury heard ample other testimony that other inmates had put the officer defendants on notice of Smith's condition, and so any error in admitting Yorke's testimony was harmless.

We find the defendants' remaining evidentiary challenges meritless. These include: Matias's deposition state-

ment that he heard a nurse say that Smith was just
"dope sick" and that there was nothing she could do
about it; the admission of the list given to the plaintiff
containing the names of inmates who wanted her to
know what happened to her son; the plaintiff's testimony
about Smith's past jobs; the admission of Smith's resume;
and the district court's decision to exclude evidence of
Smith's previously unknown child. Matias's statement
that a nurse told him that Smith was just "dope sick"
is not hearsay. Federal Rule of Evidence 801(d)(2)(D)
states that "[a] statement is not hearsay if . . . the statement
is offered against a party and is the party's own state-
ment, in either an individual or a representative
capacity . . . or a statement by the party's agent or servant
concerning a matter within the scope of the agency or
employment, made during the existence of the relation-
ship . . . .". The plaintiff used the statement, made by a
Cook County employee, to show that the County em-
ployees were deliberately indifferent to Smith's illness
and had a widespread practice of ignoring medical re-
quests; therefore, it was admissible.

Regarding the list of inmates, the plaintiff argues that the
list was only offered to show how the plaintiff found the
inmates who testified at trial. For this purpose, the list
is not hearsay, but it is unclear why it was relevant in
the first place. Many inmates on the list testified and de-
scribed in detail Smith's condition in the days leading
up to his death. As the district court noted, how the plain-
tiff found the inmate witnesses is of limited probative
value. But for that same reason, its admission was also
harmless. We cannot think of any reasonable inference

the jury could have made from the list that it could not have made from the inmates' testimony.

We also agree with the district court that the admission of Smith's resume and testimony about his past employment and education do not warrant a reversal. Rule 901(a) of the Federal Rules of Evidence states that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Smith's mother (the plaintiff) and girlfriend testified, based on their personal knowledge, to Smith's past employment and education, which included jobs at McDonald's, Dominick's, Clark gas station, T.E.A.M.S., and Commander Packaging. Any information in his resume was also presented through their testimony, which the defendants had an opportunity to challenge during trial. Finally, we see no error in the district court's decision to exclude any evidence of Smith's previously unknown fourth child. The County claims that the evidence would have enabled it to challenge the plaintiff's credibility because she had stated that Smith had only three children. The district court determined that evidence of a previously unknown child would not impeach the plaintiff, and the defendants have not demonstrated otherwise. None of these alleged infirmities entitle the defendants to a new trial.

### E.     The Jury's Verdict

The jury returned a total damage award of $4,450,000, which the district court remitted by $300,000 to $4,150,000.

As we have explained, the district court eliminated the $150,000 award for the state survival claim because it duplicated the § 1983 award for Smith's injury. The district court also reduced the total verdict by the $150,000 that the jury awarded to the plaintiff against the individual defendants on the § 1983 verdict forms. Neither party appeals those remittiturs. Instead, the defendants argue that the post-remittitur $4,150,000 award is inconsistent and excessive. But this post-remittitur amount logically represents $4,000,000 in damages to Thomas for Smith's injury (no matter under what theory) and $150,000 to Thomas for her own injury as Smith's mother in connection with her state wrongful death claim. The defendants take issue only with the $4,000,000 portion of the remaining overall award. We review the district court's decision not to grant a new trial on damages for an abuse of discretion. *Houskins v. Sheahan*, 549 F.3d 480, 496 (7th Cir. 2008).

Although the district court instructed the jury against duplicative compensatory damage awards, the verdict form for the plaintiff's federal § 1983 claim provided spaces for the jury to enter damages for both denial of medical care (against the individual defendants) and policy and practice (against the County and the Sheriff), both of which resulted in the same injury.[5] The jury

---

[5] We note that while the defendants objected to the verdict form that was ultimately used, the version that they proposed was no better. The defendants' proposed jury verdict form *also* provided spaces for the jury to enter damages for both

(continued...)

entered $150,000 in damages against the officers collectively, $3,000,000 in damages against Cook County, and $1,000,000 against the Sheriff. As a result, it is unclear from the face of the verdict form whether the jury meant to allocate duplicate awards for the same injury, or whether it merely calculated total damages and allocated the amounts separately based on what it perceived to be each party's relative fault. Because we presume that juries follow the court's instructions, we will assume the latter, *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008), which is more consistent with the district court's instruction that the jury not award compensatory damages twice for the same injury.

This raises another question, however, because the defendants were jointly and severally liable, and allocating damages between the parties for the single indivisible injury alleged in this case was improper. *See Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 821 (7th Cir. 1994). To remedy this error, the district court decided to place a ceiling at the highest assessment of compensatory damages for a given claim, citing *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987). *Bosco* suggests that in cases where a jury improperly apportions compensatory damages for a single injury among jointly liable defendants, one permissible approach to remedy

---

[5] (...continued)

the denial of medical care and policy and practice theories, and even provided separate spaces for the jury to enter a damage award as to each individual defendant.

the problem could be to place a ceiling on recovery at the highest assessment of damages that was assessed against any one defendant. *Id.* Here, however, while the highest damage award allocated to a single defendant was $3,000,000 assessed against Cook County, the district court established a "ceiling" of $4,000,000 by including the $1,000,000 award assessed against the Sheriff under the same *Monell* theory.

It appears that the district court combined two approaches in interpreting the compensatory damage awards. It placed a ceiling on the highest assessment of damages for a single injury (not a single defendant), by adding the awards allocated to different defendants (the Sheriff and Cook County). In doing so, the district court actually came up with a total that was $150,000 less than it might have been, when it established a ceiling of $4,000,000 for all of Smith's injuries. But this decision did not prejudice the defendants. As the district court recognized, we have previously suggested that a ceiling at the highest assessment of compensatory damages may be appropriate when a jury improperly allocates the award among defendants who are jointly and severally liable. *Bosco*, 836 F.2d at 281; *Watts v. Laurent*, 774 F.2d 168, 180 (7th Cir. 1985). But our cases have also sanctioned the approach of cumulating apportioned damages instead, when doing so better reflects the jury's intent. *See, e.g.*, *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1346 (7th Cir. 1992). Which of these approaches should be taken in a specific case will depend on a district court's interpretation of a jury's actions in that case, in light of the instructions the jury was given and

the verdict form that was used. Ultimately, we interpret jury awards to avoid inconsistency, *Majeske v. City of Chi.*, 218 F.3d 816, 823 (7th Cir. 2000), and presume that juries follow the court's instructions. *Soltys*, 520 F.3d at 744. Here, assuming the jury avoided duplicate compensatory damage awards, as the court ordered, then a ceiling at the highest assessment would not accurately reflect the amount that the jury determined would compensate the plaintiff. Therefore, cumulating the damage awards—which the district court ended up effectively doing—would be more consistent with the presumption we apply to jury verdicts.

Under either theory, a $4,000,000 federal award does not exactly add up, but that does not present an issue due to the posture of this case on appeal. If the district court sought to establish a ceiling based on the highest damage assessment allocated to a defendant, that number would have been $3,000,000—the damage award entered against Cook County. If, on the other hand, the district court decided to add the allocated damages based on the presumption that the jury heeded its instruction not to issue duplicate awards, then there was no need to exclude the $150,000 award against the officers, and the total amount of federal damages would have been $4,150,000. The plaintiff, however, does not challenge the $150,000 adjustment so we will not address it. *Cf. Luellen v. City of E. Chi.*, 350 F.3d 604, 612 n.4, 5 (7th Cir. 2003) (noting that arguments not raised on appeal are waived). Other than the reduction, which is not before us, we agree with the district court's decision to award the damages allocated to both Cook County and the Sheriff.

The court presumed that the jury followed its instruction not to issue duplicate awards, and its decision not to grant a new trial for damages was not an abuse of discretion.

Moreover, our conclusion that the evidence was insufficient to hold the Sheriff's office liable under *Monell* does not affect the damages calculation. The defendants were jointly and severally liable for one indivisible injury, and the damage award represents the amount required to compensate the plaintiff for that harm. *See Petersen v. Gibson*, 372 F.3d 862, 864 (7th Cir. 2004); *Maul v. Constan*, 928 F.2d 784, 787-88 (7th Cir. 1991). That amount remains the same because it is tied to the injury itself. The plaintiff may collect the full amount from any one of the defendants, and the jury's decision to include the Sheriff among those liable merely added another source of collection. *Watts*, 774 F.2d at 180. Removing the Sheriff from this list, therefore, only removes that potential source but does not affect the amount of damages to which the plaintiff is entitled.

Most of the issues surrounding the damages award in this case could have been avoided with a better verdict form, and we take this opportunity to offer some general guidance on what the proper sequence of inquiries on a civil verdict form should be. A verdict form should not ask a jury to assess damages before liability. In cases involving joint and several liability for a single indivisible injury, a verdict form should ask the jury first to indicate which, if any, of the defendants are liable. Second, if at least one defendant is found liable, the form should instruct the jury to determine the total amount

of damages for the plaintiff's injury, an inquiry that is wholly separate from the liability decisions made in the first step.[6] The form should not be structured in a way that would invite the jury to divide the damages for a single injury among defendants or theories of recovery.

A verdict form that takes a jury through these steps in this sequence—reinforced by clear instructions from the court not to duplicate damages or divide the amount among defendants—will go far to help future litigants avoid the problems that arose in this case. Tort concepts of single indivisible injuries and joint and several liability are potentially confusing for a jury, and verdict forms should help remedy potential confusion, not add to it.

The defendants also argue that the award was excessive. In particular, they note the discrepancy between the jury's allocation of damages against the individual and institutional defendants, and also point to damage awards in other cases in an attempt to show that the jury's verdict was unreasonable. "When the district court has remitted a portion of the jury's award and the defendant claims that the remitted award is still excessive," we review the evidence of damages in the light most favorable to the jury verdict and will only reverse if there is no rational connection between the evidence and the damage award. *Deloughery v. City of Chi.*, 422 F.3d 611, 619 (7th Cir. 2005).

---

[6] In a case involving comparative liability instead of joint and several liability, an additional step would occur, where the jury would be asked to apportion relative fault among the various parties.

Under the federal standard for reviewing com-
pensatory damages we assess whether the award is
"monstrously excessive," "whether there is no rational
connection between the award and the evidence," and
whether the award is comparable to those in similar
cases. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 611 (7th
Cir. 2006). As we stated earlier, the jury's allocation of
damages does not render the verdict unreasonable. Nor
is it excessive in comparison to similar cases. *Estate of
Moreland v. Dieter*, for example, involved a § 1983 claim
based on the death of an inmate, and, while the officers'
conduct in that case was much more egregious, the jury
awarded $29,000,000 in compensatory damages. 395
F.3d 747 (7th Cir. 2005). *Cf. DeBiasio v. Ill. Cent. R.R.*, 52
F.3d 678 (7th Cir. 1995) (upholding a $4,201,000 damage
award for a plaintiff who was injured and lost his left
arm while employed with Illinois Central Railroad). The
defendants, however, point to various state court cases
with lower compensatory damage awards. Aside from
the fact that these cases allege different claims, "[a] court
should not substitute a jury's damages verdict with its
own figure merely because . . . a plaintiff in a similar
case was perhaps not able to plead his facts to the jury
as well." *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478,
485 (7th Cir. 2003).

Finally, we find sufficient evidence to support the
award. Smith was only thirty-two years old and died of
a treatable illness while in custody. Numerous witnesses
testified that their attempts to obtain medical care for
Smith, or to alert officials about Smith's condition were
largely ignored. Smith had three children whom he

Nos. 08-2232, 08-2233, 08-2482, 08-2597 & 08-2948          39

supported and with whom he had a close relationship. The jury also heard evidence about Smith's employment history through witness testimony and the admission of Smith's resume. He had a solid work history that included McDonald's, Dominick's, Clark gas station, T.E.A.M.S., and working for Commander Packaging as a machine operator. Our review of the facts supporting the damage award and the district court's decision to uphold it is deferential. "We are reluctant to substitute our assessment of the evidence in place of the discretion of the district court, exercised in light of what it witnessed at trial," *Deloughery*, 422 F.3d at 620, and we see no reason to do so here.

### III. CONCLUSION

For these reasons, we AFFIRM the district court's denial of Cook County and the individual officers' motion for judgment as a matter of law, and we AFFIRM the district court's denial of the defendants' motion for a new trial. We REVERSE, however, the district court's denial of the Sheriff's motion for judgment as a matter of law and REMAND with instructions that the district court enter judgment in the Sheriff's favor.

40        Nos. 08-2232, 08-2233, 08-2482, 08-2597 & 08-2948

SYKES, *Circuit Judge,* with whom POSNER and TINDER, *Circuit Judges,* join, dissenting in part from denial of rehearing en banc. The individual defendants in this § 1983 case have requested rehearing en banc but raise no issue worthy of the full court's review. In a separate request, Cook County has also asked for en banc rehearing, and its petition has considerable merit. The County maintains that the district court incorrectly submitted the question of damages to the jury, resulting in duplicative separate awards, which the court then improperly aggregated. I would grant the County's petition and address the important issues it raises regarding the law of damages in this circuit.

The verdict form and jury instructions were badly botched in this case, inviting juror confusion and duplication of damages. The district court added the jury's improper separate awards (the total: $4.45 million), ordered a modest remittitur, and entered judgment for $4.15 million. The panel acknowledged the errors in the verdict but affirmed anyway. The panel's amended opinion does the same, albeit with a bit more and slightly different explanation, as well as some "general guidance" for the future. Op. at 31-37. I appreciate the panel's effort at clarification. But even as revised, the opinion misreads our caselaw and validates an improper approach to tort damages in general and § 1983 damages in particular. Moreover, the guidance now offered is not meaningful because the panel has not fully explained the flaws in the district court's verdict form and in the jury instructions on damages.

Here's a more complete description of the problem:

Plaintiff Marlita Thomas sued for damages stemming from the death of her son Norman Smith while he was a pretrial detainee in the Cook County Jail. She named Cook County, the sheriff, and eight individual jail employees as defendants, and stated several different claims for relief: a § 1983 claim against the individual defendants for their deliberate indifference to Smith's medical needs; a policy-or-practice § 1983 claim against Cook County and the sheriff under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978); a state-law wrongful-death claim against the individual defendants; and state-law survival and emotional-distress claims against the individual defendants. Under Illinois law a wrongful-death claim compensates the decedent's next-of-kin—here, Thomas—for her own pecuniary loss. *See* Op. at 8-9 n.1 (explaining the distinction between wrongful-death and survival claims under Illinois law). But all the other claims in the case sought compensation for a single indivisible injury—Smith's suffering and death from pneumococcal meningitis while detained in the jail—though from more than one defendant and under multiple theories of relief.

Nothing could be more common in a tort case. Personal-injury plaintiffs almost always sue every defendant plausibly within the causal chain under all available legal theories. But the presence of multiple claims and multiple defendants does not mean that damages are assessed "by claim" or "by defendant," and that's how the district court submitted this case to the jury. Damages

*may* be measured *by category*—that is, the verdict form
may have separate line-item inquiries for economic dam-
ages (medical expenses, lost wages, and other pecuniary
losses) and noneconomic damages (pain and suffering,
loss of consortium, etc.). In a comparative-liability case
(which this is not), the jury will also be instructed to
apportion *fault* (not *damages*) by assigning percentages
among the parties found to be causally responsible for
the injury. But the jury in a single-injury case should not
be asked to assess damages "by claim" or "by defendant."
That approach invites duplication of damages and is
especially problematic where liability is joint and several.
As the panel has noted, liability among defendants in
a § 1983 case *is* joint and several—at least in the usual
case of one plaintiff with a single indivisible injury. *See
Watts v. Laurent*, 774 F.2d 168, 180 (7th Cir. 1985);
*McKinnon v. City of Berwyn*, 750 F.2d 1383, 1386-87 (7th
Cir. 1984). Accordingly, in a typical § 1983 case—which
this one was—the jury should *not* be invited to attribute
different injuries to different claims, award compensa-
tory damages "by claim," or assess damages separately
against particular defendants. But that's exactly what
happened here.

More specifically, the district court gave the jury a five-
page "Verdict Form A." The first page pertained to the
deliberate-indifference claim against the individual jail
employees. The second pertained to the policy-or-practice
claim against Cook County and the sheriff. The third,
fourth, and fifth pages pertained to the state-law wrongful-
death, survival, and emotional-distress claims against
the individual employees. As to each separate claim, the

jury was first asked to award an amount of damages *as to that claim.* The jury was then asked to decide the liability of each defendant on that claim by checking a "yes" or "no" box next to the name of the defendant. The jury was also given a general "Verdict Form B," which it was to use if it found for the defendants across the board.

This verdict form was manifestly improper in several important respects. An initial and obvious flaw was that it directed the jury to decide the question of damages *first,* which is backward. The district judge struggled to explain this bizarre upside-down verdict to the jury and eventually just punted, telling the jurors to disregard the physical layout of the verdict and "answer the [liability] questions first." This is a totally unacceptable mode of submitting a case to a jury. In fairness, this strange form of verdict was proposed by the plaintiff's attorney, and as the panel notes, the defendants' proposed verdict form was just as bad. *See* Op. at 32-33 n.5. But it's the judge's responsibility to get the verdict form right, not just pick one side's proposal or the other's. The judge should have rejected both proposals and written a proper verdict form himself or insisted that the lawyers go back to the drawing board. To adopt a seriously flawed verdict form and then tell the jury to disregard its structure is a careless way to charge a jury; it invites juror confusion.

The verdict form also directed the jury to assess damages by claim, which as the panel acknowledges is legally incorrect in a case like this one involving a single indivisible injury. Finally, the verdict form invited the jury to award damages separately by defendant—that is,

separately against the individual employees, Cook County, and the sheriff. This, too, is legally incorrect, and for the same reason: This case involves a single indivisible injury for which the defendants, if liable at all, are jointly and severally liable.

That the jurors were confused is evident from the verdict they returned. The jury awarded $150,000 on the deliberate-indifference claim and found three of the eight individual employees liable on this claim. On the *Monell* claim, the jury awarded $3 million in damages against Cook County and $1 million against the sheriff. The jury awarded $150,000 on the wrongful-death claim and found the same three individual employees liable on this claim, and also awarded $150,000 on the survival claim against these same employees. Finally, the jury returned a zero-damages, no-liability verdict on the emotional-distress claim. The district court tallied every-thing up, ordered a $300,000 remittitur, and entered judgment for $4.15 million. *See* Op. at 8-9 n.1.

The amended opinion acknowledges the flaws in the verdict form but affirms nonetheless, relying on the general presumption that jurors follow their instructions and ultimately placing an appellate stamp of approval on the district court's unusual manner of reconciling the confusing verdict they returned. There are two major problems with the panel's decision: The jury instructions were just as incoherent as the verdict form, and neither of the verdict-reconciliation methods mentioned by the panel can be properly invoked here.

Taking the second point first, the panel says there are two possible ways to read the district court's

postverdict decision on damages, although neither of them quite adds up. First, the panel notes that the judge "decided to place a ceiling at the highest assessment of compensatory damages for a given claim, citing *Bosco v. Serhant*, 836 F.2d 271, 281 (7th Cir. 1987)." Op. at 33. The panel reads *Bosco* as suggesting that "in cases where a jury improperly apportions compensatory damages for a single injury among jointly liable defendants, one permissible approach to remedy the problem could be to place a ceiling on recovery at the highest assessment of damages that was assessed against any one defendant."[1] *Id.* at 33-34. This is a considerable overreading of *Bosco*, which merely hypothesized the *possibility* of using the highest single assessment as a "ceiling" under these circumstances and neither adopted nor endorsed this method of reconciling a verdict with improper separate damages awards. The panel also cites *Watts v. Laurent*, 774 F.2d 168, 180 (7th Cir. 1985), as support for this "ceiling" approach, Op. at 34, but *Watts* never uses the

---

[1] A recurring problem in the panel opinion is its use of the phrase "apportionment of damages" to describe what the jury did here. This terminology is incorrect as a matter of tort law. "Apportionment" is a comparative-liability concept; as I have earlier noted, in a comparative-liability case, the jury apportions *fault*, not *damages*. *See generally*, RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY §§ 1 *et seq.* (2000). This is not a comparative-liability case. The jury was not instructed on the principles of comparative fault. The panel's nomenclature problem, however, further illustrates the basic difficulty with this verdict.

word "ceiling" and does *not* stand for the proposition that it is appropriate in this situation to enter judgment in the amount of the highest single damages award. (More on *Watts* in a moment.) Simply put, there is no solid support for the panel's suggested "ceiling" remedy.

In any event, the panel ultimately concludes that the judge didn't use the "ceiling" approach after all because the highest single damages award was $3 million (against Cook County), and the judge entered judgment for $4.15 million instead. So the panel surmises that the judge must have "combined two approaches in interpreting the compensatory damages awards"—the so-called "ceiling" approach and another method that "cumulates" improper separate awards. Op. at 34. Citing *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1346 (7th Cir. 1992), the panel suggests that "cumulating" improper separate damages awards is appropriate "when doing so better reflects the jury's intent . . . in light of the instructions the jury was given and the verdict form that was used." Op. at 34-35.

*Havoco* does not support what the judge did here. *Havoco* was a single-injury case litigated on four theories of relief against a single defendant, and the jury was given a "no duplication of damages" instruction that was much clearer than the one used in this case. The jury in *Havoco* was instructed as follows: "Havoco seeks recovery for the same injury in more than one of its claims against Hill. You are instructed that if you have occasion to consider damages against Hill under more than one of Havoco's claims, you should not make duplicate dam-

ages awards for the same injury." *Havoco*, 971 F.2d at 1346 (quotation marks omitted). The jury returned separate damages awards on each of the four counts. The district court added them up and entered judgment for the total; this court affirmed. Based on the clarity of the no-duplication instruction, we said we would "presume that the damages the jury awarded on each of the four counts are not duplicative awards for the same injury, and thus cumulation of the awards was proper." *Id.*

Here, in contrast, the jury instructions on damages were contradictory and confounding. It is true that the jury was told not to duplicate damages:

> You must not award compensatory damages more than once for the same injury. For example, if the plaintiff prevails on two claims and establishes a dollar amount for his [sic] injuries, you must not award him [sic] any additional compensatory damages on each claim. The plaintiff is only entitled to be made whole once and may not recover more than he [sic] has lost.

But immediately after this no-duplication instruction, the judge confusingly told the jury:

> Of course, if different injuries are attributed to the separate claims, then you must compensate the plaintiff fully for all his [sic] injuries. You may impose damages on a claim solely upon the defendant or defendants that you find are liable on that claim.

> Although there are multiple defendants in this case, it does not necessarily follow that if one is liable, all or

any of the others are also liable. Each defendant is entitled to fair, separate and individual consideration of his or her case without regard to your decision as to the other defendants.

If you find that only one defendant is responsible for a particular injury, then you must award damages for that injury only against that defendant.

You may find that more than one defendant is liable for a particular injury.

If so, the plaintiff is not required to establish how much of the injury was caused by each particular defendant who[m] you find liable. Thus, if you conclude that the defendants you find liable acted jointly, then you may treat them jointly for purposes of calculating damages.

If you decide that two or more of the defendants are jointly liable on a particular claim, then you may simply determine the overall amount of damages for which they are liable without determining individual percentages of liability.

If you find that plaintiff has proven any of the claims against any of the defendants, you must determine what amount of damages, if any, plaintiff is entitled to recover from each defendant, and you will use Verdict Form A.

This bewildering hodgepodge of instructions—some inapplicable, some simply wrong—erased whatever effectiveness the no-duplication instruction might have had. The panel omits any discussion of the instructions as a whole, which like the verdict form had the effect of

inviting the jury to assess damages "by defendant" and
"by claim." The instructions also appear to have invited
the jury to decide the issue of joint liability, which is a
legal question for the court. Thus, although the jury was
indeed told not to award damages more than once for
the same injury, it was also told to award damages for
different injuries on separate claims, to award damages
separately by defendant, and to decide whether any of
the defendants "acted jointly," and if so, to "treat them
jointly for purposes of calculating damages." We cannot
safely rely on the presumption that jurors follow their
instructions when the instructions are this muddled.
Here, unlike in *Havoco*, we cannot know with any confi-
dence exactly what the jury did.[2]

This brings me back to *Watts*. That case involved a
§ 1983 claim against five defendants who specifically
asked the district court to instruct the jury to assess
damages separately by defendant. The court did so
(which was a mistake), and the jury found each defendant
liable for damages of $40,000. The plaintiff claimed this
meant he could recover $200,000, but we disagreed. The
plaintiff had a single indivisible injury for which the
defendants were jointly liable, so stacking the separate
awards was inappropriate. We gave the plaintiff a
choice: He could either accept a judgment in the amount
of $40,000 or have a new trial on damages. *Watts*, 774
F.2d at 180-81. *Watts* therefore specifically *rejected* the

---

[2] This is not to suggest that better instructions necessarily
would have cured the serious flaws in the verdict form.

remedy of aggregation for a verdict that improperly assesses damages "by defendant" in a single-injury joint-liability case.

Although there are some differences between *Watts* and this case, the material similarity is this: The jury was improperly invited to award damages "by defendant" in a single-injury joint-liability case, and the question on appeal was whether the resulting separate damages awards may properly be aggregated. *Watts* answered this question "no"—aggregation is *not* appropriate in this situation. Here, the error is even worse because the jury was invited to award damages "by defendant" *and* "by claim"—and was given unintelligible instructions to boot. Aggregation is no more appropriate here than it was in *Watts*.

In short, there are ample reasons for rehearing en banc. That this case went so badly askew suggests a need for greater clarity on how damages should be tried.[3] The amended opinion overreads *Bosco*, misapplies *Havoco*, and conflicts with *Watts*. The panel relies too heavily on the presumption that jurors follow their instructions—

---

[3] A proper verdict form would have asked the liability questions first, sequentially by claim and defendant, and then directed the jury to answer (if necessary) two damages questions: one setting an amount of damages for Thomas's pecuniary loss from Smith's death (the wrongful-death damages) and the other setting an amount of damages for Smith's death (a single award of damages on all the other claims, which were premised on the same injury).

a presumption that is unwarranted given the circumstances, or at least cannot bear the weight the panel assigns to it. The panel approves the aggregation of improper separate damages awards in a single-injury joint-liability case; this has consequences for the law of damages in our circuit. My concern is not so much with the size of this judgment than with the process by which it was reached, which the panel rightly acknowledges was flawed but wrongly declines to remedy. I would grant Cook County's petition for rehearing en banc.